Steve W. Berman (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Jeff D. Friedman (SBN 173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com

*Attorneys for Plaintiffs*
[Additional Counsel Listed on the Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: GENERAL MOTORS LLC CP4 FUEL PUMP LITIGATION | No. 3:18-cv-07054-JST |
| | CONSOLIDATED AND AMENDED CLASS ACTION COMPLAINT |
| | **JURY TRIAL DEMANDED** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     INTRADISTRICT ASSIGNMENT ......................................................................4

III.    PARTIES ...............................................................................................................4

    A.      The Plaintiffs ..............................................................................................4

    B.      The Defendant ..........................................................................................36

IV.     VENUE AND JURISDICTION ..........................................................................37

V.      FACTUAL ALLEGATIONS ..............................................................................38

    A.      The Class Vehicles ...................................................................................38

    B.      The Rise of Diesel Vehicles in the United States.....................................39

    C.      Pre-Class Period CP4 Failures are Quickly Followed by Failures in the Earliest GM-Manufactured CP4 Vehicles. ..........................................40

    D.      GM's Additional Knowledge of Incompatibility, Defectiveness, and Failures Associated with Bosch's CP4 Pump. ..........................................47

    E.      Supposed "Remedies" are Insufficient and Costly...................................62

    F.      GM Knew Durability and Superiority Were Material to Consumers and Made Hollow Promises of Durability and Superiority. ......................64

VI.     TOLLING OF THE STATUTE OF LIMITATIONS ..........................................71

VII.    CLASS ACTION ALLEGATIONS .....................................................................73

VIII.   CAUSES OF ACTION CLAIMS BROUGHT ON BEHALF OF THE CLASS AND ON BEHALF OF THE NAMED PLAINTIFFS..........................................77

COUNT I  FRAUD BY CONCEALMENT ....................................................................77

COUNT II  VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)................................................80

COUNT III  VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT ("CLRA") (CAL. CIV. CODE § 1750, *ET SEQ.*).................................................84

COUNT IV  UNJUST ENRICHMENT ..........................................................................87

COUNT V  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (CAL. COM. CODE §§ 2314 AND 10212) ..........................................................88

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT VI  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(CAL. CIV.CODE § 1791, *ET SEQ.*)....................................................................................91

COUNT VII  VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT, (15 U.S.C.
§ 2301, *ET SEQ.*)...................................................................................................................92

PRAYER FOR RELIEF ................................................................................................................95

DEMAND FOR JURY TRIAL .....................................................................................................95

Christopher Moonan, Sean T. Smith, Isaiah Rudy, Sean M. Buob, Richard Samson, Ryan Arthur Jensen, Anthony Raymond Smith, Bradley Rice, Bruce K. Garlock, Chris S. McAlister, Colby Barry, Douglas Hughes, Geoff Cochems, John Thomas White, Kevin Allen Lawson, Kevin Sutherland, Michael L. McCoy, Milton Leon Huss, Jr., Stacy Wade Sizelove, Thorin Jay Askin, Ryan Maduro, Michele Diniz, Brandon Tirozzi, and Calvin Smith, each individually and on behalf of all others similarly situated ("the Class"), file this suit against Defendant General Motors LLC. This lawsuit is based upon the investigation of counsel, the review of scientific and automotive industry papers, and the investigation of experts with relevant education and experience. In support thereof, Plaintiffs state as follows:

## I.     INTRODUCTION

1.      General Motors LLC ("GM") has sold hundreds of thousands of diesel-tank automobiles equipped with high-pressure fuel injection pumps that are proverbial ticking time bombs, wholly unbeknownst to an unassuming American public who ponies-up big bucks for these vehicles' fictitious "durability," "longevity," and "topnotch fuel economy." GM promised consumers the continued reliability of their diesel engines, but with increased fuel efficiency and power at greater fuel efficiency. However, this came with a hidden and catastrophic cost that was secretly passed on to consumers. The catalyst is the Bosch-supplied CP4 high-pressure fuel injection pump, which comes standard in 2011-2016 GMC and Chevrolet diesel trucks equipped with 6.6L Duramax engines, and which unbeknownst to consumers is incompatible with American diesel fuel.

2.      GM saw Bosch's CP4 fuel injection pump as a cost-saving measure: it uses less fuel by exerting higher fuel pressures. The CP4 fuel pump gave GM a way to profit by advertising the trucks' superior fuel efficiency, while also being able to tout the reliability and durability that diesel vehicles are known for. After the CP4 fuel injection system worked relatively successfully in vehicles in Europe, GM sought to use the CP4 pump in American vehicles, promising consumers exactly what they were looking for—improvements in torque, horsepower, durability, and fuel economy. But GM could never deliver on that promise for American vehicles because the CP4 fuel pump is not compatible with American diesel fuel; in fact, the improved fuel efficiency that comes

with the CP4 pump *also* comes at the cost of running the pump nearly dry so that it destroys itself, and—ultimately—destroys the fuel injection system and the engine altogether. This "catastrophic" (*i.e.*, complete and total) pump failure can occur as early as "mile 0," as the pump disintegration process begins at the very first fill of the tank, and starts damaging the vehicle's fuel injection system and engine immediately upon the vehicle's first use.

3.      American diesel fuel is cleaner than European diesel, which means that it also provides less lubrication than European diesel fuel. When American diesel is run through the fast-moving, high-pressure, lower volume CP4 pump, it struggles to maintain lubrication. The cleaner, thinner diesel allows air pockets to form inside the pump during operation, causing metal to rub against metal, generating metal shavings which are dispersed throughout the fuel injection system, contaminating and destroying the fuel system and indeed the entire engine. The pump secretly deposits metal shavings and debris throughout the fuel injection system and the engine until it suddenly and catastrophically fails without warning. Such catastrophic failure often causes the vehicle to shut-off while in motion and renders it unable to be restarted, because the vehicle's fuel injection system and engine component parts have been completely contaminated and destroyed. The sudden and unexpected shutoff of the vehicle's engine while it is in motion and subsequent inability to restart the vehicle present an inherent risk to consumer safety—one which GM has recognized in the past—and one which Plaintiffs were not aware of prior to purchasing the Class Vehicles. Thus, contrary to GM's claims that the CP4 fuel injection system renders the Class Vehicles more reliable, more durable, more powerful, and more fuel-efficient, the CP4 fuel injection system actually renders them unreasonably costly, destructive, and dangerous.

4.      Moreover, when catastrophic CP4 pump failure occurs, it results in an outrageously expensive repair bill, ranging from $8,000-$20,000 even when "covered under warranty," all for a repair that will not truly ameliorate the issue so long as the vehicle is being filled with U.S. diesel.

5.      Compound this with the fact that these vehicles come with a hefty price tag to begin with, as known prices range from approximately $43,000 to $75,000 if purchased brand new and from $36,000 to $75,000 if purchased used. Diesel fans pay so much more for their trucks because

diesel trucks are expected to last for 500,000 to 800,000 miles, and have more power *and* a lower fuel bill than their gasoline counterparts.

6.      The kicker is, GM knew from the specifications of the pump as compared to the specifications of American diesel, that the CP4 fuel pump was clearly incompatible with the consistency of American diesel fuel. Indeed, well before GM ever chose to implement the CP4 component part (as incorporated in the diesel engines of the subject Class Vehicles), the issue of incompatibility was (or should have been) known and yet was totally ignored in the design of the Class Vehicles' engine systems. This is further evidenced by the fact that GM, as well as its fellow "Big Three" automotive manufacturers, had experience with widespread catastrophic fuel injection pump failures when cleaner diesel standards were first implemented in the 1990s. By 2002, the Truck & Engine Manufacturers Association ("EMA")—of which GM is a member company[1]— acknowledged that the lower lubricity of American diesel could cause catastrophic failure in fuel injection system components that are made to European diesel specifications. Not only did GM fail to inform American consumers and fail to stop touting the fabricated benefits of the vehicles containing CP4 pumps, they actively attempted to shift the blame to the American consumers. For instance, GM claimed it was *consumers'* improper use of contaminated or substandard fuels that damaged the vehicles' fuel system, even when GM knew that the malfunction was *actually* the result of the CP4 fuel injection pump design, which was simply not fit for American diesel fuel.

7.      Put simply, Plaintiffs and all members of the proposed Class paid a premium for their diesel vehicles, and were harmed by being sold vehicles with a defective fuel injection pump that is substandard for American fuel. Plaintiffs and similarly situated Class members have suffered from an innately manifested—though not readily apparent—defect that secretly existed in the Class Vehicles at the time of sale (or lease), and which began damaging the Class Vehicles and their fuel delivery systems upon first use. Plaintiffs were thus injured at the point of sale and throughout their ownership of the vehicle and paid far more than they would have if GM had told the truth. Indeed,

---

[1] *See* Truck & Engine Manufacturers Association (EMA) membership webpage, http://www.truckandenginemanufacturers.org/companies/ (last visited Nov. 13, 2018).

1    neither Plaintiffs nor any reasonable consumer would have bought these vehicles if GM had told the

2    truth.

3         8.    These consumers are entitled to be reimbursed for the millions of dollars GM

4    fraudulently obtained from them, and to be compensated for their actual losses. This lawsuit seeks to

5    hold GM accountable to these consumers, who are the unwitting casualties of the company's massive

6    fraud.

7                        **II.    INTRADISTRICT ASSIGNMENT**

8         9.    This action has been properly assigned to the San Francisco Division of this District

9    pursuant to N.D. Cal. L.R. 3-2, because a substantial part of the events or omissions giving rise to the

10   Plaintiffs' and Class members' claims arose in the counties served by the San Francisco Division.

11   Several Plaintiffs and proposed Class members purchased and maintained their Class Vehicles in the

12   counties served by this Division. Moreover, (a) GM conducts substantial business in the counties

13   served by this Division; (b) GM has marketed, advertised, and sold/leased the Class Vehicles in

14   those counties; and (c) GM caused harm to Plaintiffs and Class members residing in those counties.

15                              **III.    PARTIES**

     **A.    The Plaintiffs**

16

17        10.   For ease of reference, the following chart identifies the Representative Plaintiffs and

18   their vehicles:

19

20

| Representative Plaintiff | Make | Model | Year |
|---|---|---|---|
| Isaiah Rudy | Chevrolet | Silverado 2500 HD | 2012 |
| Stacy Wade Sizelove | Chevrolet | Silverado 2500 HD | 2011 |
| Milton Leon Huss Jr. | Chevrolet | Silverado 2500 HD | 2015 |
| Christopher Moonan | Chevrolet | Silverado 2500 HD | 2016 |
| Bruce K. Garlock | Chevrolet | Silverado 3500 HD | 2016 |
| Geoff Cochems | Chevrolet | Silverado 2500 HD | 2011 |
| Sean M. Buob | Chevrolet | Silverado 2500 HD | 2015 |
| Michael L. McCoy | Chevrolet | Silverado 2500 HD | 2015 |
| Chris S. McAlister | Chevrolet | Silverado 3500 HD | 2015 |
| John Thomas White | Chevrolet | Silverado 2500 HD | 2016 |

21

22

23

24

25

26

27

28

| Representative Plaintiff | Make | Model | Year |
|---|---|---|---|
| Sean T. Smith | Chevrolet | Silverado 2500 HD | 2016 |
| Kevin Allen Lawson | Chevrolet | Silverado 2500 HD | 2013 |
| Kevin Sutherland | Chevrolet | Silverado 2500 HD | 2011 |
| Douglas Hughes | Chevrolet | Silverado 2500 HD | 2015 |
| Colby Barry | Chevrolet | Silverado 3500 HD | 2016 |
| Richard Samson | GMC | Sierra HD Denali | 2016 |
| Bradley Rice | GMC | Sierra HD | 2014 |
| Anthony Raymond Smith | GMC | Sierra 2500 HD | 2011 |
| Ryan Arthur Jensen | GMC | Sierra 3500 HD | 2015 |
| Thorin Jay Askin | GMC | Sierra 2500 HD | 2015 |
| Ryan Maduro | GMC | Sierra 2500 HD | 2016 |
| Michele Diniz | GMC | Sierra 2500 HD | 2013 |
| Brandon Tirozzi | Chevrolet | Silverado 2500 HD | 2013 |
| Calvin Smith | Chevrolet | Silverado 2500 | 2012 |

11.    Plaintiff Isaiah Rudy (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of California, and domiciled in Riverside, California. In or around November 2011, Plaintiff purchased a new 2012 Chevrolet Silverado 2500 HD, VIN 1GC1KYC83CF105132 (for the purpose of this paragraph, the "Class Vehicle") for $64,000 from Carmel Chevy, an authorized GM dealership in Los Angeles, California.  Plaintiff still owns the vehicle, and it currently has approximately 120,000 miles on it. Plaintiff uses his Silverado 2500 HD to tow his 25-foot boat and 35-foot 5th-wheel trailer on vacations with his family. In the days and weeks preceding his purchase, Plaintiff Rudy saw and heard Chevrolet's television commercials, radio advertisements, and printed brochures and advertisements wherein Chevrolet claimed the Duramax diesel truck, like the one Plaintiff would purchase, had superior horsepower and durability compared to other diesel trucks in the American market. On the date that Plaintiff Rudy purchased the vehicle, and in purchasing the vehicle, Plaintiff Rudy relied on representations that the vehicle was compatible with American diesel fuel, was durable, and was reliable. Plaintiff Rudy relied on these representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. Plaintiff Rudy relied on GM's representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have

paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. In addition, Plaintiff Rudy experienced a catastrophic failure of his CP4 fuel injection pump. One morning in 2017, the Class Vehicle would not turn on; it had approximately 90,000 miles on it at the time. He brought the vehicle in to Extreme Diesel in Hemet, California, who attempted to repair and replace the damaged parts. Plaintiff Rudy also reported the failure to Chevrolet on two different occasions. Chevrolet investigated the engine problems twice because Plaintiff Rudy brought the vehicle in after getting a "check engine" light alert. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles.

12.     Plaintiff Stacy Wade Sizelove (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of California, and domiciled in Long Beach, California. On or around September 24, 2010 Plaintiff purchased a new 2011 Chevrolet Silverado 2500 HD, VIN 1GC1KYE89BF137238

1    (for the purpose of this paragraph, the "Class Vehicle") for $67,000 from Harbor Chevrolet, an

2    authorized GM dealership in Long Beach, California. Plaintiff still owns the Class Vehicle which he

3    uses as his daily transportation and occasionally uses to pull his trailer. The Class Vehicle has

4    approximately 104,000 miles on the odometer at present. Prior to purchasing the Class Vehicle,

5    Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage

6    per gallon of a diesel vehicle.  Plaintiff Sizelove sought to purchase a diesel truck to tow his 24-foot

7    trailer. In the days and weeks preceding his purchase, Plaintiff Sizelove saw and heard Chevrolet's

8    television commercials, radio advertisements, and printed brochures and advertisements wherein

9    Chevrolet claimed the Duramax diesel truck, like the one Plaintiff would purchase, had superior

10   horsepower and durability compared to other diesel trucks in the American market. On the date that

11   Plaintiff Sizelove purchased the vehicle, and in purchasing the vehicle, Plaintiff Sizelove relied on

12   representations that the vehicle was compatible with American diesel fuel, was durable, and was

13   reliable. Plaintiff Sizelove relied on these representations in purchasing the vehicle and, absent these

14   representations, would not have purchased the vehicle and/or would have paid less for it. These

15   knowingly false representations, in combination with the advertised fuel efficiency and performance,

16   the representation that the vehicle would retain all of its promised fuel economy and performance

17   throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value,

18   caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose.

19   Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel

20   injection system that was not suitable for American vehicles and which deceived American

21   consumers.  Consequently, the vehicle could not deliver the advertised combination of durability,

22   power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Further, Plaintiff Sizelove

23   experienced a catastrophic failure of the CP4 fuel injection pump in his vehicle approximately three

24   months after the expiration of the time period through which GM told him his warranty extended, so

25   GM would not cover replacement or repairs under warranty, despite the fact that his vehicle had

26   98,000 miles on it at the time of the failure. Plaintiff Sizelove has purchased thirteen Chevrolet

27   vehicles in his life and yet GM refused to cover the pump failure in this vehicle. Repairing the

28

vehicle cost Mr. Sizelove $9,000 and it was in the shop for nine days. Moreover, as a result of his vehicle's failure, he was left stranded in the desert for seven hours on Highway 95 in middle of the summer heat. No one could locate him. He still owns the vehicle but he does not trust it at all, but does still use it only when he has to pull his trailer (he relies on another vehicle for all other travel). Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles.

13.     Plaintiff Milton Leon Huss, Jr. (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of California, and domiciled in La Mirada, California. On or around September 9, 2015 Plaintiff purchased a new 2015 Chevrolet Silverado 2500 HD, VIN 1GC1CWE83FF651836 (for the purpose of this paragraph, the "Class Vehicle") for $59,000 from AutoNation Chevrolet Valencia, an authorized Chevrolet dealership in Santa Clarita, California. Plaintiff purchased and still owns the vehicle. Plaintiff uses his Silverado 2500 HD for daily travel and also to travel between his home in La Mirada, California and his vacation home in Arizona, and the vehicle currently has approximately 50,000 miles on it. While in Arizona, Mr. Huss uses his truck to tow his boats to and from the lake. Plaintiff Huss sought to purchase a diesel truck for this purpose, to tow his 28-foot and 22-foot trailers from California to and from Arizona. In the days and weeks preceding his purchase, Plaintiff Huss saw and heard Chevrolet's television commercials, radio advertisements, and printed brochures and advertisements wherein Chevrolet claimed the Duramax diesel truck, like the one Plaintiff would purchase, was the best truck on the market, that it had superior horsepower,

durability, and reliability as compared to other diesel trucks in the American market. On the date that Plaintiff Huss purchased the vehicle, and in purchasing the vehicle, Plaintiff Huss relied on representations that the vehicle was compatible with American diesel fuel, was durable, and was reliable. Plaintiff Huss relied on these representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles.

14.     Plaintiff Christopher Moonan (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of California, and domiciled in Corona, California. In or around January 2018, Plaintiff purchased a used 2016 Chevrolet Silverado 2500 HD, VIN 1GC1CVE80GF272501 (for the purpose of this paragraph, the "Class Vehicle") for approximately $40,000 from Dutton GMC and

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Cadillac, an authorized GM dealership in Corona, California. At the time of purchase the Vehicle had approximately 11,000 miles on the odometer, and it presently has around 43,300 miles. Plaintiff purchased the vehicle as his personal daily driving vehicle. Mr. Moonan is also a general contractor and uses his Silverado 2500 HD to tow dump trailers, equipment, and other materials needed at his contracting sites. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Specifically, on the day Plaintiff Moonan purchased the Class Vehicle, and prior to his purchase, Plaintiff Moonan relied on GM's specific representations concerning the Class Vehicle's fuel economy and reliability. At the dealership, the sales representatives told Plaintiff Moonan that the vehicle had superior fuel economy with American diesel fuel as compared to other diesel trucks on the market and that is was more reliable. Plaintiff Moonan relied on GM's representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. In addition, Moonan experienced a catastrophic failure of the CP4 fuel injection pump in the Class Vehicle when the Vehicle had approximately 31,874 miles on it. Moonan was in the desert in 127º heat when his CP4 fuel injection pump failed. Plaintiff Moonan suffered from heat stroke and suffered symptoms for over three days. To date, Plaintiff Moonan continues to suffer from anxiety over the event. He took the vehicle into Bradley Chevrolet in Park, Arizona, which informed him that the CP4 fuel injection pump had "exploded." He informed the dealership that the vehicle should be recalled as it posed a significant health hazard. The engine light recently came back on and he can

smell burning coolant. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles.

15.     Plaintiff Bruce K. Garlock (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of California, and domiciled in Madera, California. In or around January 2016, Plaintiff purchased a new 2016 Chevrolet Silverado 3500 HD, VIN 1GC4K0E80GF140860 (for the purpose of this paragraph, the "Class Vehicle") for $65,000 from Hedrick's Chevrolet, a certified GM dealership in Clovis, California. Plaintiff still owns the vehicle, and it has approximately 24,400 miles on the odometer. Plaintiff uses his Silverado 3500 HD as his personal vehicle to get to work and for daily activities.  Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Specifically, on the day Plaintiff Garlock purchased the Class Vehicle, and prior to his purchase, Plaintiff Garlock relied on GM's specific representations concerning the Class Vehicle's fuel economy and reliability. At the dealership, the sales representatives told Plaintiff Garlock that the vehicle had superior fuel economy with American diesel fuel as compared to other diesel trucks on the market and that is was more reliable. Plaintiff Garlock relied on GM's representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its

promised fuel economy and performance throughout its useful life, and the Class Vehicle's

reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which

is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the

Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American

vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the

advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff

relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff

or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM

Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class

Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete

economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would

not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4

fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's

ascertainable losses include, but are not limited to, a high premium for the engine compared to what

they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles

at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles.

      16.     Plaintiff Geoff Cochems (for the purpose of this paragraph, "Plaintiff") is a citizen of

the State of California, and domiciled in Ridgecrest, California.  In or around September 2018,

Plaintiff purchased a used 2011 Chevrolet Silverado 2500 HD, VIN 1GC1KXC83BF122411 (for the

purpose of this paragraph, the "Class Vehicle") for approximately $37,500 from Pacific Auto Sales,

in Fontana, California. At the time of purchase, the Vehicle had approximately 59,400 miles, and its

current mileage is approximately 68,400. Plaintiff uses his Silverado 2500 HD as his personal

vehicle to get to work and for daily activities. Prior to purchasing the Class Vehicle, Plaintiff was

looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of

a diesel vehicle. Specifically, on the day Plaintiff Cochems purchased the Class Vehicle, and prior to

his purchase, Plaintiff Cochems relied on GM's specific representations concerning the Class

Vehicle's fuel economy and reliability. At the dealership, the sales representatives told Plaintiff

Cochems that the vehicle had superior fuel economy with American diesel fuel as compared to other diesel trucks on the market and that is was more reliable. Plaintiff Cochems relied on GM's representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. In addition, in anticipation of an inevitable catastrophic CP4 failure, Mr. Cochems has had to purchase and use fuel additives to try and further lubricate the pump, as well as a CP4 modifier lift pump, all totaling more than $1,000.

17.     Plaintiff Sean M. Buob (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of California, and domiciled in Bakersfield, California. In or around October 2017, Plaintiff purchased a used 2015 Chevrolet Silverado 2500 HD, VIN 1GT1KWE87FF564810 (for the purpose

1     of this paragraph, the "Class Vehicle") for $48,000 from 3 Way Chevrolet, an authorized Chevrolet

2     dealership in Bakersfield, California. At the time of purchase, the Vehicle had approximately 44,000

3     miles on it, and it presently has about 78,600 miles on its odometer. Plaintiff uses his Silverado 2500

4     HD as his personal vehicle to get to work and for daily activities. Prior to purchasing the Class

5     Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the

6     high mileage per gallon of a diesel vehicle. Specifically, on the day Plaintiff Buob purchased the

7     Class Vehicle, and prior to his purchase, Plaintiff Buob relied on GM's specific representations

8     concerning the Class Vehicle's fuel economy and reliability. At the dealership, the sales

9     representatives told Plaintiff Buob that the vehicle had superior fuel economy with American diesel

10    fuel as compared to other diesel trucks on the market and that is was more reliable. Plaintiff Buob

11    relied on GM's representations in purchasing the vehicle and, absent these representations, would not

12    have purchased the vehicle and/or would have paid less for it. These knowingly false representations,

13    in combination with the advertised fuel efficiency and performance, the representation that the

14    vehicle would retain all of its promised fuel economy and performance throughout its useful life, and

15    the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the

16    Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time

17    of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not

18    suitable for American vehicles and which deceived American consumers. Consequently, the vehicle

19    could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of

20    diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives

21    informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective

22    nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common

23    to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered

24    concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and

25    would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed

26    the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class

27    member's ascertainable losses include, but are not limited to, a high premium for the engine

28

1    compared to what they would have paid for a gas-powered engine, out-of-pocket losses by

2    overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and

3    diminished value of the vehicles.

4        18.    Plaintiff Michael L. McCoy (for the purpose of this paragraph, "Plaintiff") is a citizen

5    of the State of California, and domiciled in Menifee, California. On or around October 14, 2014

6    Plaintiff purchased a new 2015 Chevrolet Silverado 2500 HD, VIN 1GC1CVE87FF19739 (for the

7    purpose of this paragraph, the "Class Vehicle") for $52,000.00 from Paradise Chevrolet, an

8    authorized Chevrolet dealership in Temecula, California. Plaintiff still owns the vehicle, and it

9    currently has approximately 63,000 miles on the odometer. Plaintiff uses his Silverado 2500 HD as

10   his personal vehicle and to haul his 30-foot trailer and his boat. Prior to purchasing the Class

11   Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the

12   high mileage per gallon of a diesel vehicle. Specifically, on the day Plaintiff McCoy purchased the

13   Class Vehicle, and prior to his purchase, Plaintiff McCoy relied on GM's specific representations

14   concerning the Class Vehicle's fuel economy and reliability. At the dealership, the sales

15   representatives told Plaintiff McCoy that the vehicle had superior fuel economy with American

16   diesel fuel as compared to other diesel trucks on the market and that is was more reliable. Plaintiff

17   McCoy relied on GM's representations in purchasing the vehicle and, absent these representations,

18   would not have purchased the vehicle and/or would have paid less for it. These knowingly false

19   representations, in combination with the advertised fuel efficiency and performance, the

20   representation that the vehicle would retain all of its promised fuel economy and performance

21   throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value,

22   caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose.

23   Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel

24   injection system that was not suitable for American vehicles and which deceived American

25   consumers. Consequently, the vehicle could not deliver the advertised combination of durability,

26   power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of

27   its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of

28

the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles.

19.     Plaintiff Chris S. McAlister (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of California, and domiciled in Visalia, California. In or around May 2015, Plaintiff purchased a new 2015 Chevrolet Silverado 3500 HD, VIN 1GC1KVE88FF586334 (for the purpose of this paragraph, the "Class Vehicle") for $58,000 from Ed Dena's Auto Center, an authorized Chevrolet, GMC, and Buick dealership in Dinuba, California. Plaintiff still owns the vehicle, and it currently has approximately 62,000 miles on the odometer. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Specifically, on the day Plaintiff McAlister purchased the Class Vehicle, and prior to his purchase, Plaintiff McAlister relied on GM's specific representations made through television and print advertisements concerning the Class Vehicle's fuel economy and reliability. At the dealership, the sales representatives told Plaintiff McAlister that the vehicle had superior fuel economy with American diesel fuel as compared to other diesel trucks on the market and that is was more reliable; sales representatives told Plaintiff McAlister that the vehicle was "the best truck out there." Plaintiff McAlister relied on GM's representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high

resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles.

20.     Plaintiff John Thomas White (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of California, and domiciled in Beaumont, California. On or around November 6, 2016 Plaintiff purchased a new 2016 Chevrolet Silverado 2500 HD, VIN 1GC1KWE83GF288393 (for the purpose of this paragraph, the "Class Vehicle") for $61,000 from Gosch Chevrolet, a certified GM dealership in Hemet, California. Plaintiff has since sold the vehicle at a loss, and at the time of sale the vehicle had approximately 13,000 in mileage. Plaintiff purchased his truck as a retirement gift to himself and uses it for personal traveling and errands around town. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Specifically, in the days and weeks prior to Plaintiff White purchasing the Class Vehicle, he saw internet advertisements from GM containing specific representations concerning the Class Vehicle's fuel economy and reliability. At the dealership, the sales representatives told Plaintiff White that the vehicle had superior fuel economy

with American diesel fuel as compared to other diesel trucks on the market and that is was more reliable. Plaintiff White relied on GM's representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles.

21.     Plaintiff Sean T. Smith (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of California, and domiciled in Santa Clarita, California. In or around March 2017, Plaintiff purchased a new 2016 Chevrolet Silverado 2500 HD, VIN 1GC1KWE86GF286430 (for the purpose of this paragraph, the "Class Vehicle") for $67,000 from Rydell Chevrolet, an authorized GM dealership in Van Nuys, California.  Plaintiff still owns the vehicle, and it has approximately 23,000 miles on the odometer. Plaintiff uses his Silverado 2500 HD as his personal vehicle to get to work

and for daily activities. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Specifically, on the day Plaintiff Smith purchased the Class Vehicle, and prior to his purchase, Plaintiff Smith relied on GM's specific representations concerning the Class Vehicle's fuel economy and reliability. At the dealership, the sales representatives told Plaintiff Smith that the vehicle had superior fuel economy with American diesel fuel as compared to other diesel trucks on the market and that is was more reliable. Plaintiff Smith relied on GM's representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

22.     Plaintiff Kevin Allen Lawson (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of California, and domiciled in Temecula, California. In or around January 2013, Plaintiff purchased a new 2013 Chevrolet Silverado 2500 HD, VIN 1GC1KYE82DF168947 (for the purpose of this paragraph, the "Class Vehicle") for $62,000 from Paradise Chevrolet, an authorized Chevrolet dealership in Temecula, California. Plaintiff still owns the vehicle, and it presently has approximately 47,600 miles. Plaintiff uses his Silverado 2500 HD as his personal vehicle to get to work and for daily activities. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Specifically, on the day Plaintiff Lawson purchased the Class Vehicle, and prior to his purchase, Plaintiff Lawson relied on GM's specific representations concerning the Class Vehicle's fuel economy and reliability. At the dealership, the sales representatives told Plaintiff Lawson that the vehicle had superior fuel economy with American diesel fuel as compared to other diesel trucks on the market and that is was more reliable. Plaintiff Lawson relied on GM's representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles.

23.     Plaintiff Kevin Sutherland (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of California, and domiciled in Westminster, California. In or around July 2013, Plaintiff purchased a used 2011 Chevrolet Silverado 2500 HD, VIN 1GC1KYC8XBF182773 (for the purpose of this paragraph, the "Class Vehicle") for $42,000 from a private seller in Long Beach, California. When Plaintiff purchased the vehicle it had approximately 18,000 miles on the odometer, and it presently has around 80,000 miles. Plaintiff uses his Silverado 2500 HD as his personal vehicle and to tow all his "toys," his fishing boat, off-road cars, dirt bikes and trailers. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Specifically, on the day Plaintiff Sutherland purchased the Class Vehicle, and prior to his purchase, Plaintiff Sutherland relied on GM's specific representations concerning the Class Vehicle's fuel economy, durability, fuel efficiency, and reliability. Plaintiff Sutherland relied on GM's representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. In addition, Plaintiff Sutherland's Class Vehicle experienced catastrophic failure of its CP4 fuel injection pump when the

1   Vehicle had approximately 75,000 miles on the odometer. Specifically, on or around August 8, 2018,

2   Plaintiff and his two children were in the Class Vehicle traveling from California to Arizona and

3   towing a boat. He pulled over to use a rest stop, and when he got back in the Class Vehicle, he

4   traveled for a short distance when all of a sudden the CP4 fuel injection pump catastrophically failed,

5   causing his vehicle to shut-down. He maneuvered to the right shoulder of the highway and the Class

6   Vehicle would not restart. Over two hours later, a tow truck finally arrived. Plaintiff Sutherland

7   called Bradley Chevrolet who informed him "We've been seeing a lot of this lately, you better hope

8   it's not your fuel pump." When Bradley Chevrolet finally got the opportunity to look at the vehicle,

9   they informed him that it was a failed CP4 fuel injection pump and that it would need to be replaced,

10  to the tune of $12,000. GM would not cover the part under warranty and he ultimately had it repaired

11  at his own expense. Now, Mr. Sutherland's vehicle is approaching the 100,000-mile mark, and in

12  fear of experiencing yet another catastrophic failure, he has considered purchasing and installing a

13  CP4 bypass kit; however, his GM dealership has informed him that doing any such modification

14  would nullify any and all factory warranties on the vehicle – quite the Catch-22 for Mr. Sutherland.

15  Prior to purchasing this vehicle, neither GM nor any of its agents, dealers, or other representatives

16  informed him or other Class members of the existence of the unlawfully and/or unexpectedly

17  defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is

18  common to all Class Vehicles. Accordingly, Plaintiff and each Class member suffered concrete

19  economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would

20  not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4

21  fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's

22  ascertainable losses include, but are not limited to, a high premium for the engine compared to what

23  they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles

24  at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles.

25  Plaintiff thusly brings claims individually and as a representative of the Class.

26      24.     Plaintiff Douglas Hughes (for the purpose of this paragraph, "Plaintiff") is a citizen of

27  the State of California, and domiciled in Mokelumne Hill, California. On or around October 31, 2015

28

1   Plaintiff purchased a new 2015 Chevrolet Silverado 2500 HD, VIN 1GC1KWE80FF671495 (for the

2   purpose of this paragraph, the "Class Vehicle") for $59,000 from Burbank Chevrolet, an authorized

3   GM dealership in Burbank, California. Plaintiff still owns the vehicle, and it presently has around

4   60,000 miles on the odometer. Plaintiff uses his Silverado 2500 HD as his personal vehicle to get to

5   work and for daily activities. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car

6   that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle.

7   Specifically, on the day Plaintiff Hughes purchased the Class Vehicle, and prior to his purchase,

8   Plaintiff Hughes relied on GM's specific representations concerning the Class Vehicle's fuel

9   economy and reliability. At the dealership, the sales representatives told Plaintiff Hughes that the

10  vehicle had superior fuel economy with American diesel fuel as compared to other diesel trucks on

11  the market and that is was more reliable. Plaintiff Hughes relied on GM's representations in

12  purchasing the vehicle and, absent these representations, would not have purchased the vehicle

13  and/or would have paid less for it. These knowingly false representations, in combination with the

14  advertised fuel efficiency and performance, the representation that the vehicle would retain all of its

15  promised fuel economy and performance throughout its useful life, and the Class Vehicle's

16  reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which

17  is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the

18  Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American

19  vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the

20  advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff

21  relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff

22  or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM

23  Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class

24  Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete

25  economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would

26  not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4

27  fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's

28

ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. In addition, Mr. Hughes has had to purchase a CP4 lift pump to modify the pump and mitigate or deter the occurrence of an inevitable catastrophic failure, at a cost of more than $1,000 out-of-pocket.

25.     Plaintiff Colby Barry (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of California, and domiciled in Antioch, California.  On or around July 27, 2016 Plaintiff purchased a new 2016 Chevrolet Silverado 3500 HD, VIN 1GC4K1E86GF125043 (for the purpose of this paragraph, the "Class Vehicle") for $63,843 from Chase Chevrolet, a certified GM dealership in Stockton, California. Plaintiff still owns the vehicle, and it has approximately 11,300 miles on the odometer. Plaintiff uses his Silverado 3500 HD as his daily driver and to occasionally haul his 40-foot camping trailer. Prior to purchasing the Class Vehicle, Plaintiff Barry was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Prior to his purchase, Plaintiff Barry researched the Class Vehicle on the internet and saw GM's internet advertisements representing the Class Vehicle's reliability, durability, and efficiency. GM represented to Plaintiff Barry that the Class Vehicle had superior fuel economy with American diesel fuel as compared to other diesel trucks on the market and that is was more reliable. Plaintiff Barry relied on GM's representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives

1    informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective

2    nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common

3    to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered

4    concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and

5    would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed

6    the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class

7    member's ascertainable losses include, but are not limited to, a high premium for the engine

8    compared to what they would have paid for a gas-powered engine, out-of-pocket losses by

9    overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and

10   diminished value of the vehicles.

11          25.     Plaintiff Richard Samson (for the purpose of this paragraph, "Plaintiff") is a citizen of

12   the State of California, and domiciled in Apple Valley, California. In or around January 2018,

13   Plaintiff purchased a used 2016 GMC Sierra HD Denali, VIN 1GT12UE82GF100516 (for the

14   purpose of this paragraph, the "Class Vehicle") for $67,000 from Platinum Auto Group in

15   Victorville, California. At the time of purchase, the vehicle had around 18,000 miles on the

16   odometer, and it currently has approximately 35,000 miles. Plaintiff uses his Sierra HD Denali as his

17   personal vehicle to get to work and for daily activities. Prior to purchasing the Class Vehicle,

18   Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage

19   per gallon of a diesel vehicle. Specifically, on the day Plaintiff purchased the Class Vehicle, and

20   prior to his purchase, Plaintiff Samson relied on GM's specific representations concerning the Class

21   Vehicle's fuel economy and reliability. At the dealership, the sales representatives told Plaintiff that

22   the vehicle had superior fuel economy with American diesel fuel as compared to other diesel trucks

23   on the market and that is was more reliable. Plaintiff relied on GM's representations in purchasing

24   the vehicle and, absent these representations, would not have purchased the vehicle and/or would

25   have paid less for it. These knowingly false representations, in combination with the advertised fuel

26   efficiency and performance, the representation that the vehicle would retain all of its promised fuel

27   economy and performance throughout its useful life, and the Class Vehicle's reputation for

28

maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. In addition, Plaintiff experienced catastrophic CP4 fuel pump failure with only 28,361 miles on the Class Vehicle. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles.

26. Plaintiff Bradley Rice (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of California, and domiciled in Penryn, California. On or around March 17, 2014 Plaintiff purchased a new 2014 GMC Sierra HD, VIN 1GT125E83EF149839 (for the purpose of this paragraph, the "Class Vehicle") for $58,500 from Folsom Buick GMC, a certified GM dealership in Folsom, California. Plaintiff still owns the vehicle, and it has approximately 68,000 miles on the odometer. Plaintiff uses his Sierra HD as his personal vehicle to get to work and for daily activities. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Specifically, on the day Plaintiff Rice purchased the Class Vehicle, and prior to his purchase, Plaintiff Rice relied on GM's specific representations concerning the Class Vehicle's fuel economy and reliability. At the

dealership, the sales representatives told Plaintiff Rice that the vehicle had superior fuel economy with American diesel fuel as compared to other diesel trucks on the market and that is was more reliable. Plaintiff Rice relied on GM's representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles.

27.     Plaintiff Anthony Raymond Smith (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of California, and domiciled in Simi Valley, California. In or around August 2015, Plaintiff purchased a used 2011 GMC Sierra 2500 HD, VIN 1GT121C8XBF256930 (for the purpose of this paragraph, the "Class Vehicle") for $40,000 from Carmax, in Burbank, California. Plaintiff purchased and still owns the vehicle. Mr. Smith purchased his GMC truck to help tow large

1    loads for work and maintenance, and also as his daily driving vehicle. Now, every time he starts his

2    truck, he worries that this is going to be the day he has to "dump $10,000 into [his] truck." At the

3    time of purchase, the vehicle had approximately 44,000 miles on the odometer, and it presently has

4    approximately 167,900 miles. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car

5    that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle.

6    Specifically, on the day Plaintiff Smith purchased the Class Vehicle, and prior to his purchase,

7    Plaintiff Smith relied on GM's specific representations through printed sales and advertising

8    materials concerning the Class Vehicle's fuel economy and reliability. At the dealership, the sales

9    representatives told Plaintiff Smith that the vehicle had superior fuel economy with American diesel

10   fuel as compared to other diesel trucks on the market and that is was more reliable. Plaintiff Smith

11   relied on GM's representations in purchasing the vehicle and, absent these representations, would not

12   have purchased the vehicle and/or would have paid less for it. These knowingly false representations,

13   in combination with the advertised fuel efficiency and performance, the representation that the

14   vehicle would retain all of its promised fuel economy and performance throughout its useful life, and

15   the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the

16   Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time

17   of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not

18   suitable for American vehicles and which deceived American consumers. Consequently, the vehicle

19   could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of

20   diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives

21   informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective

22   nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common

23   to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered

24   concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and

25   would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed

26   the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class

27   member's ascertainable losses include, but are not limited to, a high premium for the engine

28

compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. Moreover, Mr. Smith has spent approximately $6,000 to modify the CP4 into a CP3 to prevent catastrophic failure from occurring in the future.

28.     Plaintiff Ryan Arthur Jensen (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of California, and domiciled in Visalia, California.  In or around June 2014, Plaintiff purchased a new 2015 GMC Sierra 3500 HD, VIN 1GT412C84FF141767 (for the purpose of this paragraph, the "Class Vehicle") for $55,000 from Bojorn, a certified GM dealership in Paso Robles, California. Plaintiff experienced a CP4-pump-induced failure in January 2017, causing the truck to stall while he was driving down the road with his family. Plaintiff rolled through an intersection without vehicle power, but was then able to safely coast to the side of the road. Plaintiff dispensed with the defective vehicle shortly thereafter, in February 2017, after being told at the GMC dealership (Visalia Buick GMC, an authorized GM dealership in Visalia, California) that repairs to the vehicle were going to cost him approximately $13,000. While the dealership did ultimately cover the repair ($5,000) under warranty, Plaintiff knew the expiration of his manufacturer warranty was coming up, and knowing that the vehicle was not adequately repaired (i.e., knowing that this problem was likely to occur again), Plaintiff traded in the defective vehicle at a non-GM dealership at a loss of $11,000. The vehicle had approximately 61,800 miles on the odometer at the time of trade-in. Plaintiff used his Sierra 3500 HD as his personal vehicle to get to work and for daily activities, and for travel and to haul horse trailers. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Specifically, on the day Plaintiff Jensen purchased the Class Vehicle, and prior to his purchase, Plaintiff Jensen relied on GM's specific representations concerning the Class Vehicle's fuel economy and reliability. At the dealership, the sales representatives told Plaintiff Jensen that the vehicle had superior fuel economy with American diesel fuel as compared to other diesel trucks on the market and that is was more reliable. Plaintiff Jensen relied on GM's representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle

and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing.  Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles.

29.     Plaintiff Thorin Jay Askin (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of California, and domiciled in Placerville, California.  On or around January 6, 2018 Plaintiff purchased a used 2015 GMC Sierra 2500 HD, VIN 1GT12YE81FF125977 (for the purpose of this paragraph, the "Class Vehicle") for $38,000 from Thompsons Buick GMC, a certified GM dealership in Placerville, California. Plaintiff purchased the vehicle with approximately 98,000 miles on the odometer, and it currently has around 108,000 miles. Plaintiff uses his Sierra 2500 HD as his personal vehicle to get to work and for daily activities. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Specifically, on the day Plaintiff Askin purchased the Class Vehicle,

and prior to his purchase, Plaintiff Askin relied on GM's specific representations concerning the Class Vehicle's fuel economy and reliability. At the dealership, the sales representatives told Plaintiff Askin that the vehicle had superior fuel economy with American diesel fuel as compared to other diesel trucks on the market and that is was more reliable. Plaintiff Askin relied on GM's representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles.

30.     Plaintiff Ryan Maduro (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of California, and domiciled in Covina, California. In or around October 2016, Plaintiff purchased a new 2016 GMC Sierra 2500 HD, VIN 1GT12UE81GF254392 (for the purpose of this

1   paragraph, the "Class Vehicle") for $66,000 from Simpson Buick GMC of Buena Park, an

2   authorized GM dealership in Buena Park, California. Plaintiff purchased this vehicle for recreational

3   and/or towing purposes, namely for his leisure 20-foot boat and two Sea-Doo watercraft, and the

4   vehicle has approximately 10,200 miles on the odometer at present. Prior to purchasing the Class

5   Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the

6   high mileage per gallon of a diesel vehicle. Specifically, on the day Plaintiff Maduro purchased the

7   Class Vehicle, and prior to his purchase, Plaintiff Maduro relied on GM's specific representations

8   concerning the Class Vehicle's fuel economy and reliability, and had heard, seen, and relied upon

9   promises made by the manufacturer via its television advertisements. Plaintiff Maduro relied on

10  GM's representations in purchasing the vehicle and, absent these representations, would not have

11  purchased the vehicle and/or would have paid less for it. These knowingly false representations, in

12  combination with the advertised fuel efficiency and performance, the representation that the vehicle

13  would retain all of its promised fuel economy and performance throughout its useful life, and the

14  Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class

15  Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of

16  acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable

17  for American vehicles and which deceived American consumers. Consequently, the vehicle could

18  not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel

19  that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives

20  informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective

21  nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common

22  to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered

23  concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and

24  would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed

25  the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class

26  member's ascertainable losses include, but are not limited to, a high premium for the engine

27  compared to what they would have paid for a gas-powered engine, out-of-pocket losses by

28

1    overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and

2    diminished value of the vehicles.

3         31.    Plaintiff Michele Diniz (for the purpose of this paragraph, "Plaintiff") is a citizen of

4    the State of California, and domiciled in Atwater, California.  In or around October 2018, Plaintiff

5    purchased a used 2013 GMC Sierra 2500 HD, VIN 1GT120C87DF113155 (for the purpose of this

6    paragraph, the "Class Vehicle") for $47,000 from Tracy Chevrolet, a GM-authorized dealership in

7    Tracy, California. Plaintiff purchased this automobile for recreational use, with plans to tow a 26-

8    foot camping trailer with the Class Vehicle. The Vehicle had approximately 11,200 miles on the

9    odometer at the time of purchase, and presently has around 12,400 miles. Prior to purchasing the

10   Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain

11   the high mileage per gallon of a diesel vehicle. More specifically, prior to purchasing the Class

12   Vehicle, Plaintiff heard, saw, and relied on promises made by GM via its television commercials

13   about the power, durability, and reliability of the Class Vehicle, and moreover was lured by GM's

14   promises that the Class Vehicle could obtain high mileage per gallon. Plaintiff relied on GM's

15   representations in purchasing the vehicle and, absent these representations, would not have

16   purchased the vehicle and/or would have paid less for it. These knowingly false representations, in

17   combination with the advertised fuel efficiency and performance, the representation that the vehicle

18   would retain all of its promised fuel economy and performance throughout its useful life, and the

19   Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class

20   Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of

21   acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable

22   for American vehicles and which deceived American consumers. Consequently, the vehicle could

23   not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel

24   that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives

25   informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective

26   nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common

27   to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered

28

concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles.

32.     Plaintiff Brandon Tirozzi (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of California, and domiciled in Rialto, California.  On or around November 22, 2013, Plaintiff purchased a used 2013 Chevrolet Silverado 2500 HD, VIN 1GC1KXE8XDF171704 (for the purpose of this paragraph, the "Class Vehicle") with approximately 20,000 miles on it for the price of $56,000 from Mark Christopher Auto Center in Ontario, California. Plaintiff no longer owns this vehicle. On August 2, 2015, when the Class Vehicle had approximately 200,000 miles on it, Plaintiff was driving approximately 65 miles per hour on Interstate I-70 and his Silverado suddenly shut down. Being a skilled professional driver with his commercial driver's license ("CDL"), he was able to maneuver the vehicle off the roadway onto the shoulder relatively safely. However, the vehicle would not restart. The vehicle was eventually towed to Ed Bozarth Chevrolet and Buick, Inc., a certified GM dealership in Grand Junction, Colorado. Plaintiff received an estimate of approximately ~$8600 for parts and ~$3100 for labor to repair the vehicle as a result of the CP4 failure. Tirozzi then had the vehicle towed from Grand Junction, Colorado back to California, where he went to an independent automotive repair shop and received a lower estimate for the repair; despite having initially given him a $4,000 estimate for the repair, though, once they got into the vehicle's engine and fuel injection system (fuel lines/etc.), they realized that this was indeed a catastrophic CP4 failure and for all intents and purposes everything was ruined internally, and no salvaging of the vehicle would be possible. The independent automotive shop showed him photographs of the vehicle's high-injection fuel pump gaskets which were *covered* with metal shavings, and these shavings had dispersed throughout his fuel injection and engine systems. The shop also told Plaintiff

Tirozzi that they had seen a lot of these CP4-induced failures in CP4-equipped vehicles, and that they had spoken to the pump manufacturer about the issue as well. As a result of the vehicle now being totally unusable and Mr. Tirozzi still owing money on his vehicle purchase less than two years prior, the vehicle was repossessed.

33.     Prior to purchasing the Class Vehicle, Plaintiff Tirozzi was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. In fact, he purchased the vehicle to earn a living pulling new travel trailers, as Plaintiff has a CDL and is therefore a professional driver. Plaintiff relied on GM's representations regarding the aforementioned qualities of the Class Vehicle in purchasing said vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by

overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles.

34.     Plaintiff Calvin Smith (for purposes of this paragraph, "Plaintiff") purchased a new 2012 Chevrolet Silverado 2500 (for purposes of this paragraph, the "Class Vehicle") from Folsom Chevrolet, an authorized GM dealership located in Folsom, California. Prior to purchase, Mr. Smith researched the vehicle online, including on the Chevrolet website, and also spoke with dealership personnel about the Class Vehicle leading up to his purchase decision. Unbeknownst to Plaintiff, the Class Vehicle came equipped with a defective factory-installed Bosch CP4 fuel pump. In October 2017, when the Vehicle had approximately 143,000 miles on the odometer, the Class Vehicle experienced catastrophic fuel-line failure, with the fuel pump sending metal shards throughout the fuel line. Mr. Smith was ultimately forced to pay approximately $4,500 for the resulting repairs. Notably, Mr. Smith was told by his GM dealership after paying for the repairs that many other vehicles were experiencing the same problem. Had GM adequately disclosed the defect, Mr. Smith would not have purchased the Class Vehicle, or would have paid substantially less for it.

**B.     The Defendant**

35.     Defendant General Motors LLC ("GM") is a Delaware limited liability company with its headquarters and principal place of business located at 300 Renaissance Center, Detroit, Michigan 48232. GM can be served with process through its agent at the aforementioned Detroit, Michigan address. The sole member and owner of General Motors LLC is General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan. GM is in the business of marketing, supplying, and selling motor vehicles in this District.

36.     Defendant GM, through its various entities, including Chevrolet and GMC, designs, manufactures, distributes, and sells GM-brand automobiles in this District and multiple other locations in the United States and worldwide. GM and/or its agents designed, manufactured, and installed the engine systems in the Class Vehicles. GM also developed and disseminated the materially misrepresentative owner's manuals and warranty booklets, advertisements, and other

1   intentionally unreasonable and deceptive promotional materials relating to the Class Vehicles. GM

2   also designed advertising material that it sent to GM Dealerships for the purpose of having dealers

3   distribute these to consumers, and GM authorized dealers to communicate with consumers about the

4   performance of the vehicles, and GM further undertook that the dealership was a place where GM

5   could disclose material facts to prospective buyers.

6              **IV.    VENUE AND JURISDICTION**

7       37.    Venue is proper in this District under 28 U.S.C. § 1391 in light of the following: (1)

8   GM conducts substantial business in this District and have intentionally availed themselves of the

9   laws and markets of the United States and this District; and/or (2) Many of the acts and transactions

10  giving rise to this action occurred in this District, including, *inter alia,* the GM's promotion,

11  marketing, distribution, and sale of vehicles containing Bosch's high injection CP4 fuel pump known

12  in this District. Several named Plaintiffs and proposed representatives, as well as tens of thousands of

13  Class members, purchased their Class Vehicles from the multiple GM dealerships located in this

14  District. Further, a significant number of the Class Vehicles were registered in this District and

15  thousands of Class Vehicles were in operation in this District. Venue is also proper under 18 U.S.C.

16  § 1965(a) because GM is subject to personal jurisdiction in this District as alleged, *infra*, and GM

17  has multiple agents, *i.e.*, GM-certified dealerships, located in this District.

18      38.    The Court has jurisdiction over this action pursuant to the Class Action Fairness Act

19  ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from the

20  Defendant, there are more than 100 Class members, and the aggregate amount in controversy

21  exceeds $5,000,000.00, exclusive of interests and costs. Subject-matter jurisdiction also arises under

22  the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et seq*. The Court has

23  personal jurisdiction over GM pursuant to 18 U.S.C. §§1965(b) and (d), and Cal. Code Civ. Proc §

24  410.10, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

25      39.    This Court has personal jurisdiction over Defendant GM. GM has committed and

26  continues to commit acts giving rise to this action within California and within this judicial District.

27  GM has established minimum contacts within the forum such that the exercise of jurisdiction over

28

GM would certainly not offend traditional notions of fair play and substantial justice. In conducting business, *i.e.*, marketing, supplying, and distributing GM-brand automobiles within the State of California, and specifically, within this judicial District, GM derives substantial revenue from its activities and its products being sold, used, imported, and/or offered for sale in California and this judicial District. GM has more than one-hundred-and-fifty certified GM-brand dealerships in the state of Califgornia and sells hundreds of thousands of automobiles each year in the state. GM provides advertising and customer facing information to these dealers for the purpose of exposing consumers in California to that information.

## V.       FACTUAL ALLEGATIONS

### A.       The Class Vehicles

40.     For purposes of this Complaint, the "Class Vehicles" consist of the following GM-manufactured diesel-fueled U.S. automobiles:

- 2011–2016 2500 HD Silverado 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2011–2016 3500 HD Silverado 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2011–2016 2500 HD Sierra 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2011–2016 3500 HD Sierra 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2010–2011 Chevrolet Express van with Duramax LGH engines;

- 2010–2011 GMC Savana van with Duramax LGH engines;

- 2010–2011 GMC Sierra trucks with RPO ZW9 (chassis cabs or trucks with pickup box delete) with Duramax LGH engines;

- 2011–2012 2500 HD 3500 Silverado 6.6L V8 Duramax Diesel Trucks with LGH engines; and

- 2011–2012 2500 HD 3500 Sierra 6.6L V8 Duramax Diesel Trucks with LGH engines.

B.     **The Rise of Diesel Vehicles in the United States**

41.     Diesel engines have long enjoyed a loyal following in some U.S. market segments because of their reliability, fuel efficiency, and power. Diesel engines produce higher torque, even at low revolutions per minute ("RPM"), making them popular in buses, heavy-duty pickups, and vans, including commercial vehicles, farm trucks, and ambulances.

42.     With the invention of common-rail systems, diesel fuel was injected at higher pressure, forming a finer mist that increases fuel efficiency and power. Common-rail systems also made diesel engines burn cleaner and with less noise. While diesel had long been popular overseas, these advances fueled a growing market here in the U.S. for diesel trucks, and even diesel passenger cars.

43.     From the outset, GM was in competition with fellow "Big Three" auto manufacturers like Ford and Fiat Chrysler, each racing to dominate the growing American diesel vehicle market. GM looked to Europe and the expertise of international automotive parts supplier Bosch to increase the fuel efficiency and power of its diesel engines. The heart of this diesel revolution would be powered by Bosch's extremely durable CP3 fuel injection pump, the predecessor to the CP4 fuel injection pump at issue in this suit. The CP3 pump was one of Bosch's heavy-duty injection pumps, simplified for increased reliability. The reliability of the CP3 became key to the "million-mile" performance of diesel truck engines in the U.S. Not surprisingly, American trust in diesel technology grew.

44.     Americans paid a premium for the increased reliability, fuel efficiency, and power of diesel—and, Bosch promised to continue to deliver advances in diesel engine technology. Bosch claimed that the next generation of fuel pump, the CP4, would maintain reliability while also increasing fuel efficiency and power.

45.     However, much like what occurred in the nationwide Volkswagen emissions scandal involving Bosch, reliance on Bosch's expertise in the design of diesel engines would lead GM into a course of action it should now regret. The heart of GM's success under increasingly competitive fuel efficiencies was Bosch's cheaper, substandard CP4 fuel injection pump. Bosch had the technical know-how to do what needed to be done to get ahead; unfortunately for the American public, the

easiest way for GM to succeed was to cheat American consumers on durability and overall vehicle functionality by equipping the Class Vehicles with this ticking time bomb of a fuel injection pump that doomed the modern GM Duramax diesel engine system from day one.

46.     Rather than remedy the problem it caused, GM chose to extract a second round of profits from the consumers it has already duped. GM created a licensing scheme to market premium diesel fuels with greater lubricity that is more compatible with its CP4 pumps, in markets where most profitable.  GM named this higher lubricity fuel "TOP TIER $^{TM}$," GM's registered trademark brand. In markets where available, GM's TOP TIER diesel is sold for a premium, costing a few cents more per gallon. GM then double dips, profiting again, a second time from its wrongdoing, by charging a licensing fee to fuel marketers who sell TOP TIER diesel.

**C.     Pre-Class Period CP4 Failures are Quickly Followed by Failures in the Earliest GM-Manufactured CP4 Vehicles.**

47.     The Bosch CP4 fuel injection pump was defective and incompatible with U.S. diesel fuel from the get-go, even prior to GM's usage of it in the Class Vehicles. CP4 failures began running rampant in American Audi and Volkswagen vehicles at least as early as 2008,[2] before GM ever implemented the cheaper, less robust pump in its 2011 and later model year diesel automobiles. These failures echo the very failures that continue to occur in the Class Vehicles to this day, and from late 2011 through early 2012, documentation regarding these widespread CP4 failures was

---

[2] *See, e.g.*, Jul. 7, 2008 email between Audi and Bosch representatives re: "Performance drop AU716 98017 with shavings in the HPP," discussing how "[s]omething is disintegrating" in the Audi 716 fuel pump and that "[w]e are a bit speechless" about "[t]he shavings, or whatever it is"), submitted as part of Bosch's May 2012 responses to NHTSA ODI Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59334P.pdf," at 6; *id.* at 27 (Jul. 31, 2008 email from Audi representative re: "Fuel quality in [**REDACTED**]," stating that, "With our [Audi's] V6TDI with the high-pressure pump CP4.2 we have significantly higher failure rates in [**REDACTED**] (higher by a factor of approx. 30 than the average of all markets) . . . . Have you any information suggesting that such a thing could be possible with this country-specific diesel fuel?"); *id.* at 28-31 (Feb.-May 2011 email chain between Audi, Volkswagen and Bosch representatives re: "Status CP4 USA," in which the parties discuss the substantial increase in warranty claims with the implementation of the CP4 in vehicles in the U.S. market).

provided to the National Highway Traffic Safety Administration ("NHTSA") by Bosch, Audi, and

Volkswagen, in connection with NHTSA's Office of Defect Investigations ("ODI") Inquiry No.

INRD-EA11003, an investigation which GM was subject to as well.[3]

48.    This documentation demonstrates the nature of the CP4 defect that would ultimately

come to exist in the Class Vehicles. For example, in August 2009, Audi sent Bosch a failed CP4 fuel

pump for analysis after "[t]he high pressure fuel pump failed catastrophically shedding metal

shavings throughout the entire fuel system. . . . This car will require a complete new fuel system

from tank to injectors and everything in between. This will be a very lengthy repair (weeks). . . We

need to determine if component failure or bad fuel is to blame." March 7, 2011 Bosch submission to

NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-

59347P.pdf," at 35. Thereafter, on September 1, 2009, Bosch responded to Audi with the following

flippant analysis note from their failed pump inspection: "Gentleman, [t]he pump mentioned below

was analyzed. The result of the finding is sand-like particles in the fuel. *Defect caused by customer*."

*Id.* at 38 (emphasis added).[4]

---

[3] *See infra* ¶ 64 & n. 11 (discussing GM's response to NHTSA's requests pursuant to ODI Inquiry No. INRD-EA11003).

[4] *See also* March 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 21 (Mar. 31, 2008 email from Volkswagen to Bosch re: "Radio: Drivetrain damage failure US07 (Jetta)," in which the parties are discussing an HPFP failure in a 2007 Jetta and the Volkswagen representative frustratedly states, "Can you (panel of experts) explain to us how the failure mechanism was after this mileage? . . . . We will certainly not accept a failure because of fuel quality! . . . . We also see a big risk here for our BIN5 pump, which has to manage with the same fuel in USA"); May 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59334P.pdf," at 9–10 (Jul. 4, 2008 email from Audi to Bosch re: "CP4 BIN5 3rd and 4th failure in USA," analyzing root cause of CP4 field failures and positing, "Why is it that EC pumps do not fail? Because of a different fuel?"); Jul. 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 7 (emphasis added) (Jun. 30, 2009 email between Bosch and Audi representatives re: "ANS: HPP measures/ USE," in which the Audi representative writes, "I don't think you're reading my mails anymore! Please look at the failure curves specifically, then you'll see that *we only have a problem in certain markets[.] . . . Depending on how poor the fuel currently on the market is*"); *id.* ("I'd prefer to have a more robust pump").

49.     Likewise, in September 2009, Bosch, at the time supplying the defective CP4 fuel pump to Audi and Volkswagen, received a notice from Audi about a "3rd HPP failure" in the U.S., explaining, "I'm afraid there's bad news from the U.S.: After 2 failures in the field . . . the 3rd HPP failure has now occurred in the EC endurance run."[5]  Photos attached to the email show the failed Bosch CP4 fuel pump, replete with metal shavings in the gasket:[6]

 

50.     Yet, GM went on to contract with Bosch to supply the CP4 fuel pumps in 2011 and later model years. Seeking to gain an advantage, GM began a long partnership with Bosch in 2000. But from the beginning, GM was aware of a mismatch between Bosch's European fuel injection pumps and American diesel fuel.

51.     GM set out to design a modern diesel engine for its pickup trucks. In 2000, GM formed a joint venture with Isuzu, called "DMAX" to create the 6.6L Duramax V8 engine. DMAX then teamed up with Robert Bosch GmbH to incorporate Bosch's high pressure common-rail for fuel injection. Two years later, the Duramax engine had garnered 30% of the U.S. market for diesel

---

[5] Sept. 2, 2009, email from Audi representative to Bosch representatives regarding "3rd HPP Failure USA," produced in response to NHTSA Inquiry EA11003EN-00639[0], *available at* https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-59428P.PDF (last accessed Nov. 6, 2018), at 146.

[6] *Id.* at 148-50.

pickup trucks. The Duramax engine has long been an option on GM pickups, vans, and medium-duty trucks, and has undergone many changes over the years.

52.     For 2010, GM created the LGH version of the Duramax engine. It featured increased power, increased torque, and greater fuel efficiency. But, in order to achieve greater fuel efficiency, the Duramax LGH engine incorporated a newer, lower-volume fuel injection pump, Bosch's CP4 pump.

53.     On February 7, 2011, as the first models of the Class Vehicles were being sold, NHTSA's Office of Defect Investigations ("ODI") opened an investigation certain major automotive manufacturers for a potential defect in predecessor diesel high-pressure fuel injection pumps as well as certain model year vehicles containing the CP4 pump.[7] As part of that investigation, in October 2011, ODI requested "peer vehicle" information from GM, specifically regarding (among other things) an "[a]lleged defect" involving "[a]ny one or more of the following symptoms or conditions. . .: (1) HPFP failure; (2) *Metallic debris/contamination in the fuel system*; (3) Repairs involving fuel system replacement; (4) General allegations of fuel pump failure (*i.e.*, the specific fuel pump is not identified); or (5) All other allegations of fuel system failures or malfunctions resulting in engine stall."[8]

54.     The data GM provided NHTSA from October-December 2011 was already sufficient to detect a serious defect involving Class Vehicles' fuel pumps. Among other things, GM responded that in the 2nd quarter of 2011 *alone*, it was aware of at least *ninety-nine* (99) field reports of high-pressure fuel pump failure in the 2011 Chevrolet Silverado HD, thirty (30) of which involved moving stalls.[9]

_____

[7] *See* Feb. 7, 2011, NHTSA ODI Resume for Investigation No. EA 11-003 regarding "High-Pressure Fuel Pump Failure (HPFP)," *available at* https://static.nhtsa.gov/odi/inv/2011/INOA-EA11003-5971.PDF (last accessed Nov. 16, 2018) .

[8] Oct. 7, 2011, Ltr. from Frank S. Borris, Director, Office of Defects Investigation, to Carmen Benavides, GM Director of Product Investigations, *available at* https://static.nhtsa.gov/odi/inv/2011/INPR-EA11003-48548.pdf (last accessed Nov. 16, 2018).

[9] Dec. 9, 2011, Ltr. from Carmen Benavides, head of GM Product Investigations and Safety Regulations, to Frank Borris, head of NHTSA's Office of Defects Investigations (ODI), in response

55.     Importantly, the data showed a significant uptick in fuel pump failure-related claims beginning with the 2011 model year (the first year the CP4 was implemented). GM counted sixteen (16) fuel pump-related warranty claims in the 2011 GMC Sierra HD by October 2011, compared to just eight (8) in the two preceding years of Sierras combined.[10] Likewise, GM reported thirty (30) catastrophic fuel pump failures in the 2011 Chevrolet Silverado HD compared to just eight (8) in the two preceding model years of Silverados combined.[11]

56.     Likewise, the data GM provided comparing warranty claims in 2011 model year Class Vehicles with their predecessors is illuminating in terms of the increase in fuel pump-related claims. Whereas the 2011 model year Silverado had already generated sixty-eight (68) warranty claims for the fuel pump, the 2010 model year Silverado only had twenty (20). And whereas the 2011 model year Sierra had generated thirty-five (35) warranty claims, the preceding model year only had two (2).[12]

57.     A major quality control measure used by GM and other automotive manufacturers is to compare a particular model year vehicle's warranty claims and other aggregate information (such as driver complaints and field reports) with the preceding model year vehicle's data to evaluate whether there is a measurable uptick in the failure rate. In modern day vehicle production, failures are typically measured per thousand vehicles or sometimes even per hundred thousand vehicles, and defect trends are frequently identified after just one or several reported failures. Where, like here, the early warranty rates reflected between a three-fold and seventeen-fold increase over the previous year, GM must have recognized the existence of a defect no later than December 2011, at the time it compiled this information for NHTSA (though it was likely conducting internal analysis of its own even earlier).

---

to ODI Inquiry No. EA11-003, at 3, *available at* https://static.nhtsa.gov/odi/inv/2011/INRL-EA11003-50067P.pdf (last accessed Feb. 16, 2019).

[10] *Id.*

[11] *Id.*

[12] *Id.* at 8.

58.     In addition, for many decades, GM has conducted durability and reliability testing of its new vehicles before introducing them to the market. This means that GM trucks, including Class Vehicles, are exposed to lengthy and comprehensive physical testing that reveals how the vehicles and component parts (including the engines and fuel pumps) will last when driven for tens of thousands of miles.

59.     Through this testing, GM also would have discovered the defect—before selling the first Class Vehicle. As the driver complaints to the NHTSA below show, it is not uncommon for the Class Vehicle fuel pump to fail before the vehicle has driven 50,000 miles, with some failing at as low as 7,000 miles of driving. Likewise, it is not uncommon for the Class Vehicle fuel pump to fail within the first year or two of driving. These early failures are well within the scope of GM's durability and reliability testing.

60.     Despite this knowledge, beginning with the 2011 model year GM was touting the improved durability of its all-new Duramax LML engine, which was installed in many of the subject Class Vehicles and incorporated the CP4 fuel pump. Indeed, GM claimed that the Duramax LML improve durability while increasing fuel injection pressure to 29,000 psi, increasing noise reduction and also tolerating up to 20% biodiesel fuel mixtures, and added a urea-based diesel exhaust fluid ("DEF") system to treat its exhaust. The Duramax LML continued to use the new lower-volume Bosch CP4 fuel injection pump, as did some of the Duramax LGH's, including but not necessarily limited to the following vehicles:

- 2011–2016 Chevrolet 2500 HD Silverado 6.6L V8 Duramax Diesel Trucks with LML engines

- 2011–2016 Chevrolet 3500 HD Silverado 6.6L V8 Duramax Diesel Trucks with LML engines

- 2011–2016 Chevrolet 2500 HD Sierra 6.6L V8 Duramax Diesel Trucks with LML engines

- 2011–2016 GMC 3500 HD Sierra 6.6L V8 Duramax Diesel Trucks with LML engines

- 2010–2011 Chevrolet Express van with Duramax LGH engines

- 2010–2011 GMC Savana Van with Duramax LGH engines

- 2010–2011 GMC Sierra Trucks with RPO ZW9 (chassis cabs or trucks with pickup box delete) with Duramax LGH engines

- 2011–2012 Chevrolet 2500 HD Silverado 6.6L V8 Duramax Diesel Trucks with LGH engines

- 2011-2012 Chevrolet 3500 HD Silverado 6.6L V8 Duramax Diesel Trucks with LGH engines

- 2011–2012 Chevrolet 2500 HD Sierra 6.6L V8 Duramax Diesel Trucks with LGH engines

- 2011-2012 Chevrolet 3500 HD Sierra 6.6L V8 Duramax Diesel Trucks with LGH engines

61.     Importantly, GM was on notice—and indeed, has repeatedly *admitted*—that the safety risks of moving stalls or "no-starts" such as those associated with the CP4 fuel pump pose an inherent risk to vehicle occupant safety. In 2014, GM issued a series of safety recalls for approximately 30 million vehicles due to an ignition switch defect which caused, among other things, loss of engine power (in other words, moving stalls), which "increase[e] the risk of a crash."[13]

62.     The federal Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including claims relating to property damage received by the automotive manufacturer, warranty claims paid by the automotive manufacturer, consumer complaints, incidents involving injury or death, and field reports prepared by the automotive manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues. 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.

63.     The Safety Act further requires immediate action when a manufacturer determines or should determine that a safety defect exists. *United States v. General Motors Corp.,* 574 F. Supp. 1047, 1050 (D.D.C. 1983). A safety defect is defined by regulation to include any defect that creates

_____

[13] *See, e.g.*, GM 573 Ltr. to NHTSA re: NHTSA Recall No. 14V346, Jun. 19, 2014. The full relevant text of paragraph 573.6(c)(5) reads as follows:

"There is a risk, under certain conditions, that some drivers may bump the ignition key with their knee and unintentionally move the key away from the "run" position. If this occurs, engine power, and power braking will be affected and power steering may be affected, increasing the risk of a crash. . . ."

an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident." 49 U.S.C. § 30102(a)(8). Within five days of learning about a safety defect, a manufacturer must notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related. 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c). Then, "within a reasonable time" after deciding that a safety issue exists, the manufacturer must notify the owners of the defective vehicles. 49 C.F.R. §§ 577.5(a), 577.7(a). Violating these notification requirements can result in a maximum civil penalty of $15,000,000. 49 U.S.C. § 30165(a)(1).

64.    Thus, pursuant to California[14] and federal law, because the Class Vehicles have an inherent safety defect (as evidenced by the customer complaints cited herein), the purchasers and lessors of the Class Vehicles have been economically injured, because a vehicle which later turns out to have a safety defect is clearly worth less than it was at the point-of-sale while the defect was still being concealed.

**D.    GM's Additional Knowledge of Incompatibility, Defectiveness, and Failures Associated with Bosch's CP4 Pump.**

65.    The Bosch CP4 Pump operates at higher pressures than its predecessor, the CP3. The CP4 achieves greater fuel efficiency by pumping less fuel through the engine. The Bosch CP4 Pump had a proven track record in Europe, but it is not compatible with American diesel fuel.

66.    The CP4 relies on the diesel fuel itself to maintain lubrication. The lubricity of diesel in Europe is more standardized than American diesel, but European diesel is also dirtier. Because the sulfur in diesel exhaust is a major cause of smog and acid rain, in 2007, the EPA required diesel fuel sold in the U.S. to have less than 15 ppm of sulfur. This is known as Ultra Low Sulfur Diesel

---

[14] *See, e.g.*, *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1163 (C.D. Cal. 2011) ("[O]nce the safety defect is sufficiently and plausibly pled by all Plaintiffs, the economic losses resulting from the defect are readily established: defective cars are simply not worth as much").

("ULSD"). It is produced through a refinery process known as hydrodesulfurization ("HDS"). Sulfur provides some of the lubricity needed for the pump to operate. But more importantly, the refinery process required to produce low sulfur diesel destroys a variety of important nitrogen and oxygen based polar and organic compounds that give diesel fuel its lubricity. American diesel does not contain the lubrication necessary for the Bosch CP4 Pump to operate durably.

67.     Low sulfur diesel fuel first appeared in American markets in the 1990's, with fewer than 500 ppm of sulfur. It is estimated that 65 million fuel injection pumps failed as a result. It was thought that the pumps failed at the equivalent of 100 to 200 hours of operation. Thus, the critical importance of lubricity for diesel injection pumps was well known to all auto manufacturers for a decade or more before the Class Vehicles were designed or introduced into the market.

68.     Engine manufacturers were well aware of the mismatch between engine part specifications that require a maximum of a 460-micrometer wear scar, and the lower lubricity specifications of Ultra Low Sulphur American diesel fuel:

> Lubricity describes the ability of a fluid to minimize friction between, and damage to, surfaces relative to motion under loaded conditions.  Diesel fuel injection equipment relies on the lubricating properties of fuel.  Shortened life of engine components such as fuel injection pumps and unit injectors can usually be attributed to lack of fuel lubricity and, hence, lubricity is of concern to engine manufacturers.  This property is not addressed adequately by ASTM D 975.

4/22/2002 Engine Manufacturers' Association, Position Statement titled, "EMA Consensus Position Pump Grade Specification." GM is a member of the Engine Manufacturers' Association.[15]

69.     Further, the Engine Manufacturers' Association made clear:

> Regardless of the fuel sulfur level, ASTM D975 currently requires lubricity specified as a maximum wear scar diameter of 520 micrometers using the HFRR test method (ASTM D6079) at a temperature of 60°C. Based on testing conducted on ULSD fuels, however, fuel injection equipment manufacturers have required that ULSD fuels have a maximum wear scar diameter of 460 micrometers. EMA recommends that the lubricity specification be consistent with the fuel injection equipment manufacturers' recommendation.

---

[15] *See* Truck & Engine Manufacturers Association (EMA) membership webpage, *available at* http://www.truckandenginemanufacturers.org/companies/ (last accessed Nov. 13, 2018).

8/8/2005 Engine Manufacturers Association, Position Paper titled "North American Ultra Low Sulfur Diesel Fuel Properties."

70.     In 2005, the EPA instituted a lubricity requirement for the lower sulfur diesel sold in the U.S. It required sellers of diesel to ensure the fuel meets a minimum lubricity level of a maximum wear scar diameter of 520 microns based on the testing and standard propounded by the American Society for Testing and Materials ("ASTM") D-975. A prudent manufacturer would design or select a fuel injection pump designed for this low lubricity fuel.

71.     Yet, Bosch provided the CP4 Pump for GM's Duramax engines in the 2010 and 2011 model years.  It was no secret to any of them that the Bosch CP4 Pump is inappropriate for diesel vehicles in the U.S. The Bosch CP4 Pump specifications for fuel lubricity allow for a maximum of 460 wear scar. By definition, the 520 wear scar specification of American diesel fuel is inadequate to lubricate the Bosch CP4 Pump.

72.     In order to increase fuel efficiency, GM sold vehicles with a fuel injection pump that was clearly out of specification, having inadequate lubrication for the U.S. market.

73.     The Bosch CP4 Pump multiplies the diesel fuel problem in ways that are catastrophic. But GM chose the Bosch CP4 Pump because it was supposed to improve fuel efficiency by using less fuel. The Bosch CP4 Pump struggles to supply adequate fuel to the engine under the lower pressure of newer engines. The combination of the low volume of fuel, which is under constant suction, and the low lubricity of the fuel, allows cavitation of the fuel. Air pockets form inside the pump during operation. These air bubbles allow metal to rub against metal. GM had achieved greater fuel efficiency at the expense of running the pump dry.

74.     As the Bosch CP4 Pump wears, it sends metal shavings and sometimes even larger particles throughout the fuel system. As the shavings disperse and contaminate the engine and the high-pressure fuel system, the fuse of the proverbial CP4 "time bomb" has been lit, and it is only a matter of time before the entire engine system fails. The catastrophic failure of a CP4 pump requires

repair or replacement of the entire high-pressure fuel system, including the pump, fuel injectors, fuel rails, and injection lines, costing on average $8,000 to $20,000.[16]

75.     Indeed, field incidents involving CP4 implosions in 2011 MY Class Vehicles came rolling in almost as soon as the vehicles were off the assembly line. To be sure, GM has had notice of *scores* of consumer complaints regarding the now-notorious CP4 pump failure, and is notorious for blatantly refusing to take responsibility for its own defective vehicle design. GM, like other automotive manufacturers, not only receives and tracks driver complaints directly from its customers, but also monitors the NHTSA website and other websites to evaluate potential problems affecting its vehicles.

76.     For example, on October 5, 2010, a Duramax Forum member posted the following regarding a nearly brand-new 2011 Chevrolet Silverado 3500 Crew Cab 6.6L Duramax:

> "Ive got 3200 miles on my 2011 3500 srw, crew cab, 4x4, z71, duramax. And ive already got- in my opinion a serious[] problem- it wont start. Cranks and Cranks and cranks. Usually it finally starts. After extensive diagnostic review, the dealer and the chief duramax engineer from gm feel its an Injector Pump issue. . . . Of course the part is back ordered. Any one else had similar issues? Im pretty frustrated."[17]

77.     In the same vein, on October 13, 2013, the owner of a 2011 GMC Sierra HD 2500 posted the following on the diesel enthusiast website TheDieselPageForums.com: "My 2011 GMC 2500HD recently experienced what has been diagnosed at a GM dealership as a high pressure fuel

---

[16] *See, e.g.*, Nov. 18, 2016, "2011-2015 6.6L LML/LGH Duramax Diagnostics," <u>Oregon Fuel Injection, Inc.</u>, at 6, *available at* https://cdn.oregonfuelinjection.com/content/uploads/2016/08/gm-duramax-11-15-diagnostic.pdf (last accessed Nov. 17, 2018) (providing diagnostic tips for addressing CP4 failures and noting, "**Note: The CP4.2 pumps are not as durable as the CP3 pumps. . . . When they fail it is often catastrophic and they send metal particles throughout the high pressure side of the fuel system, causing further damage**").

[17] Oct. 5, 2010, DuramaxForum.com thread post entitled, "2011 Injector Pump failure," *available at* https://www.duramaxforum.com/forum/11-16-lml-duramax-powertrain/72500-2011-injector-pump-failure.html (last accessed Nov. 16, 2018).

pump failure . . . . a bit of a loss of confidence in the reliability of the bullet proof 6600 Durmax here.

. ."[18]   The truck owner went on to note the following diagnosis from his GM service advisor:

> "CONTAMINATED FUEL SYSTEM CAUSED BY HIGH PRESSURE PUMP FAILURE[.] CRANK NO START-SCAN PCM, NO FAILURE CODES. CHECK CRANK SENSOR OPERATION AND CRANKING RPM'S-HAS NORMAL CRANKING SPEED AND RPM'S. CHECK FUEL API RATING-API OF 40. INSPECT FOR FUEL LEAKS AND AIR IN FUEL SYSTEM-NO AIR AND NO FUEL LEAKS. CHECK FUEL PRESSURE WHILE CRANKING...INSTALL PRESSURE GUAGE AT FUEL TEST PORT AND AND PUMP TO 10 PSI WITH FUEL PRIMER PUMP-CRANK ENGINE FUEL PRESSURE DOES NOT DROP. CALL TAC. **INSPECT FUEL PRESSURE REGULATOR AND SENSORS FOR METAL DEBRIS. FOUND FUEL SYSTEM CONTAMINATED WITH METAL FROM HIGH PRESSURE FUEL PUMP**. SEE PIP5133, PIP5151, PIP4949C. . . ."[19]

78.     Similarly, on July 2, 2014, the following customer complaint involving a 2012 GMC Sierra 3500 HD was filed with NHTSA:

> "DRIVING FROM GM DEALER FOR TWO MILES CHANGE FUEL FILTER MESSAGE APPEARED AND ENGINE DIED. TOWED TO A DEALER DIAGNOSED AS A HIGH PRESSURE INJECTOR PUMP FAILURE WITH METAL CONTAMINATION TO FUEL SYSTEM. I HAVE FOUND A BULLETIN DATED 2009 FROM EQUIPMENT MANUFACTURERS. THIS JOINT STATEMENT HAS INFORMATION ABOUT THE FUEL USED IN THE USA THAT I WAS NOT AWARE OF AND MAY HAVE AVOIDED THIS FAILURE. THIS IS A VERY EXPENSIVE REPAIR AS I USE MY TRUCK FOR WORK. *TR"[20]

79.     Likewise, on August 5, 2014, the owner of a 2012 Chevrolet Silverado 2500 filed a complaint with NHTSA about the following incident which occurred on July 11, 2014, in Chualar, California:

> VEHICLE WOULD NOT START. WHEN THEY PUT IT ON SCOPE THEY FOUND THAT THE FUEL RAIL PRESSURE WAS TO LOW. **THEY FOUND METAL SHAVINGS THROUGHOUT THE FUEL SYSTEM AS IF A PART WAS COMING APART FROM THE INSIDE**. THEY HAD TO REPLACE

---

[18] Oct. 30, 2013, TheDieselPageForums.com thread post entitled, "High Pressure Fuel Pump Failure at 50K," *available at* https://www.thedieselpageforums.com/tdpforum/archive/index.php/t-42676.html (last accessed Nov. 17, 2018).

[19] *Id.* (emphasis added).

[20] NHTSA ID No. 10607796.

ENTIRE FUEL SYSTEM FROM PUMP TO INJECTORS PLUS ALL THE LINES AND INJECTION PUMP. THIS VEHICLE IS 2 YEARS OLD. *TR[21]

80.     On December 26, 2014, the following report regarding another 2012 Chevrolet Silverado 2500 was sent to NHTSA:

THE CONTACT OWNS A 2012 CHEVROLET SILVERADO 2500. THE CONTACT STATED THAT WHILE DRIVING AT APPROXIMATELY 35 MPH, THE VEHICLE STALLED. THE VEHICLE WAS NOT ABLE TO RESTART. THE VEHICLE WAS TOWED TO A DEALER, WHO DIAGNOSED THAT THE FUEL PUMP NEEDED TO BE REPLACED. THE TECHNICIAN MENTIONED THAT THE FUEL PUMP FRACTURED AND DEBRIS WENT THROUGH THE FUEL SYSTEM CAUSING INTERNAL DAMAGES. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 47,000.[22]

81.     On February 7, 2015, the following "catastrophic failure" caused by the CP4 pump in a 2012 GMC Sierra Duramax truck was reported to NHTSA:

"**THE FUEL INJECTION PUMP CP4 HAD A CATASTROPHIC FAILURE AS I WAS DRIVING ON A HEAVILY TRAVELED FOUR LANE HIGHWAY**, US RT.20. I LOST POWER STEERING AND BRAKES. I FELT FORTUNATE THAT I WAS NOT TOWING A 16,000 LB. FIFTH WHEEL CAMPER DOWN A MOUNTAIN ROAD.I SAY THIS BECAUSE IT WAS EXTREMELY DIFFICULT TO MAINTAIN CONTROL OVER THE TRUCK STEERING IT AND BRINGING IT TO A CONTROLLED STOP. I HAVE READ ABOUT THESE PUMPS FAILING ON NUMEROUS DIESEL FORD AND GM TRUCKS. I ALSO FEEL IF A WOMAN OR SMALL PERSON HAD THIS HAPPEN TO THEM THE OUTCOME COULD END IN LOSS OF CONTROL RESULTING IN INJURIES EVEN DEATHS. THE ONLY ONE THAT KNOWS THE ACTUAL NUMBER OF PUMPS THAT HAVE FAILED IS THE MANUFACTURERS, WHO WILL NOT SHARE THAT INFORMATION WILLINGLY. *JS"[23]

82.     On May 4, 2015, the following report regarding a 2011 GMC Sierra Duramax HD was filed with NHTSA:

"VEHICLE WAS TRAVELING DOWN ACCESS ROAD COMING UP TO INTERSTATE OFFRAMP. **RIGHT BEFORE YIELD SIGN BOSCH CP4 PUMP FAILED STOPPING MOTOR**. BRAKES AND STEERING AFFECTED. JUST

---

[21] NHTSA ID No. 10619113 (emphasis added).

[22] NHTSA ID No. 10668322.

[23] NHTSA ID No. 10681960 (emphasis added).

1    ENOUGH MOMENTUM TO FIGHT TRUCK INTO ADJACENT PARKING LOT
     RIGHT AFTER RAMP. *TR"[24]

2         83.    On June 29, 2015, the following incident involving a 2011 GMC Sierra 3500 was

3    reported to NHTSA:

         WHILE   DRIVING   UP   HILL   THE   TRUCK   JUST   SHUT   OFF.
         COULD NOT START IT AGAIN. THERE WAS NO WARNING SIGNS
         IT   TOOK   OVER   2   WEEKS   AND   2   DIFFERENT   GM
         DEALERS TO FIGURE OUT IT WAS A FUEL INJECTOR PUMP THAT
         EXPLODED. THERE WERE NO CODES ON THE TRUCKS COMPUTER
         TO   ACKNOWLEDGE   THERE   WAS   ANY   PROBLEM   WITH   THE
         TRUCK   EVEN   AFTER   IT   WOULD   NOT   START.
         COULD HAVE BEEN EXTREMELY DANGEROUS IF OUR CIRCUMSTANCE
         WE'RE DIDFERENT. 5 MILES EARLIER AND WE WOULD HAVE BEEN ON
         AN EXPRESS WAY.[25]

         84.    On October 29, 2015, the following complaint involving a 2013 Chevrolet Silverado

     2500 was reported to NHTSA:

         ON AUG 2, 2015 ABOUT 25 MILES EAST OF GRAND JUNCTION CO. DRIVING
         SPEED WAS ABOUT 65 MPH ON INTERSTAE I-70. MY CHEVY SILVERADO
         2500   WENT   INTO   A   COMPUTER   SHUT   DOWN.BEING   A   SKILLED
         PROFESSIONAL DRIVER , WITH A CLASS A CDL I JUST MADE IT TO THE
         SHOULDER BEFORE TRUCK SHUR DOWN, TRUCK AND TRAVEL TRAILER I
         WAS TOWING NEEDED TO BE TOWED TO ED BOZARTH GM DEALER.ON
         MONDAY I WAS INFORMED WOULD NEED TO PAY $ 775 TO DETERMINE
         POINT OF FAILURE. AT THE TIME A COMPANY CALLED SPEEDCO WAS
         AND MAYBE SUSPECT AS TO CAUSE. THE DID A OIL CHANGE AND FUEL
         FILTER IN W. MEMPHIS AR. THIS SERVICE WAS DONE ON JULY 24,2015. ON
         JULY 25,2015 TRUCK NO START, SPEEDCO CAME OUT WITH ANOTHER
         FUEL FILTER. WHEN FIRST FUEL FILTER TAKEN OFF , THERE WERE NO
         GASKETS. HOWEVER GM APPEARS TO BE CONCELING MATERIAL FACTS
         AS TO INTERNAL SERVICE BULLETINS. THIS BULLETIN AS TO POINT
         FAILER WAS PRINTED AUG 3, 2015 , 5 PAGES . A ESTIMATE BY SAID
         DEALER WAS GIVEN TO SPEEDCO AND MYSELF IN THE AMOUNT OF $
         8,692.02. WHEN THE FUEL INJECTION PUMP WENT , SENT METAL
         SHAVINGS THOUGH MY WHOLE SYSTEM ENGINE, FUEL OIL, COOLING
         SYSTEM ECT. GM HAS KNOW ABOUT THIS PROBLEM FOR A LONG TIME,
         HOWEVER FAILED TO DISCLOSE TO ITS CUSTOMERS. IN MY OPINION TO
         ALLOW FOR WARRANTY TO EXPIRE. ONCE SPEEDCO WAS PRESENTED
         WITH SERVICE BULLETIN THEY BACKED DOWN FROM PAYING. GM HAD

     _____

         [24] NHTSA ID No. 10714457 (emphasis added).

         [25] NHTSA ID No. 10730877.

PROVED TO SPEEDCO THAT GM IS THE PROBLEM. I HAVE CONTACTED GM IN DETRIOIT MANY TIMES WITH DIFFERENT CASE NUMBERS. ONE PHONE CALL I GOT FROM GM , STATED THE ORIGINAL ESTIMATED STATED ABOVE WAS FAR LOW. WHEN I ASKED HOW MUCH, STATED TO ME COULD NOT SAY HOWEVER MUCH HIGHER. I'M IN POSSESSION OF A LOT OF DOCUMENTATION. I HAVN'T SCANED THE DOCUMENTS YET. THIS TRUCK WAS PURCHASED IN OCT. OF 2013 FOR $ 56,000, BANK FINANCING. ALSO THIS TRUCK WAS PURCHASED TO EARN A LIVING PULLING NEW TRAVEL TRAILERS. MY EXCELLENT CREDIT IS ON THE LINE DUE TO THIS LEMOM. TRUCK HAD 20K, WITH WARRANTY.[26]

85.     Similarly, on June 13, 2016, the owner of a 2012 Chevrolet Silverado submitted the following complaint to NHTSA regarding the defective condition:

"I WAS DRIVING DOWN A HIGHWAY ROAD WHEN MY VEHICLE ABRUPTLY LOST POWER, I RECEIVED A WARNING FROM MY DASHBOARD SAYING FUEL FILTER NEEDS REPLACING AND SUBSEQUENTLY LOST ENGINE POWER WHICH RESULTED IN NO POWER STEERING AND NO BRAKES. I WAS ABLE TO KEEP THE VEHICLE UNDER CONTROL AND GOT IT TO THE SIDE OF THE ROAD BEFORE IT BECAME DEAD. **AFTER GETTING THE VEHICLE TOWED TO A GARAGE IT WAS DETERMINED THAT THE CP4 FUEL INJECTION PUMP HAD FAILED RESULTING IN FUEL BEING STARVED FROM THE ENGINE AND THE RESULT WAS THE ENGINE SHUTTING OFF.** THE REPAIRS ALONE FOR THIS SINGLE FAILURE ARE $8550 BECAUSE THIS PUMP HAS FOULED ALL THE FUEL INJECTORS AND REGULATORS IN THE FUEL SYSTEM. MOST IMPORTANTLY THOUGH, I WAS FORTUNATE ENOUGH TO BE IN A POSITION ON HIGHWAY WHERE I HAD NO TRAFFIC BEHIND ME, AND ON A RELATIVELY STRAIGHT ROAD WHERE I WAS ABLE TO GET TO THE CURB BEFORE IT BECOME A BIGGER PROBLEM. FROM WHAT I HAVE FOUND THIS IS BECOMING A COMMON PROBLEM ON ALL OF THE DURAMAX 6.6L LML ENGINES UTILIZING THIS TYPE OF FUEL INJECTION PUMP AND GM NEEDS TO RECALL THESE SYSTEMS AND REPAIR THEM. I DO NOT HAVE THE REPAIR INVOICE YET BECAUSE THE VEHICLE IS STILL BEING REPAIRED BUT WILL BE HAPPY TO SUPPLY IT WHEN I RECEIVE IT."[27]

86.     On December 19, 2016, the owner of a 2012 Chevrolet Silverado 2500 reported the following failure to NHTSA:

"TL* THE CONTACT OWNS A 2012 CHEVROLET SILVERADO 2500. WHILE DRIVING 10 MPH, THE VEHICLE STALLED WITHOUT WARNING. THE VEHICLE WAS TOWED TO THE DEALER TO BE DIAGNOSED. THE CONTACT

---

[26] NHTSA ID No. 10787120.

[27] NHTSA ID No. 10873931 (emphasis added).

WAS INFORMED THAT THERE WAS METAL CONTAMINATION IN THE FUEL SYSTEM DUE TO A FUEL PUMP FRACTURING IN THE FUEL TANK. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 130,000."[28]

87.     On December 28, 2016, the owner of a 2016 GMC Sierra 2500 reported the following to NHTSA regarding an incident that occurred on November 27, 2016:

"TL* THE CONTACT OWNS A 2016 GMC SIERRA 2500. WHILE DRIVING APPROXIMATELY 15 MPH, THE ENGINE STALLED WITHOUT WARNING. THE VEHICLE WAS TOWED TO A DEALER WHERE IT WAS DIAGNOSED THAT THE FUEL INJECTOR PUMP FAILED AND NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED. THE MANUFACTURER WAS INFORMED OF THE FAILURE. THE VIN WAS UNKNOWN. THE APPROXIMATE FAILURE MILEAGE WAS 11,000."[29]

88.     Likewise, on January 9, 2017, the owner of a 2013 GMC Sierra 2500 submitted the following complaint to NHTSA regarding the defective condition:

"**BOSCH CP4 FUEL PUMP FAILURE**. PLEASE REFERENCE EA11-003 AND FIND THE SAME FUEL PUMPS THAT WERE FOUND TO FAIL ON AUDI/VW VEHICLES ARE ALSO USED ON GM, FORD, AND DODGE VEHICLES. SAID PUMP FAILED DURING DRIVING WITHOUT WARNING CAUSING COMPLETE ENGINE SHUTDOWN AND LOSS OF POWER. CERAMIC AND METAL INTERNALS OF THE PUMP DISINTEGRATED AND TRAVELED THROUGH THE FUEL SYSTEM, SUBSEQUENTLY CAUSING THE INJECTORS TO FAIL. SIMILAR TO THE FINDINGS IN EA11-003, PAGE 16 PARAGRAPH 2, THE REPAIR IS TO COST APPROXIMATELY $10,000 TO FIX THE ENTIRE FUEL SYSTEM. *TR"[30]

89.     Similarly, on March 15, 2017, the owner of a 2012 Chevrolet Silverado 3500 submitted the following complaint to NHTSA regarding the defective condition:

"WHILE DRIVING ON A FOUR-LANE HIGHWAY TOWING OUR 15,500 LB FIFTH WHEEL, SUDDENLY, WITHOUT ANY WARNING, WE HEARD RATTLING, LOST POWER, AND THE ENGINE SHUT DOWN. THE NOISE AND LOSS OF PROPULSION, POWER STEERING AND POWER BRAKES ALL OCCURRED WITHIN ABOUT 2-3 SECONDS. GRATEFULLY, THE DRIVER HAD THE FORTITUDE TO IMMEDIATELY BEGIN PULLING ONTO THE SHOULDER OF THE SLIGHT DOWNWARD SLOPE ON WHICH WERE [SIC]

---

[28] NHTSA ID No. 10936256.

[29] NHTSA ID No. 10937972.

[30] NHTSA ID No. 10943828 (emphasis added).

DRIVING. LUCKILY, WE WERE ON A STRETCH OF ROAD THAT WAS NOT INCLINED, NOT IN A CONSTRUCTION ZONE WITH BARRIERS, NOT IN A SNOWY MOUNTAIN PASS OR IN OTHER INCLEMENT WEATHER, NOT IN THE LEFT LANE PASSING, ETC. HAD ANY OF THESE FACTORS PREVENTED US FROM SIMPLY PULLING ONTO THE SHOULDER OF THE ROAD, THE POTENTIAL FOR A LIFE THREATENING ACCIDENT WOULD HAVE BEEN SIGNIFICANT. **THE CHEVROLET/GM SERVICE CENTER CONFIRMED THE BOSCH CP4 HPFP SUFFERED A CATASTROPHIC FAILURE, DESTROYING THE ENTIRE FUEL SYSTEM OF THE TRUCK.** GM IS COVERING PART OF THE REPAIR COSTS (TRUCK IS AT 119,705 MILES), BUT OUR BILL WILL REMAIN SUBSTANTIAL. RESEARCH OF DIESEL, TDI, AND OTHER FORUMS DOCUMENT THIS PROBLEM AS WELL-KNOWN AND BROADER THAN THE EXISTING 9 COMPLAINTS IN THE NHSTA PUBLIC DATABASE AND THE INVESTIGATION OF VW/AUDI. SOME PEOPLE ARE EVEN REPORTING MULTIPLE FAILURES. THE MOST COMMON BELIEVABLE CAUSE OF THE FAILURES SEEMS TO BE A MISMATCH OF LUBRICITY SPECS BETWEEN THE BOSCH CP4 AND THE DIESEL FUEL IN THE U.S. PLEASE OPEN AN INVESTIGATION, AND ORDER GM, FORD, VW, BOSCH AND OTHERS TO RECALL THESE VEHICLES TO PROVIDE THE NECESSARY REPAIRS. ALSO PLEASE MANDATE, TO THE EXTENT YOU'RE ABLE, REIMBURSEMENT TO THOSE OF US PAYING FOR REPAIRS TODAY. I HAVE READ, BUT HAVE NOT BEEN ABLE TO CONFIRM, THAT VW EXTENDED THE WARRANTY TO 120K MILES. THIS SEEMS LIKE A MINIMUM (MORE IS BETTER) STEP, AND IT SHOULD BE RETROACTIVE."[31]

90.     On May 26, 2017, the owner of a 2012 GMC Denali Duramax Sierra 2500 posted the following on DuramaxForum.com:

"So I have a 2012 GMC Denali Duramax with 116k on the odometer. A couple of weeks it just stopped working while driving. We had it towed to the dealer and they took a look at it and stated the fuel pump 'blew' up and contaminated the entire fuel delivery system. They want to replace the entire fuel system as well as put in an 'upgraded' GM pump for about $7100."[32]

91.     In the same vein, diesel truck owners in the online forum DieselPlace.com lamented their woes in the following conversation thread entitled, *"Have they fixed the CP4 issue yet?"*

- "[My 2015 GMC LML] just blew up at 68k. Sent metal through the whole fuel system. [$]10.5K to fix."

---

[31] NHTSA ID No. 10966092 (emphasis added).

[32] May 26, 2017, DuramaxForum.com thread entitled, "Injection CP4 pump failure," *available at* https://www.duramaxforum.com/forum/11-16-lml-duramax-powertrain/909393-injection-cp4-pump-failure.html (last accessed Nov. 7, 2018).

- "There is nothing NORMAL about a +$10k repair bill. . . . If CP4s failed like CP3[']s nobody would be talking about it. But the fact they puke with no [failsafe] is the real issue. When people are having to take out 2nd mortgages to get their truck repaired there's a problem with that."[33]

92.     Along these same lines, in January 2015, the owner of a 2015 GMC Sierra 3500 began a thread on the DuramaxForum.com stating as follows:

"I have a new 2015 GMC 3500 with 14k miles that the injection pump crapped out on me. Dealer has had it for 3 1/2 weeks. Was told if they find any metal they would have to tear the engine down. Well they found metal but didn't tear it all the way down. Has anyone else had an issue [with] the injection pump on the 2015 Duramax[?]"[34]

93.     Shortly thereafter, the following response comes in from a fellow DuramaxForum.com user: "[L]ots of LML's have had injector pump issues in the states[,] go down to the LML [forum] and read, it[']s caused by the new cp4.2 pump that needs better fuel then what you can buy."[35]

94.     Notably, the initial complainant then explained how he finally got his truck back after a series of fuel line/tank line/chassis line flushes and replacements by the dealership, including a fuel pump injector replacement: "[I]t was around [an $]8000.00 job and that was warranty price."[36] One DuramaxForum.com user aptly responded, "To[o] bad the dealers won[']t just install a cp3 instead of the crappy cp4 when these go out in the lml[]s. It only makes sense!!!"[37]

95.     Along the same lines, on August 3, 2017, the owner of a 2012 Chevrolet Silverado 2500 submitted the following complaint to NHTSA regarding the defective condition:

"**BOSCH CP4.2 FUEL PUMP MALFUNCTIONED AND CONTAMINATED THE ENTIRE FUEL AND INJECTION SYSTEM WITH METAL SHAVINGS.** THE TRUCK ENGINE STOPPED WHILE TRAVELING AT 50 MPH ON A CITY

[33] https://www.dieselplace.com/forum/63-gm-diesel-engines/365-duramax-fifth-generation-2011-2016-lml/794162-have-they-fixed-cp4-issue-yet.html (last accessed Nov. 3, 2018).

[34] *See* https://www.duramaxforum.com/forum/general-discussion/560786-2015-duramax-injection-pump-troubles.html (last accessed Nov. 3, 2018).

[35] *See id.*

[36] *Id.*

[37] *Id.*

STREET AND LEFT ME WITH NO POWER STEERING. THE ENTIRE FUEL SYSTEM NEEDS TO NOW BE REPLACED AND NOT COVERED BY THE MANUFACTURER. REPAIR BILL OF OVER $7,000."[38]

96.    On November 13, 2017, the following incident involving a 2014 GMC Sierra 2500HD Duramax truck was filed with NHTSA:

"MY FUEL PUMP AND INJECTORS FAILED WHILE I WAS DRIVING, STRANDING MY TRUCK IN THE MIDDLE OF TRAFFIC RIGHT WHERE A CITY STREET WAS CHANGING TO A COUNTRY ROAD. THE GMC DEALERSHIP FALSELY CLAIMED THAT THIS WAS CAUSED BY USING UNAPPROVED FUEL. THE FUEL I USED WAS B20 BIODIESEL, WITH 80% RENEWABLE DIESEL, WHICH MEETS DIESEL SPECIFICATIONS AND IS A LEGAL ROAD FUEL IN CALIFORNIA. THEY ALSO CLAIMED THAT A CASCADE OF OTHER PROBLEMS WERE ALL CAUSED BY MY FUEL AND REFUSED TO APPLY MY WARRANTY."[39]

97.    On April 10, 2018, the following customer complaint involving a 2016 Chevrolet Silverado 3500 diesel truck was filed with NHTSA:

"TL* THE CONTACT OWNS A 2016 CHEVROLET SILVERADO 3500. WHILE DRIVING 40-45 MPH, THE REDUCED ENGINE SPEED WARNING INDICATOR ILLUMINATED AND THE VEHICLE STALLED. THE CONTACT WAS UNABLE TO RESTART THE VEHICLE. THE VEHICLE WAS TOWED TO HERB EASLEY MOTORS (1125 CENTRAL E FWY, WICHITA FALLS, TX 76306, (940) 723-6631) WHERE IT WAS DIAGNOSED THAT THE FAILURE WAS DUE TO CONTAMINATION OF METAL SHAVINGS IN THE FUEL PUMP AND FUEL RAILS. IN ADDITION, THE FAN CLUTCH FAILED AND NEEDED TO BE REPLACED, INCLUDING THE ENTIRE FUEL SYSTEM. THE VEHICLE WAS REPAIRED, BUT THE FAILURE RECURRED SEVERAL MONTHS LATER. THE VEHICLE WAS TAKEN BACK TO THE DEALER WHERE IT WAS DIAGNOSED THAT THE FUEL SYSTEM NEEDED TO BE REPLACED AGAIN. THE VEHICLE WAS NOT REPAIRED DUE TO COST. THE MANUFACTURER WAS NOTIFIED OF THE FAILURES AND CASE NUMBER: 8-4064184145 WAS OPENED. THE APPROXIMATE FAILURE MILEAGE WAS 38,000."[40]

98.    On April 17, 2018, the following report was submitted to NHTSA on behalf of the owner of a 2013 GMC Sierra 3500:

---

[38] NHTSA ID No. 11012551 (emphasis added).

[39] NHTSA ID No. 11045708.

[40] NHTSA ID No. 11084287.

1

2

3

4

5

"TL* THE CONTACT OWNS A 2013 GMC SIERRA 3500. THE CONTACT STATED THAT THE VEHICLE FAILED TO START. THE VEHICLE WAS TOWED TO KUHIO CHEVROLET CADILLAC HYUNDAI NISSAN (3033 AUKELE ST, LIHUE, HI 96766, (808) 245-6731) WHERE IT WAS DIAGNOSED THAT THE FUEL PUMP AND INJECTORS FAILED AND NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS CONTACTED AND DID NOT ASSIST. THE APPROXIMATE FAILURE MILEAGE WAS 34,500. THE VIN WAS NOT AVAILABLE."[41]

6

7

99.     On November 12, 2018, the owner of a 2011 Chevrolet Silverado 2500 submitted the following complaint to NHTSA regarding the defective condition:

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

"I WAS TRAVELING TO WORK IN THE FAST LANE OF THE FREEWAY WHEN I HEARD A FAINT SQUEALING NOISE AND THE TRUCK SUDDENLY STARTED RUNNING ROUGH. I BEGAN CROSSING ALL 4 LANES AND BY THE TIME I MADE IT TO THE [SIC] SLOW LANE THE TRUCK COMPLETELY DIED. I WAS ABLE TO SAFELY COAST OFF OF THE FREEWAY DUE TO MY QUICK REACTION AND LACK OF TRAFFIC AT THE TIME, BUT THE SITUATION WAS VERY DANGEROUS AND COULD HAVE BEEN MUCH MORE SO WITH HEAVIER TRAFFIC OR A LESS AWARE DRIVER. **LATER DIAGNOSIS AT THE CHEVROLET DEALERSHIP TOLD ME THAT THE CP4 FUEL PUMP DISINTEGRATED INSIDE. AFTER SPEAKING WITH THE DIESEL TECHNICIAN AT THE DEALER I LEARNED THAT IT IS A VERY COMMON PROBLEM AND THE REPAIR COMES WITH A $10,000 PRICE TAG.** I WAS ALSO VERY SURPRISED THAT THERE HAS NEVER BEEN A RECALL FOR THIS PROBLEM AND GM CONTINUED TO USE THEM UNTIL 2017...7 YEARS! MY TRUCK IS A 2011 WITH ONLY 54K MILES, AND THEY JUST FIXED A 2017 WITH ONLY 7K MILES! I HAVE SINCE DONE A LOT OF RESEARCH FINDING HUNDREDS OF LOW MILEAGE GM DURAMAX DIESEL BETWEEN 2011-2017 WITH THE EXACT SAME FAILURE. I WAS ABLE TO GET THE BOTTOM OF THE FAILURE ITSELF AND I FOUND THE FOLLOWING...THE BOSCH CP4 FUEL PUMPS THAT WERE USED IN THESE TRUCKS (ALSO FOUND IN LATE FORD AND VW DIESELS) ARE MADE IN EUROPE TO DIFFERENT SPECIFICATIONS. THE PUMPS RELY ON LUBRICANT FOUND IN DIESEL #1 TO OPERATE SMOOTHLY AND LAST A LONG TIME. HERE IN THE U.S. WE ONLY HAVE DIESEL #2 WHICH LACKS THAT LUBRICANT AND CAUSES THE INTERNAL PARTS OF THE PUMP TO DISINTEGRATE SENDING METAL SHAVINGS THROUGHOUT THE ENTIRE FUEL SYSTEM. THIS IS WHY THE REPAIR AVERAGES $10,000 ACROSS THE COUNTRY, THE ENTIRE FUEL SYSTEM BECOMES CONTAMINATED AND HAS TO BE REPLACED. I CONTACTED GM AND THEY DON'T BELIEVE THIS IS A SAFETY ISSUE. A VEHICLE SUDDENLY DIEING WITH SECONDS NOTICE ON THE FREEWAY IS CERTAINLY A SAFETY ISSUE IN MY EYES.

26

27

[41] NHTSA ID No. 11088735.

28

ESPECIALLY WHEN IT'S A COMMON FAILURE THAT CAN BE PREVENTED."[42]

100.    Notably, in August 2014, GM issued an internal "Preliminary Information" service bulletin to dealers—but *not* consumers—regarding the following vehicles equipped with the 6.6L Duramax Diesel RPO codes LGH and LML: 2010-15 Chevrolet Express van, 2010-15 Chevrolet Silverado, 2010-15 GMC Savana van, and the 2010-15 GMC Sierra.[43] The bulletin's subject was, "Duramax Diesel Hard Start No Start P0087 P0088 P0191 P128E Or Injection Pump Replacement," and stated that if a customer with one of the aforementioned vehicles came into a dealership with "a hard start or a no start" problem, and the normal diagnostic procedure led the dealer to conclude that fuel injection pump replacement was necessary, "Fuel Pressure Regulator 1 must be inspected for magnetic metal debris" as well.[44] In other words, simply replacing the fuel injection pump would not completely solve the problem because metal shavings would have contaminated the entire fuel injection system. The bulletin directed dealers to remove the fuel injection pump and pressure regulator and "inspect[] for magnetic metal debris," and if metal debris was found, GM required its dealers to retain the affected fuel system components which "will be requested back for an engineering inspection."[45] The following photographs of a contaminated fuel pressure regulator were

---

[42] NHTSA ID No. 11150932 (emphasis added).

[43] *See* Aug. 2014 GM Service Bulletin PIP4949D, Preliminary Information regarding "Duramax Diesel Hard Start No Start P0087 P0088 P0191 P128E Or Injection Pump Replacement," *available at* https://static.nhtsa.gov/odi/tsbs/2014/SB-10044240-3551.pdf (last accessed Nov. 18, 2018).

[44] *Id.* at 1.

[45] *Id.* at 1, 3.

provided as examples of the condition having manifested – and metal shavings can be seen throughout:[46]

 

101.    Rather than issue a recall, in March 2017 GM went on to reissue the Preliminary Information as Technical Service Bulletin #16-NA-102, expanding the affected model years to include the 2016 model year.[47]

102.    Tellingly, GM stopped equipping the Class Vehicles with the CP4 pump after the 2016 model year, opting instead for the Denso HP4 fuel injection pump[48] – a design that has been available for medium and large-sized trucks since at least the 2004 model year.[49]

---

[46] *Id.* at 2-3.

[47] Mar. 2, 2017, GM Technical Service Bulletin #16-NA-102: Duramax Diesel Hard Start, No Start, DTCs P0087, P0088, P0191, P128E or Injection Pump Replacement, Document ID: 4474673, *available at* https://f01.justanswer.com/Bluegorilla/53288260-1d95-4c61-94ef-9cbd4868f4c1_My_Boot_Camp_printed_document.pdf (last accessed Nov. 18, 2018).

[48] *See*, *e.g.*, Nov. 1, 2017, "Everything You Need to Know About the 2017 Silverado HDS," Ultimate Diesel Builder's Guide, *available at* https://www.pressreader.com/usa/ultimate-diesel-builders-guide/20171101/281535111145444 (last accessed Nov. 18, 2018) ("Breaking away from Bosch for the first time, the [2017] L5P Duramax makes use of a high-pressure common-rail fuel system from Denso.  At the heart of the system rests a Denso HP4 injection pump. . .").

[49] *See*, *e.g.*, Sept. 2007 Denso Diesel Injection Pump Service Manual for Common Rail System (CRS) Operation, Sec. 1.5 ("Common Rail System And Supply Pump Transitions"), *available at* http://steldiesel.ru/files/crdensoservismanual.pdf (last accessed Nov. 18, 2018) ("In 2004, the three-cylinder HP4 based on the HP3 was introduced"); Dec. 2013 Denso Diesel Systems & Diagnostics, Technical News Bulletin, Issue 1, at 1, *available at* http://www.denso.ro/media/151806/2013_technical-service-bulletin_no-01.pdf (last accessed Nov. 18, 2018) (showing different types of Denso high-pressure pumps and their range of applications, including the HP4, beginning in the 2004 2nd Generation Common Rail System).

103.    Despite its knowledge of the defect, GM has concealed the problem from drivers and potential customers alike. GM has never warned consumers at the point of sale or lease (nor instructed its dealerships to do so) and has made no effort to alert drivers to the risk of stalling that may result. As a result, drivers are unaware that they are driving unsafe vehicles and consumers are deprived of the right to make informed purchasing and lease decisions taking into account the available information at the time of purchase or lease.

104.    As GM also knows, the defect is not reasonably discoverable by consumers unless they experience the stalling or other symptoms firsthand and thus are exposed to the attendant safety risks. While vehicles with similar defects have been the subject of voluntary safety recalls—which by law requires notification to owners and lessees of the danger—GM has conducted no such recall, instead profiting from the sale and lease of defective vehicles through the 2016 model year and continuing to profit from resulting repairs at its authorized dealerships.

105.    Given the severity and the safety risks posed by the defect, GM either should not have sold or leased Plaintiffs and class members their vehicles or it should have prominently disclosed— both in a written disclosure to be acknowledged in writing by Plaintiffs and class members and through an oral disclosure to be given by GM's authorized dealerships—that the vehicles are prone to stalling, including at highway speeds.

**E.      Supposed "Remedies" are Insufficient and Costly.**

106.    Because of its incompatibility with U.S. diesel fuel, CP4 pumps and corresponding fuel injection systems, even when replaced or "fixed," will continue to fail in the Class Vehicles. Indeed, in a June 2010 email chain between Bosch and representatives of Audi and Volkswagen regarding the failure of a CP4 pump in a 2010 Audi A3 TDI, Audi asked Bosch, "[W]hy are the defects mentioned below still present after replacing the high-pressure pump and the injector? What could the [dealer] have done wrong by way of incorrect repair so that such defects are appearing?" Bosch responded that "In this case the complete fuel system (HPP, rail, injectors, **all** lines) need to be changed. . . .  I assume that because of the 'cruncher,' the entire system is contaminated with chips, which are then pumped in circulation and can soon lead to the next failure! The rough running can be

explained by the fact that a chip is already present before or in the injector and is impairing its function."[50]

107.    The Bosch CP4 Pump problem is so prevalent that several automotive manufacturers now provide kits to mitigate the inevitable harm. "Disaster Preventer Kits" or "bypass kits" usually refer to a fuel bypass system that does not prevent the failure, the loss of the expensive injection pump, or the need to clean metal shavings from the fuel system. But these kits are designed to redirect the lubricating fuel for the CP4 back to the fuel tank, so that it will be filtered before it returns to the engine. The bypass kit directs the fuel contaminated with metal shavings into the gas tank, which is less expensive to clean than the engine and high-pressure fuel system – in other words, a "Band-Aid" solution. These bypass kits are also less expensive than more complete remedies, requiring only $300-$400 in parts, and are marketed as having the ability to "[p]revent CP4 failures from contaminating the high pressure fuel system."[51] Many consumers have turned to this sort of remedy preemptively due to the known impending failures their vehicles are facing.

108.    Another method of addressing the Bosch CP4 Pump failure is to modify the Class Vehicles to return to the older, more reliable technology of simply using more fuel. With Duramax engines, the strategy may be simply to buy a predecessor CP3 pump from an independent automotive parts vendor and install it in place of the Bosch CP4 Pump. Indeed, the CP4 pump is so substandard that many Class Vehicle owners have opted to replace their CP4 pumps with CP3 pumps at a cost of at least $3,000 per vehicle for the replacement parts alone.[52] Resorting to this "remedy" fails to make

---

[50] Mar. 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 79-80 (Jun. 7-9, 2010 email chain between Bosch, Audi, and Volkswagen representatives regarding CP4 fuel pump failure falsely attributed to "misfuel").

[51] Online sales listing for "2011-2016 LML CP4 Fuel Bypass Kit," PerformanceFueled.com, *available at* http://performancefueled.com/cp4-fuel-bypass-kit/ (last accessed Nov. 16, 2018).

[52] *See, e.g.*, http://www.engineered-diesel.com/lml-duramax-cp3-conversion-kit-with-re-calibrated-pump-50-state-carb-certified (selling "LML Duramax CP3 Conversion Kit with re-calibrated Pump[s]" for $3,000.00 and noting that the "[k]it is designed to replace the less reliable CP4 that comes stock on the LML"); https://www.dieselpowerproducts.com/p-15627-industrial-injection-436403-cp4-to-cp3-injection-pump-conversion-kit-tuning-required-11-16-66l-gm-

consumers whole because they are not getting the fuel efficiency promised with the Bosch CP4 Pump, and for which they paid a premium. Further, consumers are having to pay thousands of dollars out of pocket to essentially redesign a design flaw that was implemented by GM in the Class Vehicles.

109.    Another potential "remedy" is to leave the CP4 in place on the Class Vehicle, but install a lift pump, a second pump to assist the Bosch CP4 Pump and increase the fuel pressure. But, again, this "remedy" deprives consumers of the fuel-efficiency for which they paid a premium.

110.    The lift pump and CP3 pump options remedy part of the problem by pumping and burning more fuel. So, in addition to the expense of buying a new fuel injection pump, the "remedies" would require owners to purchase more fuel.

111.    A fourth way to mitigate the damage is to spend money for fuel additives to increase the lubricity of the fuel. This approach may work best in conjunction with the previously discussed modifications, but even by itself, it can be expensive.

112.    In short, there is no known way to remedy or mitigate CP4 pump failure without decreasing the fuel efficiency promised to Plaintiffs and other Class members and without significant expense to Plaintiffs and other Class members.

**F.    GM Knew Durability and Superiority Were Material to Consumers and Made Hollow Promises of Durability and Superiority.**

113.    When it first came on the scene in 2010, GM announced that its new 6.6 liter Duramax V-8 diesel engine for 2011 model year Chevrolet Silverado and GMC Sierra heavy duty trucks would be 11 percent more fuel efficient than its previous Duramax diesel engines, with "a

---

duramax-lml.aspx (selling an "Industrial Injection CP4 to CP3 Injection Pump Conversion Kit" for 2011-2016 6.6L GM Duramax LML and noting, "With the release of the LML Duramax in 2011, GM made the switch from the reputable CP3 injection pump to the lower output CP4 pump, simply because they deemed it was 'good enough.' Is 'good enough' good enough for you and your truck? We've seen numerous failures on the CP4 on stock trucks, let alone even slightly modified trucks that chew them up and spit them out. Industrial Injection has this complete conversion kit that delivers everything you need to swap out your failure prone CP4 to a dependable CP3").

mind-blowing 765 pounds-feet of torque."[53] In a press release, GM's chief Duramax engineer, Gary Arvan, proclaimed, "[W]e've enhanced the Duramax to make it one of the most competitive engines in the segment – one that takes performance and fuel economy to the next level. Whether it's a new Sierra Denali HD or an ambulance based on a Sierra chassis cab, customers will find the Duramax is the power behind the greater capability these trucks offer."[54]

114.    GM's 2011 Chevrolet Silverado HD truck brochure boasted of an eleven-percent increase in fuel efficiency while claiming the durability of its predecessors, "PROVEN DURABILITY[:] The Duramax-Allison combination continues to build on its proven reliability."

115.    GM's 2011 Chevrolet Silverado HD brochure further emphasized that GM had "engineered the new 2011 Silverado HD with durable, advanced technology that makes this [their] **most powerful heavy-duty ever.**" GM also provided an express "100,000 mile/5-year Powertrain Warranty to guarantee the quality." The brochure further stated "[t]he new Silverado HD. From Chevrolet – the most dependable, longest-lasting full-size pickups on the road."

116.    Moreover, this brochure expressly stated that the Duramax diesel engine in the 2011 Silverado could run on "B20 biodiesel. . . which is composed of 20% biodiesel mixed with regular diesel:"[55]

---

[53] Mar. 9, 2010, "GM Announces Best-in-Class Power Figures for 2011 6.6-liter Duramax V-8 Diesel," PickupTrucks.com, *available at* https://news.pickuptrucks.com/2010/03/gm-announces-best-in-class-power-figures-for-2011-duramax-v8-diesel.html (last accessed Nov. 17, 2018).

[54] Mar. 10, 2010, "GMC's 2011 Heavy-Duty Trucks Build on Proven Heritage with New Duramax 6.6L Turbo Diesel Engines," GM Pressroom, *available at* https://media.gm.com/media/us/en/gmc/vehicles/sierra_hd/2011.detail.html/content/Pages/news/us/en/2010/Mar/0310_gmc_sierra_hd/0310_duramax.html (last accessed Nov. 17, 2018).

[55] 2011 Chevrolet Silverado HD Vehicle Brochure, at 5, *available at* http://www.auto-brochures.com/makes/Chevrolet/Silverado/Chevrolet_US%20SilveradoHD_2011.pdf (last visited Nov. 16, 2018).





117.     Likewise, for the 2012 GMC Sierra HD, GM actively touted the Duramax diesel

engine's "advanced" high-pressure diesel direct injection system "that helps it start in as little as 3.0

seconds . . . [and] can give you a maximum highway range of up to 680 miles on a single fill-up,

thanks to its extra-large 36-gallon fuel tank:"[56]

---

[56] 2012 GMC Sierra Vehicle Brochure, at 28, *available at*
https://cdn.dealereprocess.net/cdn/brochures/gmc/2012-sierra.pdf (last accessed Nov. 16, 2018).

**HEAVY DUTY ENGINES**

**VORTEC 6.0L V-8 VVT (L96)** For strong, steady power at a standstill to bold acceleration on the highway, the 6.0L V-8 is up to the task and then some. Thanks to VVT technology, this engine can dig in at low speed to move a cabin cruiser up a boat ramp without complaint. It can just as easily apply its full power for safe highway passing or offer up the muscle to conquer a steep grade.

**Vortec 6.0L V-8 VVT (L96)**
HORSEPOWER: 360 hp @ 5400 rpm          TORQUE: 380 lb-ft @ 4200 rpm
FlexFuel Capable



**E85 FLEXFUEL CAPABILITY**[2] To give you more choices at the pump for 2012, the 6.0L V-8 (L96) is capable of running on E85 ethanol. This advanced biofuel is a mostly renewable fuel that burns cleaner than gasoline and helps to reduce the need for imported oil.

**DURAMAX DIESEL 6.6L V-8 TURBO** For off-the-chart horsepower and torque with off-the-map range, the choice is Duramax. With advanced diesel direct-injection technology that helps it start in as little as 3.0 seconds at –40°F and a sophisticated Allison transmission with overdrive, this available powertrain can give you a maximum highway range of up to 680 miles on a single fill-up, thanks to its extra-large 36-gallon fuel tank.

**Duramax Diesel 6.6L V-8 Turbo**
HORSEPOWER: 397 hp @ 3000 rpm          TORQUE: 765 lb-ft @ 1600 rpm

**DURAMAX B20 BIODIESEL CAPABILITY** To reduce carbon-dioxide emissions and stretch your fuel budget further, the Duramax 6.6L is engineered to operate on B20 biodiesel, a mixture of 20 percent biodiesel produced from domestic, renewable resources, and 80 percent petroleum diesel.

**DURAMAX HIGH-PRESSURE DIRECT INJECTION** For fast starts in cold weather, quieter operation and maximum efficiency, the direct injection system operates at nearly 30,000 psi to turn heavy diesel fuel into a fine mist, burning clean and fast with lower emissions and greater power than the previous model.

118.    GM's 2012 Chevrolet Silverado HD brochure highlights the "dependable, long-lasting workhorse of a truck that comes with the best coverage of any size pickup –a 100,000 MILE/5-YEAR POWERTRAIN WARRANTY. Because [they know] it's one thing to talk quality and quite another to back it up:"[57]

_____
[57] 2012 Chevrolet Silverado Vehicle Brochure, at 3, *available at* https://cdn.dealereprocess.net/cdn/brochures/chevrolet/2012-silveradohd.pdf (last accessed Nov. 16, 2018).



119.    GM's 2013 Chevrolet Silverado HD brochure underlined the depth of their heritage and passion for what they do at Chevrolet. Chevrolet's brochure indicated that it is "ingrained in the bold design, spirited performance, proven durability, and exceptional value [their] drivers enjoy."[58] Moreover, GM touted its 2013 1500 HD trucks as the "most dependable[,] longest-lasting full-size pickups on the road:"[59]

---

[58] 2013 Chevrolet Silverado Vehicle Brochure, at 2, *available at* https://cdn.dealereprocess.net/cdn/brochures/chevrolet/2013-silverado1500.pdf (last accessed Nov. 16, 2018).

[59] *Id.* at 4 (last accessed Nov. 16, 2018).

1
2
3
4
5
6
7
8
9



10    120.    GM's 2014 Chevrolet Silverado HD brochure emphasized that consumers could

11 "EXPECT THE BEST" and guaranteed that, "every Silverado 2500HD and 3500HD is backed by

12 the Best Pickup Coverage in America, including a 100,000-mile/5-year Powertrain Limited Warranty

13 and 24,000-mile/2-year scheduled maintenance. That's long-lasting dependability you can believe

14 in."[60]

15    121.    For the 2015 Chevrolet Silverado HD, which GM touted as "our most advanced

16 heavy-duty pick-up ever," GM's vehicle brochure proclaimed, "You don't get to be part of the most

17 dependable, longest-lasting full-size pickups on the road by tampering with what works. You build

18 on proven success. You make your best even better:"[61]

19
20
21
22
23
24

_____

25    [60] 2014 Chevrolet Silverado HD Vehicle Brochure, at 2, *available at*
https://cdn.dealereprocess.net/cdn/brochures/chevrolet/2014-silverado2500hd.pdf (last accessed Nov.
26 16, 2018).

27    [61] 2015 Chevrolet Silverado HD Vehicle Brochure, at 3, *available at*
https://www.gmcertified.com/PDFs/ModelLibrary/Chevrolet/Silverado%20HD/2015-Chevrolet-
28 Silverado-HD.pdf (last accessed Nov. 16, 2018).

122.     Likewise, GM touted the longevity and reliability of the Duramax 6.6L Turbo-Diesel engines in 2016 Chevrolet Silverado HD 2500 and 3500 vehicles by proclaiming that, "There are over 1 million Duramax diesels with Allison transmissions on the road today with over 100 billion miles of experience. . . . [The] Duramax Turbo-Diesel engine lets Silverado HD offer you best-in-class maximum conventional towing capability. That's power you can trust to go the distance."[62]

123.     GM similarly touted the capability of the 2011 Chevrolet Express van by noting that its new 6.6L Duramax diesel engine had "up to 11-percent greater fuel economy" than previous models, along with a "new 30,000-psi (2,000 bar) piezo-actuated fuel injection system – capable of operating on ASTM grade B20 biodiesel – ensur[ing] more precise fuel delivery, improving emission performance."[63]

124.     Likewise, GM advertised the 2011 GMC Savana van as having a "new Duramax 6.6L turbo diesel" engine that was "more fuel-efficient – up to 11-percent greater fuel economy than the outgoing model," as well as having a "new 30,000-psi (2,000 bar) piezo-actuated fuel injection

---

[62] 2016 Chevrolet Silverado HD Vehicle Brochure, at 9, *available at* https://www.gmcertified.com/PDFs/ModelLibrary/Chevrolet/Silverado%20HD/2016-Chevrolet-Silverado-HD.pdf (last accessed Nov. 17, 2018).

[63] "2011 Chevrolet Express Offers Powerful Duramax Diesel in 3500 Passenger Vans, Greater Connectivity," GM Pressroom, *available at* https://media.gm.com/media/us/en/chevrolet/vehicles/express-psgr/2011.html (last accessed Nov. 17, 2018).

system – capable of operating on ASTM grade B20 biodiesel – ensur[ing] more precise fuel delivery, improving emission performance."[64]

125.    GM also provided an express 60-month, 100,000-mile written warranty with the Class Vehicles it manufactured.

126.    GM has repeatedly refused to honor its warranties, deviously claiming that the metal shavings caused by the failures of their pump design voided the warranty because they also caused fuel contamination.

127.    GM induced Plaintiffs and other Class members to pay a premium for increased durability, performance and fuel efficiency, with a design GM has long known would cause fuel contamination—a condition GM now uses to absolve itself of the catastrophic and costly consequences to Plaintiffs and other Class members.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

128.    As of the date of this Complaint, GM continues to market the Class Vehicles based on superior durability, performance, and fuel efficiency, despite its knowledge that the Class Vehicles are defective and have failed or will fail—in fact, GM still has not disclosed and continues to conceal that the Class Vehicles are defective, incompatible with American diesel fuel, and will experience catastrophic and costly failure.

129.    Until shortly before the filing of this Complaint, Plaintiffs and other Class members had no way of knowing about GM's wrongful and deceptive conduct with respect to their defective Class Vehicles.

130.    With respect to Class Vehicles that have not experienced CP4 pump failure, Plaintiffs and other Class members did not discover and could not reasonably have discovered that their Class Vehicles are defective, that their Class Vehicles are out of specification and incompatible with American diesel fuel, that this incompatibility has resulted in the breakdown of fuel components and

---

[64] "2011 GMC Savana Offers Powerful Duramax Diesel in 3500 Passenger Vans, Greater Connectivity," GM Pressroom, *available at* https://media.gmc.com/media/us/en/gmc/vehicles/savana/2011.html (last accessed Nov. 17, 2018).

contamination of fuel caused by the defective CP4 fuel pump, that their CP4 fuel pumps will fail, that the durability and performance of their Class Vehicles is impaired by this defect and incompatibility and that such durability and performance is far less than GM promised, or that, as a result of the foregoing, they overpaid for their vehicles, the value of their vehicles is diminished, and/or their vehicles will require costly modification to avoid a catastrophic, even more costly failure, and that any such modifications will impair other qualities of the Class Vehicles that formed a material part of the bargain between the parties in the purchase of the Class Vehicles by Plaintiffs and other Class members.

131.    With respect to Class Vehicles that have experienced CP4 pump failure prior to the filing of this Complaint, Plaintiffs and other Class members did not discover and could not reasonably have discovered that their CP4 pump failure was due to a defect known to GM or that such failure was due to an incompatibility between the Class Vehicle and the fuel intended by GM to be used in the Class Vehicles.

132.    Within the period of any applicable statutes of limitation or repose, Plaintiffs and members of the proposed classes could not have discovered through the exercise of reasonable diligence that GM was concealing the conduct complained of herein and misrepresenting the defective nature of the Class Vehicles.

133.    Plaintiffs and other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that GM did not report information within their knowledge to consumers, dealerships, or relevant authorities; nor would a reasonable and diligent investigation have disclosed that GM was aware of the non-conforming and defective nature of the CP4 fuel pump and the Class Vehicles in which it was incorporated. Plaintiffs only learned of the defective nature of the CP4 fuel injection pump and their vehicles, and of GM's scheme to design and sell such non-conforming and defective fuel pumps and vehicles, shortly before this action was filed.

134.    All applicable statutes of limitation and repose have also been tolled by GM's knowing, active, and fraudulent concealment, and denial of the facts alleged herein throughout the period relevant to this action.

135.    Instead of disclosing the defective nature of the CP4 fuel pumps to consumers, GM falsely and misleadingly represented that CP4 pump failure in the Class Vehicles was caused by Plaintiffs' or other Class members' conduct or by the use of contaminated fuel.

136.    In reality, GM's conduct in designing, manufacturing, marketing, or selling Class Vehicles for use with American diesel fuel, with which GM knew the Class Vehicles were incompatible, causes the "fuel contamination" that ultimately leads to CP4 pump failure.

137.    GM, with the purpose and intent of inducing Plaintiffs and other Class members to refrain from filing suit, pursuing warranty remedies, or taking other action with respect to GM's conduct or the Class Vehicles, fraudulently concealed the true cause of CP4 pump failure by blaming Plaintiffs, Class members, and/or contaminated fuel when GM, even before the design, manufacture, or sale of the Class Vehicles, knew that the defective nature of the Bosch CP4 Pump would and has caused fuel contamination and resulting CP4 pump failure.

138.    GM was under a continuous duty to disclose to Plaintiffs and other Class members the true character, quality, and nature of the durability and performance of Class Vehicles, the ongoing process of fuel contamination in Class Vehicles, CP4 pump failure, and the true cause of CP4 pump failure. Instead, GM knowingly, affirmatively, and actively concealed or recklessly disregarded the foregoing facts. As a result, GM is estopped from relying on any statutes of limitation or repose as a defense in this action.

139.    For the foregoing reasons, all applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by GM's fraudulent concealment with respect to all claims against GM; and, GM is estopped from asserting any such defenses in this action.

## VII.    CLASS ACTION ALLEGATIONS

140.    This is a class action brought pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class:

All persons or entities who have purchased or leased one of the following vehicles in the state of California:

- o 2011–2016 2500 HD Silverado 6.6L V8 Duramax Diesel Trucks with LML engines;

- o 2011–2016 3500 HD Silverado 6.6L V8 Duramax Diesel Trucks with LML engines;

- o 2011–2016 2500 HD Sierra 6.6L V8 Duramax Diesel Trucks with LML engines;

- o 2011–2016 3500 HD Sierra 6.6L V8 Duramax Diesel Trucks with LML engines;

- o 2010–2011 Chevrolet Express van with Duramax LGH engines;

- o 2010–2011 GMC Savana van with Duramax LGH engines;

- o 2010–2011 GMC Sierra trucks with RPO ZW9 (chassis cabs or trucks with pickup box delete) with Duramax LGH engines;

- o 2011–2012 2500 HD 3500 Silverado 6.6L V8 Duramax Diesel Trucks with LGH engines; and

- o 2011–2012 2500 HD 3500 Sierra 6.6L V8 Duramax Diesel Trucks with LGH engines.

141. Excluded from the Class are individuals who have personal injury claims resulting from a CP4 fuel injection pump failure. Also excluded from the Class are GM and its officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, as well as any entity in which GM has a controlling interest. In addition, governmental entities and any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff are excluded from the Class. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

142. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

143.     The Class Representatives are asserting claims that are typical of claims of the Class, and they will fairly and adequately represent and protect the interests of the Class in that they have no interests antagonistic to those of the putative Class members.

144.     The amount of damages suffered by each individual member of the Class, in light of the expense and burden of individual litigation, would make it difficult or impossible for individual Class members to redress the wrongs done to them. Plaintiffs and other members of the Class have all suffered harm and damages as a result of GM's unlawful and wrongful conduct. Absent a class action, GM will likely not have to compensate victims for GM's wrongdoings and unlawful acts or omissions, and will continue to commit the same kinds of wrongful and unlawful acts or omissions in the future.

145.     **Numerosity under Federal Rule of Civil Procedure 23(a)(1):** The Class is so numerous that individual joinder of all of its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the total number of Class Plaintiffs is at least in the thousands, and are numerous and geographically dispersed across California. While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, as well as by the notice Class members will receive by virtue of this litigation so that they may self-identify. The disposition of the claims of Class members in a single class action will provide substantial benefits to all Parties and the Court. Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice. The number of persons for whom this action is filed who are citizens of California effectively exhausts the membership of the class, with the potential exception of some few, but unknown, transients in California or residents of California who happen to be citizens of other states.

146.     **Commonality and Predominance under Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):** This action involves common questions of law and fact which predominate over any questions affecting individual Class members, including, without limitation:

      a.     Whether GM engaged in the conduct alleged herein;

      b.     Whether GM knew about the CP4 defect and the inherent problems related thereto when said component part is used with American diesel fuel, and if so, how long GM knew or should have known as much;

      c.     Whether GM designed, advertised, marketed, distributed, leased, sold, or otherwise placed the defective Class Vehicles into the stream of commerce in the United States;

      d.     Whether the GM diesel engine systems that are the subject of this complaint are defective such that they are not fit for ordinary consumer use;

      e.     Whether GM omitted material facts about the quality, durability, fuel economy, and vehicle longevity of the Class Vehicles;

      f.     Whether GM designed, manufactured, marketed, and distributed Class Vehicles with defective or otherwise inadequate fuel injection systems;

      g.     Whether GM's conduct violates California consumer protection statutes, and constitutes breach of contract or warranty and fraudulent concealment, as asserted herein;

      h.     Whether Plaintiffs and the other Class members overpaid for their vehicles at the point of sale; and

      i.     Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, what amount.

147.    **Typicality under Federal Rule of Civil Procedure 23(a)(3):** Plaintiffs' claims are typical of the other Class members' claims because all have been comparably injured through GM's wrongful conduct as described above.

148.    **Adequacy of Representation under Federal Rule of Civil Procedure 23(a)(3):** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members they seek to represent. Additionally, Plaintiffs have retained counsel with substantial experience in handling complex class action and multi-district litigation. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the

financial resources to do so. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

149.    **Superiority of Class Action under Federal Rule of Civil Procedure 23(b)(3):** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The financial detriment suffered by Plaintiffs and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against GM's wrongful conduct. Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.   CAUSES OF ACTION
### CLAIMS BROUGHT ON BEHALF OF THE CLASS
### AND ON BEHALF OF THE NAMED PLAINTIFFS

### COUNT I
### FRAUD BY CONCEALMENT

150.    Plaintiffs re-allege and incorporate the preceding paragraphs as though fully set forth herein.

151.    Plaintiffs bring this Count individually and on behalf of the Class against GM.

152.    As set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles. Plaintiffs and other Class members are seeking recovery for this manifested defect and any and all consequential damages stemming therefrom.

153.    As alleged above, GM intentionally concealed and suppressed material facts concerning the durability and performance of the Bosch CP4 Pump and (more importantly) facts concerning the durability and performance of the Class Vehicles and their engines, in order to defraud and mislead the Class about the true nature of the Class Vehicles.

154.    As alleged above, GM knew at least by 2002 that its fuel injection systems required heightened lubricity, which was not met by American diesel fuel specifications.

155.    As alleged above, GM had specific knowledge by at least 2002 that their fuel injection systems were incompatible with American diesel fuel specifications.

156.    As alleged above, prior to the design, manufacture, and sale of the Class Vehicles, GM knew that the Bosch CP4 Pumps were expected to quickly fail in the Class Vehicles and that such failure would result in contamination of the fuel system components and require repair and replacement of those components, the repairs or replacements of which GM would refuse to cover under their warranties.

157.    The foregoing omitted facts and representations were material because they directly impacted the value of the Class Vehicles purchased or leased by Plaintiffs and other Class members, because those facts directly impacted the decision regarding whether or not Plaintiffs and other Class members would purchase a Class Vehicle, and because they induced and were intended to induce Plaintiffs and other Class members to purchase a Class Vehicle.

158.    Despite this knowledge, GM marketed the Class Vehicles, touting the increased durability and performance of the Class Vehicles.

159.    Due to their specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail, and due to their false and misleading representations regarding the increased durability of the Class vehicles, GM had a duty to disclose to Class members that their vehicles were incompatible with the use of U.S. fuel, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other diesel vehicles or of their namesake predecessor engines, that failure of the Bosch CP4 Pumps will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles.

160.    GM knew that Plaintiffs and other Class members reasonably relied upon GM's false and misleading representations and omissions. Plaintiffs and other Class members had no way of knowing that GM's representations and omissions were false and misleading, that the Class Vehicles

were incompatible with the fuel GM knew would be used to operate the Class Vehicles, that the normal and intended use of the Class Vehicles will cause the Bosch CP4 Pumps to fail, or that GM would refuse to repair, replace, or compensate Plaintiffs and other Class members for the failure of the Bosch CP4 Pumps and the known consequences of that failure to the Class Vehicle engines.

161.     Plaintiffs and other Class members could not have known that the Class Vehicles, which were touted by GM for their durability and performance, will fail when used as intended by GM.

162.     GM knew that Plaintiffs and other Class members could not have known that Class Vehicles will fail when used as intended by GM.

163.     GM falsely and misleadingly represented the durability of the Class Vehicles and omitted material facts regarding the lack of durability of the Class Vehicles, the incompatibility of the Class Vehicles with the fuel intended by GM to be used in the Class Vehicles, and the consequences of that incompatibility, for the purpose of inducing Plaintiffs and other Class members to purchase Class Vehicles, and to increase their revenue and profits.

164.     GM's devious scheme to design, market, and sell Class Vehicles with defective CP4 pumps, knowing that U.S. fuel was certain to be used in the Class Vehicles and the consequence of using U.S. diesel fuel in those vehicles, then concealing their fraudulent scheme from the public and consumers over numerous model years, reveals a corporate culture that emphasized sales and profits over integrity and an intent to deceive Plaintiffs, other Class members and the American public regarding the durability and performance of the Class Vehicles and their fuel delivery systems.

165.     GM had a duty to disclose the incompatibility of Class Vehicles with U.S. diesel fuel, including the consequences of that incompatibility, to Plaintiffs and Class members.

166.     Had Plaintiffs and other Class members known that the Class Vehicles did not have increased durability over other diesel vehicles, the Class Vehicles were incompatible with the fuel intended by Plaintiffs, the other Class members, and GM to be used in the Class Vehicles (without which the Class Vehicles would serve no purpose to Plaintiffs and other Class members), or that the Class Vehicles will fail when used as intended, Plaintiffs and other Class members would not have

purchased a Class Vehicle, or would have paid substantially less for their Class Vehicle based on GM's false and misleading representations and omissions, or, in the case of Plaintiffs and other Class members whose vehicles experienced CP4 pump failure, would have taken affirmative steps to mediate the impact of or prevent failure.

167.   Because of GM's false and misleading representations and omissions, Plaintiffs and other Class members have sustained damages because they own vehicles that are diminished in value as a result of GM's concealment of the true nature and quality of the Bosch CP4 Pump and the Class Vehicles.

168.   GM's failure to disclose the incompatibility of the Class Vehicles with U.S. diesel fuel was intended to cause and did cause Plaintiffs and other Class members to operate Class Vehicles with U.S. fuel; and, as a result, certain Plaintiffs and other Class members have been damaged by the failure of the Bosch CP4 Pumps and the resulting failure of Class Vehicle engines, resulting in damages to Class members and Plaintiffs including but not limited to the cost of repair or replacement of the CP4 fuel pump, the cost of damage caused to the Class Vehicles by the failure of the CP4 fuel pump, loss of use of the Class Vehicles, loss of earnings, and other damages.

169.   Accordingly, GM is liable to Plaintiffs and other Class members for damages in an amount to be proved at trial.

170.   GM's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other Class members' rights, and the representations made by GM to them were made in order to enrich GM. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT II

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)

171.   Plaintiffs re-allege and incorporate the preceding paragraphs as though fully set forth herein.

172.   Plaintiffs assert this Count individually and on behalf of the Class against GM.

173.     Plaintiffs have Article III standing to bring these claims for economic losses ensuing from the defects in the Class Vehicles because, among other things and as alleged herein, the CP4 fuel pump defect involves a safety defect which presents an actual and/or imminent risk to vehicle occupant safety; specifically, the risk of a moving stall, which is a known consequence of the CP4 fuel pump defect, presents a risk to occupant safety which GM has admittedly recognized through, *inter alia*, its 2014 Ignition Switch Defect recalls in which GM recalled millions of vehicles for that very risk. Put simply, defective cars are just not worth as much.[65] Further, even without a safety issue, Plaintiffs overpaid at the point of sale as these vehicles have impaired performance due to the defect.

174.     As set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles. In this Count, Plaintiffs and other Class members are seeking any and all relief available under Cal. Bus. & Prof. Code § 17200 *et seq*. for this manifested defect and the consequences stemming therefrom, including restitution and injunctive relief.

175.     California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

176.     GM's conduct, as described herein, was and is in violation of the UCL. GM's conduct violates the UCL in at least the following ways:

a.     By failing to disclose that the CP4 high-pressure fuel injection pump is out of specification for use with diesel fuel in the United States; that the fuel injection system on the Class Vehicles destroys the reliability and durability of the

---

[65] *See, e.g.*, *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1163 (C.D. Cal. 2011) ("[O]nce the safety defect is sufficiently and plausibly pled by all Plaintiffs, the economic losses resulting from the defect are readily established: defective cars are simply not worth as much").

engine and its high-pressure fuel system, because the fuel injection pump will run dry on the thinner, cleaner, less lubricating higher water content diesel used in the United States; that the CP4 pump will emit shavings of metal that travel throughout the engine and fuel injection system; and that eventually, the CP4 pump will fail catastrophically, requiring extensive repairs;

b.    By selling and leasing Class Vehicles that suffer from a defective Bosch CP4 fuel injection pump;

c.    By knowingly and intentionally concealing from Plaintiffs and the other Class members that the Bosch CP4 Pumps would fail in the Class Vehicles when used with American diesel fuel;

d.    By marketing Class Vehicles for their durability, reliability, and performance when GM knew the Class Vehicles were incompatible with American fuel, causing the "fuel contamination" that ultimately leads to CP4 pump failure; and

e.    By violating other California laws, including California consumer protection laws.

177.    In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose the incompatibility of Class Vehicles with U.S. diesel fuel and the fact that the Bosch CP4 fuel injection pumps were defective and have failed or will fail, requiring extensive repairs.

178.    Plaintiffs and Class members were also deceived by GM's portrayal of the Class Vehicles as reliable, durable, containing the fuel efficiency and power expected of a diesel vehicle, and compatible with American diesel fuel, even though GM knew: (1) the Class Vehicles were incompatible with the use of U.S. fuel; (2) the Bosch CP4 pumps will fail in Class Vehicles; (3) Class Vehicles do not have the expected durability over other diesel vehicles or of their namesake

1   predecessor engines; (4) failure of the Bosch CP4 Pumps will cause catastrophic damage to Class

2   Vehicle engines; and (5) that GM would require Plaintiffs and Class members to bear the cost of the

3   damage to their vehicles.

4        179.    Plaintiffs and Class members reasonably relied upon GM's false or misleading

5   representations in making their decision to purchase their Class Vehicles. They had no way of

6   knowing that GM's representations were false and gravely misleading.  As alleged herein, GM

7   engaged in extremely sophisticated methods of deception.  Plaintiffs and Class members did not, and

8   could not, unravel GM's deception on their own.

9        180.    GM owed Plaintiffs and the Class a duty to disclose the incompatibility of Class

10   Vehicles with U.S. diesel fuel, including the consequences of that incompatibility, to Plaintiffs and

11   other Class members. Specifically, GM:

12           a.    Possessed exclusive knowledge that that the lower lubricity of American diesel

13                 could cause catastrophic failure in Class Vehicles' CP4 fuel injection system

14                 components that are made to European diesel specifications;

15           b.    Intentionally concealed the foregoing from Plaintiffs and other Class members;

16                 and/or

17           c.    Made incomplete representations that consumers' improper use of

18                 contaminated or substandard fuels damaged Class Vehicles' fuel systems,

19                 while purposefully withholding material facts from Plaintiffs and other Class

20                 members that contradicted these representations.

21        181.    GM further owed a duty of disclosure since the the defect is material. The defect

22   would be important to a reasonable person because, among other things, it impacts the central

23   functionality of Class Vehicles and poses an unreasonable safety hazard.

24        182.    Plaintiffs and the other Class members relied on GM's omissions in deciding to

25   purchase and lease their Class Vehicles at the prices they paid.

26        183.    GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

27

28

1

184.    Plaintiffs and the other Class members were injured and suffered ascertainable loss,

2

injury-in-fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the

3

other Class members overpaid for their vehicles, and/or their vehicles have suffered a diminution in

4

value, and/or their vehicles will require costly modification to avoid a catastrophic, even more costly

5

failure, and that any such modifications will impair other qualities of the Class Vehicles that formed

6

a material part of the bargain between the parties in the purchase of the Class Vehicles by Plaintiffs

7

and other Class members. These injuries are the direct and natural consequence of GM's

8

misrepresentations and omissions.

9

185.    GM's misrepresentations and omissions alleged herein caused Plaintiffs and the other

10

Class members to purchase or lease the Class Vehicles. Absent those misrepresentations and

11

omissions, Plaintiffs and the other Class members would not have purchased or leased Class

12

Vehicles, would not have purchased or leased Class Vehicles at the prices they paid, and/or would

13

have purchased or leased less expensive alternative vehicles that did not contain a defective Bosch

14

CP4 fuel injection pump that was incompatible with American diesel fuel. Accordingly, Plaintiffs

15

have suffered injuries in fact and have lost money or property as a result of GM's misrepresentations

16

and omissions.

17

186.    Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by

18

GM under Cal. Bus. & Prof. Code § 17200.

19

187.    Plaintiffs request that this Court enter such orders or judgments as may be necessary

20

to restore to Plaintiffs and members of the Class any money GM and/or its affiliates, subsidiaries,

21

agents, *et al.*, acquired by unfair competition, including restitution and/or restitutionary

22

disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345; and for

23

such other as may be appropriate.

24

### COUNT III

25

### VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT ("CLRA")
26
### (CAL. CIV. CODE § 1750, *ET SEQ.*)

27

188.    Plaintiffs re-allege and incorporate the preceding paragraphs as though fully set forth

28

herein.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT - 84
Case No.: 3:18-cv-07054-JST
010784-11 1080616 V1

189.    Plaintiffs bring this Count individually and on behalf of the Class against GM.

190.    Plaintiffs assert a claim under the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA"), which prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a). Plaintiffs have made a demand in satisfaction of the Act and at least thirty (30) days have elapsed from the time the demand was made. Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles, and which they could not have discovered prior to purchase. Plaintiffs and other Class members seek appropriate relief under the CLRA for this defect and any and all consequential damages stemming therefrom.

191.    Plaintiffs, Class Members, and GM are all "persons" within the meaning of Cal. Civ. Code § 1761(c).  Plaintiffs and the Class members are "consumers" within the meaning of Cal. Civ. Code § 1761(d), and have engaged in a "transaction" within the meaning of Civil Code §§ 1761(e) and 1770.

192.    In the course of its business, GM, through its agents, employees, and/or subsidiaries, violated the CLRA as detailed above. GM engaged in one or more of the following unfair or deceptive acts or practices as defined in Cal. Civ. Code § 1770(a) by representing that the Class Vehicles have approval, characteristics, uses or benefits that they do not have; by representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; and/or by advertising the Class Vehicles with the intent not to sell or lease them as advertised. GM's conduct was deceptive and violated the CLRA in at least the following ways:

a. By representing that the CP4 high-pressure fuel injection pump was within specification for use with diesel fuel in the United States and failing to disclose that it was not;

b. By representing that that the fuel injection system on the Class Vehicles does not destroy the reliability and durability of the engine and its high-pressure fuel system, and by failing to

disclose that that it did, because the fuel injection pump runs itself dry and self-destructs when it is

used with the thinner, cleaner, less lubricating higher water content diesel used in the United States;

c. By failing to disclose that the CP4 pump will emit shavings of metal that travel throughout

the engine and fuel injection system and that eventually, the CP4 pump will fail catastrophically,

requiring extensive repairs;

d. By selling and leasing Class Vehicles that suffer from a defective Bosch CP4 fuel injection

pump;

e. By knowingly and intentionally concealing from Plaintiffs and the other Class members

that the Bosch CP4 Pumps would catastrophically fail in the Class Vehicles when used with

American diesel fuel; and

f. By marketing Class Vehicles for their durability, reliability, and performance when GM

knew the Class Vehicles were incompatible with American fuel, causing the "fuel contamination"

that ultimately leads to CP4 pump failure.

193.    GM's scheme and concealment of the true characteristics of o the Bosch CP4 Fuel

Pump system were material to Plaintiffs and the Class members, as GM intended. The defect would

be important to a reasonable person because, among other things, it impacts the central functionality

of Class Vehicles and poses an unreasonable safety hazard. Had they known the truth, Plaintiffs and

the Class members would not have purchased or leased the Class Vehicles, or—if the Class

Vehicles' true nature had been disclosed and mitigated—would have paid significantly less for them.

194.    Plaintiffs and the Class members had no way of discerning that GM's representations

were false and misleading, or otherwise of learning the facts that GM concealed or failed to disclose.

Plaintiffs and the Class members did not, and could not, uncover GM's deception on their own.

195.    Defendant had an ongoing duty to Plaintiffs and the Class members to refrain from

unfair and deceptive practices under the CLRA in their course of its business. Specifically, GM owed

Plaintiffs and Class members a duty to disclose all the material facts concerning the Bosch CP4

Pump because it possessed exclusive knowledge, intentionally concealed information from Plaintiffs

and Class members, and/or made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

196.    Plaintiffs and the Class members suffered damage as a direct and proximate result of GM's concealment, misrepresentations, and/or failure to disclose material information.

197.    GM's violations present a continuing risk to Plaintiffs and Class members, as well as to the general public as there is a risk that the vehicles could unexpectedly shut down on roadways, and the sudden loss of vehicle power while the vehicle is in motion poses a risk to vehicle occupant safety.

198.    Pursuant to Cal. Civ. Code § 1780(a), Plaintiffs and Class members seek an order enjoining GM's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the CLRA.

199.    On November 16, 2018, November 20, 2018, and January 10, 2019, Plaintiffs sent notice letters to GM complying with Cal. Civ. Code § 1780(b). Because GM failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and Class members are entitled.

## COUNT IV

### UNJUST ENRICHMENT

200.    Plaintiffs re-allege and incorporate the preceding paragraphs as though fully set forth herein.

201.    Plaintiffs bring this Count individually and on behalf of the Class against GM.

202.    As set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles. Plaintiffs and other Class members are seeking recovery for this manifested defect and any and all consequential damages stemming therefrom.

203.    As a result of its wrongful and fraudulent acts and omissions, as set forth herein, pertaining to the defects in the Bosch CP4 Pump and the Class Vehicles and the concealment thereof,

GM charged a higher price for the Class Vehicles than the Vehicles' true value and GM, therefore, obtained monies that rightfully belong to Plaintiffs and other Class members.

204.    GM has benefitted from manufacturing, selling, and leasing at an unjust profit defective Class Vehicles whose value was artificially inflated by GM's concealment of the defective nature of the CP4 fuel pump and of the Class Vehicles, and false and misleading representations related thereto.

205.    GM enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members, who paid a higher price for their vehicles that actually had lower values.

206.    GM has received and retained unjust benefits from the Plaintiffs and other Class members, and inequity has resulted.

207.    It would be inequitable and unconscionable for GM to retain these wrongfully obtained benefits.

208.    Because GM concealed its fraud and deception, Plaintiffs and other Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

209.    GM knowingly accepted and retained the unjust benefits of its fraudulent conduct.

210.    As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and other Class members, in an amount to be proven at trial.

211.    Plaintiffs and other Class members, therefore, seek an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.

## COUNT V

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (CAL. COM. CODE §§ 2314 AND 10212)

212.    Plaintiffs re-allege and incorporate the preceding paragraphs as though fully set forth herein.

213.    Plaintiffs bring this Count individually and on behalf of the Class against GM.

214.    As set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery

systems upon the first use of the Class Vehicles. Plaintiffs and other Class members are seeking

recovery for this manifested defect and any and all consequential damages stemming therefrom.

215.     A warranty that the Class Vehicles were in merchantable condition and fit for the

ordinary purpose for which the vehicles are used is implied by law pursuant to Cal. Com. Code

§§ 2314 and 10212. "The core test of merchantability is fitness for the ordinary purpose for which

such goods are used. Such fitness is shown if the product is in safe condition and substantially free

from defects." *Isip v. Mercedes-Benz, USA, LLC,* 155 Cal. App. 4th 19, 26 (2007); *see also Mexia v.*

*Rinker Coat Co., Inc.*, 174 Cal. App. 4th 1291 (2009). Thus, "where a car can provide safe, reliable

transportation, it is generally considered merchantable." *Am. Suzuki Motor Corp. v. Superior Court*,

37 Cal. App. 4th 1291 (1995). As demonstrated herein, the Class Vehicles are not substantially free

from defects; the Class Vehicles contain an existing, manifested defect which is certain to continue

to destroy the engines and other fuel system components and which renders the Class Vehicles

unreliable.

216.     GM is and was at all times a "merchant" with respect to motor vehicles under Cal.

Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

217.     With respect to leases, GM is and was at all relevant times a "lessor" of motor

vehicles under Cal. Com. Code § 10103(a)(16).

218.     The Class Vehicles are and were at all relevant times "goods" within the meaning of

Cal. Com. Code §§ 2105(1) and 10103(a)(8).

219.     A warranty that the Class Vehicles were in merchantable condition and fit for the

ordinary purpose for which the vehicles are used is implied by law pursuant to Cal. Com. Code

§§ 2314 and 10212.

220.     The Class Vehicles, when sold or leased and at all times thereafter, were not in

merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

Specifically, the Class Vehicles are incompatible with the use of American diesel fuel (the fuel GM

intended and expected Plaintiffs and other Class members to use) in that use of American diesel fuel

(the only fuel reasonably available to Plaintiffs and other Class members) causes a breakdown of the

CP4 fuel pump (a condition that GM knew would occur prior to its design and sale of the Class Vehicles), resulting in fuel contamination, ultimate and catastrophic failure of the Bosch CP4 Pump, and contamination and failure of other components in the Class Vehicle fuel delivery system.

221.    It was reasonable to expect that Plaintiffs may use, consume, or be affected by the defective vehicles, regardless of contractual privity with GM.

222.    The Class Vehicles contained an inherent defect that was substantially certain to result in malfunction during the useful life of the product.

223.    Plaintiffs were and are third-party beneficiaries to the defendant manufacturer's contracts with GM-certified/authorized retailers who sold the Class Vehicles to Plaintiffs.[66]

224.    In addition, or in the alternative, Plaintiffs directly relied upon Defendant GM's advertising, as alleged above.[67]

225.    GM was provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Class Vehicles, by letters from Plaintiffs' counsel, on behalf of Plaintiffs, to GM, complaints by Plaintiffs or Class members to GM either orally or in writing, complaints to GM dealerships, intermediate sellers, or repair facilities either orally or in writing, presentation of the vehicles for repair to dealerships or to intermediate sellers or repair facilities, countless consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

---

[66] *See In re Nexus 6P Prod. Liab. Litig.*, 293 F. Supp. 3d 888, 922 (N.D. Cal. 2018) ("[California law] allow[s] plaintiffs to bring implied warranty claims in the absence of privity if the plaintiff shows that he was a beneficiary to a contract between the defendant and a third party."); *id.* (internal citations omitted) ("Because third party beneficiary status is a matter of contract interpretation, a person seeking to enforce a contract as a third party beneficiary must plead a contract which was made expressly for his [or her] benefit and one in which it clearly appears that he [or she] was a beneficiary."); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 983 (N.D. Cal. 2014) (internal citations omitted) ("[T]here is an exception to the privity requirement that applies when a plaintiff is the intended beneficiary of implied warranties in agreements linking a retailer and a manufacturer").

[67] *See Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008)  (holding that, for purposes of a breach of implied warranty claim, a Plaintiff need not stand in vertical contractual privity with the defendant when the plaintiff relies on written labels or advertisements of a manufacturer).

226.     As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and other Class members have been damaged in an amount to be proven at trial.

**COUNT VI**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Cal. Civ. Code § 1791, *et seq.*)**

227.     Plaintiffs re-allege the paragraphs above as if fully set forth herein.

228.     Class Vehicles are "consumer goods" and Plaintiffs and the Proposed Class are "buyers" within the meaning of Cal. Civ. Code § 1791. GM is also a "manufacturer," "distributor," or "retail seller" under Cal. Civ. Code § 1791.

229.     The implied warranty of merchantability included with the sale of each Class Vehicle means that GM warranted that each Class Vehicle (a) would pass without objection in trade under the contract description; (b) was fit for the ordinary purposes for which the Class Vehicle would be used; and (c) conformed to the promises or affirmations of fact made on the container or label.

230.     The Class Vehicles would not pass without objection in the automotive trade because of the defect affecting the Bosch CP4 fuel pump, which also makes them unfit for the ordinary purpose for which a Class Vehicle would be used.

231.     The Class Vehicles are not adequately labeled because their labeling fails to disclose the defect and risk of stalling and does not advise the members of the proposed California Class of the existence of the issue prior to experiencing failure firsthand.

232.     GM's actions have deprived Plaintiffs and the members of the proposed California Class of the benefit of their bargains and have caused Class Vehicles to be worth less than what Plaintiffs and other members of the proposed California Class paid.

233.     As a direct and proximate result of GM's breach of implied warranty, members of the proposed California Class received goods whose condition substantially impairs their value. Plaintiffs and members of the proposed California Class have been damaged by the diminished value of their Class Vehicles.

234.     Under Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiff and members of the proposed California Class are entitled to damages and other legal and equitable relief, including, at their election, the right to revoke acceptance of Class Vehicles or the overpayment or diminution in value of their Class Vehicles. They are also entitled to all incidental and consequential damages resulting from GM's breach, as well as reasonable attorneys' fees and costs.

## COUNT VII

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT,
### (15 U.S.C. § 2301, *et seq.*)

235.     Plaintiffs re-allege and incorporate the preceding Paragraphs as though fully set forth herein.

236.     Plaintiffs bring this Count individually and on behalf of the Class against GM.

237.     As set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles. Plaintiffs and other Class members are seeking recovery for this manifested defect and any and all consequential damages stemming therefrom.

238.     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)–(d).

239.     The Class Vehicles manufactured and sold by GM are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

240.     Plaintiffs and other Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantors the obligations of their implied warranties.

241.     GM was a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

242.     GM provided Plaintiffs and other Class members with an implied warranty of merchantability in connection with the purchase or lease of the Class Vehicles, that is an "implied

warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, GM warranted that the Class Vehicles were fit for their ordinary purpose as motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

243.    GM breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs and other Class members pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles were equipped with defective CP4 fuel pumps that are incompatible with American diesel fuel (which fuel is intended by GM to be used in the Class Vehicles, expected by Plaintiffs and other Class members to be used in Class Vehicles, and is the only fuel reasonably available in order for Plaintiffs and other Class members to use the Class Vehicles for their intended or ordinary purpose), which, when used with the intended American diesel fuel, break down, resulting in fuel contamination, complete and catastrophic failure of the Bosch CP4 Pump, and contamination and catastrophic and costly failure of the Class Vehicles' fuel delivery systems.

244.    In its capacity as a warrantor, GM had knowledge of the inherent defects in the Class Vehicles. Any effort by GM to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

245.    Any limitations GM might seek to impose on their warranties are procedurally unconscionable. There was unequal bargaining power between GM and Plaintiffs and the other Class members, as, at the time of purchase and lease, Plaintiffs and the other Class members had no other options for purchasing warranty coverage other than directly from GM.

246.    Any limitations GM might seek to impose on its warranties are substantively unconscionable.  GM knew that the Class Vehicles were defective and would continue to fail during and after any purported expiration of warranties.

247.    Despite knowing that failure was expected to occur with the intended use of American diesel fuel, GM failed to disclose these defects to Plaintiffs and the other Class members. Therefore,

1    any enforcement of the durational limitations on those warranties is harsh and shocks the conscience,

2    and moreover violates public policy.

3    248.    Plaintiffs and each of the other Class members have had sufficient direct dealings

4    with either GM or its agents (*i.e.*, dealerships) to establish privity of contract between GM, on the

5    one hand, and Plaintiffs and each of the Class members, on the other hand.  Nevertheless, privity is

6    not required here because Plaintiffs and each of the other Class members are intended third-party

7    beneficiaries of contracts between GM and its dealers, and specifically, of GM's implied warranties.

8    The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights

9    under the warranty agreements provided with the Class Vehicles; the warranty agreements were

10   designed for and intended to benefit consumers.

11   249.    Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and

12   are not required to give GM notice and an opportunity to cure until such time as the Court determines

13   the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

14   250.    Nonetheless, GM was provided notice of the defective and non-conforming nature of

15   the Class Vehicles, as described herein, within a reasonable time of Plaintiffs' knowledge of the non-

16   conforming and defective nature of the Class Vehicles, by letters from Plaintiffs' counsel, on behalf

17   of Plaintiffs, to GM, complaints by Plaintiffs or Class members to GM either orally or in writing,

18   complaints to dealerships, intermediate sellers, or repair facilities either orally or in writing,

19   presentation of the vehicles for repair to dealerships, intermediate sellers or repair facilities, and by

20   the allegations contained in this Complaint.

21   251.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum

22   of $25.00. The amount in controversy of this action exceeds the sum of $50,000.00 exclusive of

23   interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs,

24   individually and on behalf of other Class members, seek all damages permitted by law, including

25   diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15

26   U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the

27   aggregate amount of costs and expenses (including attorneys' fees based on actual time expended)

28

determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against GM as follows:

A.      Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;

B.      An order temporarily and permanently enjoining GM from continuing unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.      Injunctive relief in the form of a recall, free replacement, or buy-back program;

D.      An order establishing GM as a constructive trustee over profits wrongfully obtained, plus interest;

E.      Costs, restitution, damages, including punitive damages, exemplary damages and treble damages, and disgorgement in an amount to be determined at trial;

F.      An order requiring GM to pay both pre- and post-judgment interest on any amounts awarded;

G.      An award of costs and attorney's fees; and

H.      Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: February 27, 2019                Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By /s/ Steve W. Berman
Steve W. Berman (admitted *pro hac vice*)

1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Jeff D. Friedman (SBN 173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com

-and-

Robert C. Hilliard (admitted *pro hac vice*)
Lauren Akers (admitted *pro hac vice*)
Marion Reilly (admitted *pro hac vice*)
Bradford P. Klager (admitted *pro hac vice*)
HILLIARD, MARTINEZ, GONZALES LLP
719 S. Shoreline Blvd.
Corpus Christi, Texas 78401
Telephone: (361) 882-1612
Facsimile: (361) 882-3015
bobh@hmglawfirm.com
lakers@hmglawfirm.com
marion@hmglawfirm.com
brad@hmglawfirm.com

-and-

Andrew Parker Felix, Esq. (SBN 276002)
MORGAN & MORGAN, P.A.
20 North Orange Ave., Ste. 1600
P.O. Box 4979
Orlando, FL  32801
Telephone: (407) 244-3204
Facsimile: (407) 245-3334
Andrew@forthepeople.com

-and-

Eric H. Gibbs (SBN 178659)
David Stein (SBN 257465)
Steven Lopez (SBN 300540)
GIBBS LAW GROUP LLP
505 14th Street, Suite 1110
Oakland, California 94612

Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
ds@classlawgroup.com
sal@classlawgroup.com

*Attorneys for Plaintiffs*