Steve W. Berman (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Jeff D. Friedman (SBN 173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com

Attorneys for Plaintiffs

*[Additional Counsel Listed on the Signature Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: GENERAL MOTORS LLC CP4 FUEL PUMP LITIGATION | No.  3:18-cv-07054-JST **PLAINTIFFS' OPPOSITION TO GENERAL MOTORS LLC'S MOTION TO DISMISS CONSOLIDATED AND AMENDED COMPLAINT** Date: June 27, 2019 Time: 2:00 p.m. Judge: Hon. Jon S. Tigar Courtroom: 9, 19th Floor |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................................1

II.    PLAINTIFFS' FRAUD CLAIMS ARE ADEQUATELY PLED ...........................3

    A.    GM Had a Duty to Disclose the CP4 Defect and Breached That Duty. .....................3

        1.    The Defect Is Material Because It Impairs Vehicle Functionality. .................3

        2.    The Defect Is Material Because It Renders the Class Vehicles Dangerous to Drive. ...............................................................................4

    B.    GM Knew of the Defect Before It Sold the Class Vehicles. ....................................5

        1.    GM's and the Automotive Industry's Knowledge Dating Back to 2011. .......6

        2.    Design-Phase Testing Put GM on Notice of the Defect. ...............................6

        3.    Alarming Uptick in GM Fuel-Pump Failures. ............................................7

    C.    GM's Superior Knowledge Obligated It to Disclose the Defect. ..............................8

    D.    The Omissions Claims are Stated with Adequate Particularity Under Rule 9(b). ..........................................................................................................9

    E.    Representations Are Pleaded With Adequate Specificity and Are Not Puffery. .......11

III.   PLAINTIFFS HAVE STATED A VALID UNJUST-ENRICHMENT CLAIM .................13

    A.    The Existence of an Express Warranty Does Not Bar the Unjust Enrichment Claim. ........................................................................................................13

    B.    Plaintiffs May Not Have Adequate Remedies at Law and May Plead in the Alternative. .................................................................................................14

    C.    Plaintiffs Need Not Have Purchased Vehicles From GM Dealerships. ...................15

IV.    PLAINTIFFS HAVE STATED A VALID IMPLIED-WARRANTY CLAIM ...................15

    A.    Plaintiffs are Third-Party Beneficiaries to GM's Contracts with GM Dealers. ........15

    B.    Plaintiffs Directly Relied on GM's Advertising. ..................................................16

    C.    Plaintiffs Have Validly Pleaded Agency Facts. ...................................................17

    D.    The Class Vehicles Were Unmerchantable at the Time of Sale. ..............................17

    E.    Plaintiffs' Vehicles Contained a Latent Safety Defect at the Time of Sale. .............18

V.     PLAINTIFFS HAVE STATED VALID SB AND MMWA CLAIMS ...............................20

VI.   ALL PLAINTIFFS HAVE ARTICLE III STANDING, AS THE DEFECT BEGINS MANIFESTING FROM THE FIRST CRANK OF THE ENGINE. ...................................20

VII.   PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED ..........................................................22

   A.   GM's Fraudulent Conduct Tolls the Statute of Limitations. ....................................23

   B.   The Discovery Rule Applies to Toll Plaintiffs' Claims. ............................................24

VIII.   CONCLUSION ...................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aberin v. Am. Honda Motor Co.*,
   2018 WL 1473085 (N.D. Cal. Mar. 28, 2018) ........................................................ 14, 23

*Astiana v. Hain Celestial Grp.*,
   783 F.3d 753 (9th Cir. 2015) ...................................................................................... 12

*Atari Corp. v. 3DO Co.*,
   1994 WL 723601 (N.D. Cal. May 16, 1994)................................................................ 12

*Avedisian v. Mercedes-Benz USA, LLC*,
   2013 WL 2285237 (C.D. Cal. May 22, 2013)................................................................ 4

*Baranco v. Ford Motor Co.*,
   294 F. Supp. 3d 950 (N.D. Cal. 2018)................................................................... 18, 19

*Beyer v. Symantec Corp.*,
   333 F. Supp. 3d 966 (N.D. Cal. 2018)............................................................... 3, 4, 11

*Borkman v. BMW of N. Am., LLC*,
   2017 WL 4082420 (C.D. Cal. Aug. 28, 2017) ............................................................. 9

*Brand v. Hyundai Motor Am.*,
   226 Cal. App. 4th 1538 (2014) ................................................................................... 17

*In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*,
   288 F.3d 1012 (7th Cir. 2002) .................................................................................... 20

*Bryde v. Gen. Motors, LLC*,
   2016 WL 6804584 (N.D. Cal. Nov. 17, 2016) ........................................... 10, 11, 16, 17

*Butler v. Porsche Cars N. Am., Inc.*,
   2016 WL 4474630 (N.D. Cal. Aug. 25, 2016) ................................................... 5, 20, 21

*Cholakyan v. Mercedes-Benz USA, LLC*,
   796 F. Supp. 2d 1220 (C.D. Cal. 2011) ........................................................................ 5

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*
   295 F. Supp. 3d 927 (N.D. Cal. 2018)......................................................................... 20

*Cirulli v. Hyundai Motor Co.*,
   2009 WL 5788762 (C.D. Cal. June 12, 2009)......................................................... 4, 10

*Clark v. LG Elecs. U.S.A., Inc.*,
  2013 WL 5816410 (S.D. Cal. Oct. 29, 2013)...................................................................8

*Clemens v. DaimlerChrysler Corp.*,
  534 F. 3d 1017 (9th Cir. 2008) ................................................................. 15, 16, 20

*Collins v. eMachings, Inc.*,
  202 Cal. App. 4th at 253, 257–59 (2011) ...................................................................4

*Daniel v. Ford Motor Co.*,
  2016 WL 2899026 (E.D. Cal. May 18, 2016) .............................................................18

*Davidson v. Apple, Inc.*,
  2017 WL 3149305 (N.D. Cal. July 25, 2017) ...............................................................7

*Deras v. Volkswagen Grp. of Am., Inc.*,
  2018 WL 2267448 (N.D. Cal. May 17, 2018)...............................................................13

*Edenborough v. ADT, LLC*,
  2016 WL 6160174 (N.D. Cal. Oct. 24, 2016) ............................................................8, 9

*Edmundson v. Proctor & Gamble*,
  537 F. App'x 708 (9th Cir. 2013)...............................................................................12

*Ehrlich v. BMW of N. Am., LLC*,
  801 F. Supp. 2d 908 (C.D. Cal. 2010)..............................................................4, 8, 18

*Espineli v. Toyota Motor Sales U.S.A., Inc.*,
  2018 WL 3769383 (E.D. Cal. Aug. 9, 2018) ..............................................................14

*Falco v. Nissan N. Am. Inc.*,
  2013 WL 5575065 (C.D. Cal. Oct. 10, 2013) ............................................................8, 9

*Falk v. Gen. Motors Corp.*,
  496 F. Supp. 2d 1088 (N.D. Cal. 2007)........................................................................8

*Ferrari v. Nat. Partners, Inc.*,
  2016 WL 4440242 (N.D. Cal. Aug. 23, 2016) ............................................................17

*Finney v. Ford Motor Co.*,
  2018 WL 2552266 (N.D. Cal. June 4, 2018).........................................................12, 24

*Gerstle v. Am. Honda Motor Co., Inc.*,
  2017 WL 2797810 (N.D. Cal. June 28, 2017)..............................................................22

*Gilbert Fin. Corp. v. Steelform Contracting Co.*,
  82 Cal. App. 3d 65 (1978) ........................................................................................15

*Glenn v. Hyundai Motor Am.*,
  2016 WL 7507766 (C.D. Cal. Nov. 21, 2016) ..................................................... 13

*Haskins v. Symantec Corp.*,
  2013 WL 6234610 (N.D. Cal. Dec. 2, 2013) ....................................................... 10

*Hernandez v. Lopez*,
  180 Cal. App. 4th 932 (2009) ............................................................................ 13

*Hinojos v. Kohl's Corp.*,
  718 F.3d 1098 (9th Cir. 2013) ........................................................................... 20

*Hodson v. Mars, Inc.*,
  891 F.3d 857 (9th Cir. 2018) ............................................................................... 3

*Hovsepian v. Apple, Inc.*,
  2009 WL 2591445 (N.D. Cal. Aug. 21, 2009) .................................................... 19

*Isip v. Mercedes-Benz*,
  155 Cal. App. 4th 19 (2007) ............................................................................... 17

*Keegan v. Am. Honda Motor Co.*,
  838 F. Supp. 2d 929 (C.D. Cal. 2012) .......................................................... 10, 15

*Kowalsky v. Hewlett Packard Co.*,
  2011 WL 3501715 (N.D. Cal. Aug. 10, 2011) .................................................... 11

*Kwikset Corp. v. Superior Court*,
  51 Cal. 4th 310 (2011) ......................................................................................... 3

*Lewis v. Rodan & Fields, LLC*,
  2019 WL 978768 (N.D. Cal. Feb. 28, 2019) ........................................................ 3

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ........................................................................................... 20

*Luong v. Subaru of Am.*,
  2018 WL 2047646 (N.D. May 2, 2018) ......................................................... 14, 22

*MacDonald v. Ford Motor Co.*,
  37 F. Supp. 3d 1087 (N.D. Cal. 2014) ............................................................. 9, 10

*Marsikian v. Mercedes Benz USA, LLC*,
  2009 WL 8379784 (May 4, 2009) ......................................................................... 4

*Marty v. Anheuser-Busch Cos., LLC*,
  43 F. Supp. 3d 1333 (S.D. Fla. 2014) ................................................................. 12

*Matanky v. Gen. Motors LLC*,
    2019 WL 1430114 (E.D. Mich. Mar. 29, 2019) ........................................................... 15

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) ................................................................................... 20

*Mei Ling v. City of Los Angeles*,
    2018 WL 3814498 (C.D. Cal. July 25, 2018) ............................................................ 13

*Mexia v. Rinker Boat Co., Inc.*,
    174 Cal. App. 4th 1297 (2009) ................................................................................. 18

*Mui Ho v. Toyota Motor Co.*,
    931 F. Supp. 2d 987 (N.D. Cal. 2013) ......................................................................... 7

*In re MyFord Touch Consumer Litig.*,
    46 F. Supp. 3d 936 (N.D. Cal. 2014) .................................................................. 15, 24

*In re Nexus 6P Prod. Liab. Litig.*,
    293 F. Supp. 3d 888 (N.D. Cal. 2018) ...................................................................... 15

*Norcia v. Samsung Telecomms. Am., LLC*,
    2015 WL 4967247 (N.D. Cal. Aug. 20, 2015) ......................................................... 8, 9

*Norcia v. Samsung Telecomms. Am., LLC*,
    2018 WL 4772302 (N.D. Cal. Oct. 1, 2018) ............................................................... 4

*Parenteau v. Gen. Motors, LLC*,
    2015 WL 1020499 (C.D. Cal. Mar. 5, 2015) ....................................................... 5, 6, 7

*Philips v. Ford Motor Co.*,
    2015 WL 4111448 (N.D. Cal. July 7, 2015) ...................................................... 5, 22, 24

*Philips v. Ford Motor Co.*,
    2016 WL 1745948 (N.D. Cal. May 3, 2016) ....................................................... 18, 22

*Precht v. Kia Motors Am., Inc.*,
    2014 WL 10988343 (C.D. Cal. Dec. 29, 2014) ........................................................ 10

*Price v. Kawasaki Motors Corp., USA*,
    2011 WL 10948588 (C.D. Cal. Jan. 24, 2011) ..................................................... 5, 10

*Process Specialties, Inc. v. Sematech, Inc.*,
    2002 WL 35646610 (E.D. Cal. Jan. 18, 2002) ......................................................... 14

*Reniger v. Hyundai Motor Am.*,
    122 F. Supp. 3d 888 (N.D. Cal. 2015) ...................................................................... 19

*Rollolazo v. BMW of N. Am., LLC,*
    2017 WL 1536456 (C.D. Cal. Feb. 3, 2017) ............................................................... 22

*Rubenstein v. Neiman Marcus Grp., LLC,*
    687 F. App'x 564 (9th Cir. 2017) ................................................................... 10, 11

*Rutledge v. Hewlett-Packard Co.,*
    238 Cal. App. 4th 1164 (2015) ......................................................................... 3, 4

*Schreidel v. Am. Honda Motor Co.,*
    34 Cal. App. 4th 1242 (1995) ........................................................................ 5, 16

*In re Seagate Tech. LLC Litig.,*
    233 F. Supp. 3d 776 (N.D. Cal. 2017) ................................................................. 15

*Seifi v. Mercedes-Benz, LLC,*
    2013 WL 2285339 (C.D. Cal May 23, 2013) ............................................................ 5

*Southland Sod Farms v. Stover Seed Co.,*
    108 F.3d 1134 (9th Cir. 1997) ......................................................................... 23

*Sterling Drug, Inc. v. FTC,*
    741 F.2d 1146 (9th Cir. 1984) ......................................................................... 23

*In re Tobacco II Cases,*
    46 Cal. 4th 298 (2009) ................................................................................. 23

*In re Toyota Motor Corp.,*
    790 F. Supp. 2d 1152 (C.D. Cal. 2011) ................................................................ 22

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods.
Liab. Litig.,*
    754 F. Supp. 2d 1145 (C.D. Cal. 2010) ................................................. 8, 15, 17, 18

*U.S. v. Brown,*
    348 F.3d 1200 (10th Cir. 2003) ....................................................................... 13

*Velasco v. Chrysler Group LLC,*
    2014 WL 4187796 (C.D. Cal. Aug. 22, 2014) ...................................................... 9, 10

*Victorino v. FCA US LLC,*
    326 F.R.D. 282 (S.D. Cal. 2018) .................................................................. 19, 21

*In re Volkswagen Clean Diesel Mktg., Sales Practices, & Prod. Liab. Litig.,*
    2018 WL 4777134 (N.D. Cal. Oct. 3, 2018) ........................................................... 21

*Wildin v. FCA US LLC,*
    2018 WL 3032986 (S.D. Cal. June 19, 2018) .......................................................... 14

*Wilson v. Hewlett-Packard Co.*,
    668 F.3d 1136 (9th Cir. 2012) ......................................................................................... 4

*Zeiger v. WellPet LLC*,
    304 F. Supp. 3d 837 (N.D. Cal. 2018) ......................................................................... 15

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure Rule 9(b) ................................................................. *passim*

## I.       INTRODUCTION

The CP4 high-pressure fuel injection pump, which comes standard in all Class Vehicles,[1] relies on the lubricating properties of diesel fuel to function properly. Because of American diesel fuel's "cleaner" (i.e., drier) composition, these pumps are inadequately lubricated and begin disintegrating from the very first fill of the tank, causing metal shavings to disperse throughout the vehicle's fuel system. This metal contamination process ultimately leads to catastrophic failure of fuel and engine systems, oftentimes while the vehicle is in motion, causing sudden loss of engine power. Because it is cheaper to manufacture than its predecessor, GM chose the Bosch CP4 pump, a European-designed fuel pump, for its 2011-2016 Duramax diesel vehicles, *even though GM knew the CP4 pump is incompatible with American diesel-fuel lubricity standards.* GM passes along the cost of catastrophic CP4 failure to consumers by deceitfully claiming that "fuel contamination"—which is *caused* by disintegrating particles from the CP4—is the consumer's fault.

GM incorrectly asserts that Plaintiffs "have cit[ed] no facts in support" of their allegation that "Bosch's CP4 fuel pumps, which GM used in its Duramax diesel engines, are incompatible with 'Ultra Low Sulfur Diesel' fuel available in the United States." ECF No. 39 at 5. But GM's assertion is belied by its own profit-motivated maneuvers: *GM itself* created a licensing scheme to market premium, higher lubricity diesel fuels in the U.S. under its "TOP TIER™" trademarked fuel brand which is ostensibly more compatible with CP4 fuel pumps due to its increased lubricity. ¶ 46.[2] GM cannot feign ignorance. GM capitalizes on both the front end by commanding a premium from consumers for vehicles that are inherently incompatible with U.S. diesel, and on the back end by charging more per gallon for TOP TIER™ diesel fuel and extorting a licensing fee for TOP TIER™ diesel sales.

Yet GM proclaims it owes no duty to consumers to disclose the defect. GM contends consumers have *no* valid claims against GM, despite the fact that they were duped into purchasing vehicles equipped with a defective CP4 pump that causes catastrophic engine destruction and sudden

---

[1] As stated in Plaintiffs' Consolidated and Amended Class Action Complaint ("CAC") (ECF No. 36), the "Class Vehicles" presently consist of GM-manufactured 2011-2016 model year vehicles with 6.6L Duramax diesels with LML or LGH engines.
[2] All "¶" references are to the CAC.

loss of vehicle power while the vehicle is in motion, followed by a five-figure repair bill that GM refuses to cover under warranty. Perhaps if GM nationally advertised *this* narrative instead of the one that induced Plaintiffs and Class members into purchasing the vehicles, consumers would not have been fraudulently induced into paying $50,000-$70,000+ for a vehicle that is inherently incompatible with U.S. diesel fuel and that can and has caused catastrophic engine failure, subjecting them to thousands *more* dollars in CP4-failure-induced repairs. Instead, in purchasing or leasing the Class Vehicles from GM, Plaintiffs and Class members saw, heard, and relied upon depictions of the vehicles driving across American roadways, traversing all sorts of American terrain as if they are adequately drivable and compatible with U.S. diesel fuel—*but they are not.*

*First*, Plaintiffs' fraud-related claims satisfy Rule 9(b). Plaintiffs plead the who, what, when, where, and how of GM's deception. GM had a duty of disclosure due to its superior knowledge of material facts that would have affected these consumers' purchasing or leasing decisions, particularly given the safety risk posed by the CP4 incompatibility defect.

*Second*, Plaintiffs plead a colorable unjust enrichment claim. Put simply, Plaintiffs and all members of the proposed Class paid a premium for their diesel vehicles, and were harmed by being sold vehicles with a defective fuel injection pump that is substandard for American fuel.

*Third*, Plaintiffs assert valid implied warranty claims. The vehicles are unfit for their ordinary purposes, and further present an unreasonable risk to vehicle occupant safety, as sudden engine failure poses the risk of serious car crashes resulting in injury or death. Because Plaintiffs validly plead warranty claims, their Song-Beverly ("SB") Act and Magnuson-Moss Warranty Act ("MMWA") claims survive as well.

*Fourth,* Plaintiffs' claims are timely because their vehicles contained a latent defect in the fuel injection system at the time of sale which was unknowable and undiscoverable to them prior to acquisition.

1      *Finally,* all Plaintiffs have standing to bring claims in this action. "There is no difficulty"

2  regarding Article III injury where, as here, Plaintiffs contend that class members paid more for a

3  product than they otherwise would have paid had they known of the defect.

4  **II.      PLAINTIFFS' FRAUD CLAIMS ARE ADEQUATELY PLED**
   **A.    GM Had a Duty to Disclose the CP4 Defect and Breached That Duty.**

5          As the CAC details, the Class Vehicles' CP4 fuel pump is prone to catastrophic failure. The

6  low lubricity of U.S. fuel causes air pockets to form inside the fuel pump, causing metal to rub

7  against metal from the very first drive. ¶¶ 2-3. Resulting metal shards are then blown throughout the

8  fuel-injection system, destroying the system and ultimately the entire engine. *Id.* The best scenario a

9  vehicle owner could hope for is a repair bill of $8,000–$20,000. ¶ 4. The worst is that the fuel-pump

10 failures cause engine shutdowns, often while the vehicles are moving, with many drivers reporting

11 trucks stalling at highway speeds. *E.g.*, ¶¶ 3, 23, 28, 32, 80-85, 89, 95-97, 99. GM knew of the defect

12 and of the safety hazards it imposed, rendering GM legally obligated to disclose the defect to

13 customers. By choosing instead to actively conceal the defect, GM injured Plaintiffs and the Class,

14 and incurred liability under California's Consumers Legal Remedies Act (CLRA) and the Unfair

15 Competition Law (UCL), and engaged in common-law fraud. *See, e.g., Hodsdon v. Mars, Inc.*, 891

16 F.3d 857, 862–63 (9th Cir. 2018); *Beyer v. Symantec Corp.*, 333 F. Supp. 3d 966, 978–79 (N.D. Cal.

17 2018).

18         **1.      The Defect Is Material Because It Impairs Vehicle Functionality.**

19         California law imposes liability for failing to disclose material product defects. *Rutledge v.*

20 *Hewlett-Packard Co.*, 238 Cal. App. 4th 1164 (2015); *Beyer,* 333 F. Supp. 3d at 978. "A non-

21 disclosed fact is material if the omitted information would cause a reasonable consumer to behave

22 differently if he or she was aware of it." *Lewis v. Rodan & Fields, LLC*, 2019 WL 978768, at *2

23 (N.D. Cal. Feb. 28, 2019) (citations omitted); *Kwikset Corp. v. Superior Court,* 51 Cal. 4th 310, 332–

24 33 (2011) (representation is material if reasonable consumer would consider important to

25 transaction). Here, the CP4 defect is material both because it impairs the central function of the Class

26 Vehicles *and* because it presents an unreasonable safety risk. ¶¶ 3, 32, 61, 64.

27

28

1    GM is wrong to suggest that safety is a *necessary* element of an unlawful-omission claim

2    under California law, however. *Rutledge*, 238 Cal. App. 4th 1164, 1174 2015); *Beyer*, 333 F. Supp.

3    3d at 978 (safety hazard requirement "has been cast into doubt by recent California Court of Appeal

4    opinions"). Rather, defects that affect a central function of a product are also material under

5    California law. *See Beyer,* 333 F. Supp. 3d at 979-80 (holding CLRA claim properly alleged where

6    defect was "central" to product's function). The defect here meets that standard. When CP4 fuel

7    pumps fail, they not only destroy the vehicles' fuel-injection systems, they cause total engine

8    inoperability, and a vehicle's engine is central to its functioning. *See, e.g.*, ¶¶ 1-3. Accordingly, the

9    CP4's incompatibility with U.S. diesel fuel, giving rise to engine failures and five-figure repair bills,

10   satisfies the requisite showing under California law. *Id.* ¶¶ 1–4; *Ehrlich v. BMW of N. Am., LLC*, 801

11   F. Supp. 2d 908, 918 (C.D. Cal. 2010) (cost of repairing safety defect properly considered in

12   materiality analysis); *see also Beyer*, 333 F. Supp. 3d at 978–80 (defect that opened computer to

13   cyberattack related to security software's central function); *Norcia v. Samsung Telecomms. Am.,*

14   *LLC,* 2018 WL 4772302, at *1–2 (N.D. Cal. Oct. 1, 2018) (defect affecting smartphone's "speed and

15   performance" went to device's central function); *Collins v. eMachines, Inc.*, 202 Cal. App. 4th at

16   253, 257–59 (2011) (plaintiffs stated viable CLRA and UCL claims by alleging defect in central

17   function of computer: disk drive corrupting data); *Rutledge*, 238 Cal. App. 4th at 1168, 1178–79

18   (alleged defect could cause laptop screens to "dim and darken" "at some time in the future").

      **2.     The Defect Is Material Because It Renders the Class Vehicles Dangerous to Drive.**

19

20   Independent of the defect's impact on the central functioning of Class Vehicles, the Court

21   should also find a duty to disclose because the defect is dangerous. Courts have consistently held that

22   consumers must be told about dangerous defects. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136,

23   1141 (9th Cir. 2012); *see also Cirulli v. Hyundai Motor Co.*, 2009 WL 5788762, at *3 (C.D. Cal.

24   June 12, 2009) (upholding CLRA claim based on failure to disclose vehicle safety defect that

25   resulted in corrosion of vehicle frame); *Marsikian v. Mercedes Benz USA, LLC,* 2009 WL 8379784,

26   at *7 (May 4, 2009) (upholding CLRA and UCL claims based on failure to disclose defect that could

27

28

cause water damage to vehicle's electrical system); *Avedisian v. Mercedes-Benz USA, LLC*, 2013 WL 2285237, at *6 (C.D. Cal. May 22, 2013) (upholding claims alleging failure to disclose defect in chrome trim that could lead to sharp edges).

Here, the complaint explains the CP4's "catastrophic failure often causes the vehicle to shut-off while in motion and renders it unable to be restarted." ¶ 3; *see also* ¶¶ 12, 23. In 2011, field data confirmed Class Vehicles experienced "moving stalls" as their CP4s failed. ¶ 54. Drivers repeatedly complained of their Class Vehicles dying when the CP4 pump failed. ¶ 97 ("while driving at 40–45mph"); ¶ 99 (while traveling "in the fast lane of the freeway"). Even GM has acknowledged defects which cause stalling "increase[] the risk of a crash," and present a safety risk to consumers. ¶ 61. Courts recognize stalling defects are sufficiently dangerous to require disclosure. *Seifi v. Mercedes-Benz, LLC*, 2013 WL 2285339, at *7 (C.D. Cal May 23, 2013); *Price v. Kawasaki Motors Corp., USA*, 2011 WL 10948588, at *6 (C.D. Cal. Jan. 24, 2011); *see also Schreidel v. Am. Honda Motor Co.*, 34 Cal. App. 4th 1242, 1250 (1995) (stalling "is a dangerous situation on the highway").

At least three plaintiffs experienced CP4-induced engine shutdown while driving, and one plaintiff while driving 65 miles per hour. ¶¶ 23, 28, 32. It is not necessary, however, for a Plaintiff's vehicle to actually stall. The risk of stalling from this defect is itself a material hazard, and is enough "to survive a motion to dismiss." *Butler v. Porsche Cars N. Am., Inc.*, 2016 WL 4474630, at *4 (N.D. Cal. Aug. 25, 2016) (plaintiff adequately alleged "material safety hazard" where defect "could cause" car to "cease functioning" even though he "did not personally experience" malfunction); *Philips v. Ford Motor Co.*, 2015 WL 4111448, at *11 (N.D. Cal. July 7, 2015) (defects that increase risk of losing control of moving vehicles constitute material hazard); *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1236 (C.D. Cal. 2011) (plaintiff sufficiently alleged safety hazard without alleging that any class member had experienced moving engine failure).

**B.      GM Knew of the Defect Before It Sold the Class Vehicles.**

GM has long known that the CP4 pump was incompatible with American diesel fuel. However, as a threshold matter, Rule 9(b)'s heightened-pleading requirement does not apply to allegations of knowledge. *E.g.,* Fed. R. Civ. P. 9(b) ("[K]nowledge . . . may be alleged generally");

*Parenteau v. Gen. Motors, LLC*, 2015 WL 1020499, at *6 (C.D. Cal. Mar. 5, 2015). Here, Plaintiffs adequately pled GM's knowledge in several different ways.

### 1. GM's and the Automotive Industry's Knowledge Dating Back to 2011.

GM knew before it sold the first Class Vehicle that the CP4 pump would not work with low-lubricity American diesel fuel. *E.g.*, ¶¶ 73–74. The fuel-incompatibility problem was known to GM "well before GM ever chose to implement the CP4" pump in the Class Vehicles. ¶ 6. The whole industry had "experience[d] . . . widespread catastrophic fuel injection pump failures when cleaner diesel standards were first implemented in the 1990s." *Id.* When low-sulfur diesel "first appeared in the American market in the 1990's," an "estimated . . . 65 million fuel injection pumps failed as a result." ¶ 67. "By 2002, the Truck & Engine Manufacturers Association ('EMA')—of which GM is a member company—acknowledged" that low-sulfur, lower-lubricity American diesel "could cause catastrophic failure" in fuel-injection components, like the CP4, that "are made to European diesel specifications." ¶ 6. A 2007 EPA regulation mandated that American diesel fuel have sulfur content low enough to degrade the fuel's lubricity; American diesel thus would "not contain the lubrication necessary for the [CP4] to operate," and caused premature, catastrophic failure." ¶ 32. When GM chose, years later, to use the CP4 pump, "[i]t was no secret to GM that the Bosch CP4 Pump was inappropriate for diesel vehicles in the U.S." ¶ 71.

### 2. Design-Phase Testing Put GM on Notice of the Defect.

GM's design-phase testing revealed this incompatibility. ¶¶ 58–59. That testing put the CP4-equipped Class Vehicles through "lengthy and comprehensive physical testing" to reproduce how the fuel pump would perform "when driven for tens of thousands of miles." ¶ 58. "Through this testing, GM . . . discovered the defect—before selling the first Class Vehicle." *Id.* In this regard, Plaintiffs point to "driver complaints to NHTSA" not as proof that GM knew that the CP4 was failing—obviously, driver complaints years later cannot have yielded earlier knowledge of the defect—but because those complaints confirm that the pump indeed failed at use levels "well within the scope of GM's durability and reliability testing." ¶¶ 58–59.

### 3.     Alarming Uptick in GM Fuel-Pump Failures.

In October 2011, as part of a wider inquiry into numerous CP4 failures, NHTSA asked GM for "peer vehicle" information that embraced (among other things) "[a]lleged defect[s]" involving: high-pressure fuel-pump "failure" or "*[m]etallic debris/contamination in the fuel system*." ¶ 53 (emphasis added); *see also* ¶¶ 54–56. The investigation was prompted by catastrophic CP4 failures in Audis and Volkswagens. ¶¶ 47–49. NHTSA received data, including from the CP4's manufacturer, Bosch, showing the CP4 "failed catastrophically" in U.S. vehicles before 2011, and entities including Bosch singled out "bad fuel" in the U.S. ¶ 48. By the time GM gathered data to provide to NHTSA, it was already clear the defect was a problem in Class Vehicles, as the problem manifested as soon as GM began selling them in 2011. By the second quarter of 2011, GM knew of at least ***99 fuel-pump failures*** in the 2011 Chevrolet Silverado HD, of which 30 involved stalling. ¶ 54. This early data showed a substantial increase in fuel-pump failures compared to the preceding year's model. The 2009 and 2010 trucks had yielded just 8 total failures by October 2011, but with the CP4 onboard, the 2011 Silverado HD alone already had 30 such failures. *Id.* Likewise, the 2009 and 2010 GMC Sierra HD trucks experienced only 8 fuel-pump failures combined; but by October 2011, the 2011 model year alone already experienced 16. ¶ 55. The Chevrolet Silverado HD was even worse. ¶ 54.

Warranty claims also spiked. While the 2010 Silverado had 20 fuel-pump-related warranty claims, the 2011 Silverado generated 68 claims by October 2011. ¶ 56. While the 2010 Sierra yielded two such claims, the 2011 Sierra quickly generated 35. *Id.* The CP4 thus brought an immediate ***three- to seventeen-fold*** increase in fuel-pump warranty claims. These numbers are not "statistically insignificant." Vehicle manufacturers watch year-on-year failure data closely so they can react quickly to developing problems. ¶ 57. As vehicles generally become more reliable, the absolute number of failures in any year has plummeted, with few vehicles failing in large absolute numbers. "[D]efect trends are [now] frequently identified after just one or several reported failures." *Id.* Here, the failure rate skyrocketed immediately after GM began selling CP4-equipped vehicles and GM accessed that very data in 2011 to share with federal regulators, demonstrating that, at the latest, GM knew of the defect by early 2011.

1       The complaint is replete with detailed allegations that GM knew of the fuel-incompatibility

2   problem long before it sold the first Class Vehicle. *See Davidson v. Apple, Inc.,* 2017 WL 3149305,

3   at *15 (N.D. Cal. July 25, 2017) ("pre-release . . . testing" and consumer complaints on "third-party

4   forums" contributed to sufficient allegations of knowledge); *Mui Ho v. Toyota Motor Co.*, 931 F.

5   Supp. 2d 987, 998 (N.D. Cal. 2013) (automaker had knowledge of defect "through pre-release testing

6   data, aggregate data from . . . dealers, early consumer complaints, and other internal sources of

7   aggregate information," sufficiently pled knowledge); *Falco v. Nissan N. Am. Inc.*, 2013 WL

8   5575065, at *6–7 (C.D. Cal. Oct. 10, 2013) (same); *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d

9   1088, 1096–97 (N.D. Cal. 2007) (same); *Ehrlich*, 801 F. Supp. 2d at 918–19 (same). "[C]onsidering

10  the totality of Plaintiff[s'] factual allegations," the complaint viably pleads GM's pre-sale knowledge

11  of the defect. *See Clark v. LG Elecs. U.S.A., Inc.*, 2013 WL 5816410, at *5 (S.D. Cal. Oct. 29, 2013).

**C.      GM's Superior Knowledge Obligated It to Disclose the Defect.**

12      Under California law, GM was obligated to disclose what it knew, both because it had

13  "superior knowledge" of the defect and because it took steps to actively conceal it.

14      Plaintiffs allege facts sufficient to show that GM, as *the manufacturer of the Class Vehicles*,

15  had "exclusive knowledge" of the CP4 defect within the meaning of California non-disclosure law.

16  "Generally, courts have not defined 'exclusive' literally, but have found such claims cognizable if

17  the defendant had 'superior' knowledge of a defect that was not readily apparent and there is no or

18  only a limited publicly available information about the defect." *Edenborough v. ADT, LLC*, 2016 WL

19  6160174, at *6 (N.D. Cal. Oct. 24, 2016) (quoting *Daniel v. Ford Motor Co*., 2016 WL 2899026, at

20  *4 (E.D. Cal. May 18, 2016); *see also In re Toyota Motor Corp. Unintended Acceleration Mktg.,*

21  *Sales Practices, & Prods. Liab. Litig*., 754 F. Supp. 2d 1145, 1174 (C.D. Cal. 2010).

22      The nature of the CP4 defect put GM in a "superior position" to have knowledge of the

23  defect. *See, e.g.*, ¶¶ 7, 57-59 (GM conducts comprehensive pre-market vehicle testing which would

24  have yielded knowledge of the defect); *see also* ¶ 23 (GM dealer telling Plaintiff Sutherland, "We've

25  been seeing a lot of this lately, you better hope it's not your fuel pump"). Plaintiffs did not discover

26  and could not have discovered the CP4's fuel-incompatibility defect on their own. *E.g.*, ¶ 3

(emphasis added) (the pump "*secretly* deposits metal shavings and debris throughout the fuel injection system"). The CP4's incompatibility with American diesel fuel was hidden inside an internal component of the Class Vehicles, and it involved the fuel pump's chemical–mechanical characteristics; it was a defect the "ordinary consumer would not have been able to easily discover." *See Norcia v. Samsung Telecomms. Am., LLC*, 2015 WL 4967247, at *7 (N.D. Cal. Aug. 20, 2015) (smartphone's code was not "easily accessible or understandable to the average consumer"). Borrowing this Court's language: The "specific workings and technological details" of the CP4 pump "are outside the realm of knowledge of the average consumer;" even after a wholesale failure of the CP4, it would not be "readily apparent" to the ordinary consumer what had happened. *See Edenborough*, 2016 WL 6160174 at *6. GM designed and built the Class Vehicles, and chose the CP4 pump for them; it was thus in a "superior position" to know the pump's characteristics and fatal limitations. These facts are sufficient to allege the fuel-incompatibility defect was within GM's exclusive knowledge and therefore subject to a duty to disclose. *Norcia*, 2015 WL 4967247 at *7.

Finally, Plaintiffs sufficiently allege facts from which the Court can infer that GM actively concealed the CP4 defect. Courts have found active concealment sufficiently pled where, as here, the automaker did not notify customers of the defect, "recall the subject vehicles," or at least "offer[] suitable repairs." *Borkman v. BMW of N. Am., LLC*, 2017 WL 4082420, at *7 (C.D. Cal. Aug. 28, 2017) (citing *Falk,* 496 F. Supp. 2d at 1097). Although GM issued an internal service bulletin to dealers (not consumers) concerning the pump, it has never recalled the Class Vehicles. ¶¶ 100–01, 103. In fact, "[r]ather than remedy the problem it caused, GM chose to extract a second round of profits from the consumers it has already duped" by "creat[ing] a licensing scheme to market premium diesel fuels with greater lubricity that is more compatible with its CP4 pumps." ¶ 46.

**D.      The Omissions Claims are Stated with Adequate Particularity Under Rule 9(b).**

Claims based on omissions "can succeed without the same level of specificity required by a normal fraud claim." *Falco*, 2013 WL 5575065, at *11(quoting *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1267 (C.D. Cal. 2007)). "This is because a plaintiff alleging an omission-based fraud will 'not be able to specify the time, place, and specific content of an omission as would a

1   plaintiff in a false representation claim.'" *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1096

2   (N.D. Cal. 2014) (Tigar, J.) (quoting *Baggett*, 582 F. Supp. 2d at 1267). What is important is that

3   Plaintiffs provide enough detail "so that a defendant can prepare an adequate answer from the

4   allegations." *Velasco v. Chrysler Group LLC*, 2014 WL 4187796, at *3 (C.D. Cal. Aug. 22, 2014)

5   (quoting *Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 540 (9th Cir. 1989)); *see*

6   *MacDonald*, 37 F. Supp. 3d at 1092 ("The allegations must be specific enough to give a defendant

7   notice of the particular misconduct alleged to constitute the fraud such that the defendant may defend

8   against the charge.").

9       Plaintiffs have met that pleading standard here. The complaint describes the "who, what,

10  when, where, and how of the misconduct charged." *Bryde v. Gen. Motors, LLC*, 2016 WL 6804584,

11  at *3 (N.D. Cal. Nov. 17, 2016) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th

12  Cir. 2003)). Again borrowing this Court's language from an automotive-defect case: "In short, the

13  'who' is [GM], the 'what' is its knowledge [and concealment] of a defect, the 'when' is prior to the

14  sale of Class Vehicles, and the 'where' is the various channels of information through which [GM]

15  sold Class Vehicles." *MacDonald*, 37 F. Supp. 3d at 1096. "Plaintiffs have pled sufficient facts to

16  survive a motion to dismiss" their omission claims. *Id.*

17      Numerous courts have denied Rule 9(b) challenges where concealing an automotive defect

18  was pled with similar specificity. *See Bryde*, 2016 WL 6804584, at *13–14 (following *MacDonald*);

19  *Price*, 2011 WL 10948588 at *3; *Velasco*, 2014 WL 4187796, at *3; *Precht v. Kia Motors Am., Inc.*,

20  2014 WL 10988343, at *6 (C.D. Cal. Dec. 29, 2014); *Keegan v. Am. Honda Motor Co.*, 838 F. Supp.

21  2d 929, 961 (C.D. Cal. 2012); *Cirulli*, 2009 WL 5788762 at *3–4; *see also Haskins v. Symantec*

22  *Corp.*, 2013 WL 6234610, at *8 (N.D. Cal. Dec. 2, 2013) (Tigar, J.) (holding that "unfair" conduct

23  under the UCL is not coterminous with fraud and plaintiff sufficiently alleged that it was an "unfair

24  practice for Defendant to sell a product it knew to be compromised, regardless of the content of its

25  advertisements").

26

27

28

1    GM thus wrongly suggests that Plaintiffs must specifically plead "who at GM was

2    purportedly aware of any concealed facts." ECF No. 39 at 9. Courts have rejected defendants'

3    attempts to force plaintiffs to identify information outside their control at the pleading stage.

4    *Rubenstein v. Neiman Marcus Grp., LLC*, 687 F. App'x 564, 567–68 (9th Cir. 2017) (plaintiff

5    "cannot reasonably be expected to have detailed personal knowledge of Neiman Marcus's internal

6    pricing policies" and "need not specifically plead facts to which she cannot reasonably be expected

7    to have access") (quotation omitted). Accordingly, Plaintiffs need not "identify with … specificity"

8    what GM's product testing entailed, when it was performed, what it revealed, or how and when the

9    results were obtained inside GM. *Id.*; *Kowalsky v. Hewlett Packard Co.*, 2011 WL 3501715, at *4

10   (N.D. Cal. Aug. 10, 2011) ("knowledge of the defect … need only be alleged 'generally'"); *accord*

11   *Elias*, 2014 WL 493034 at *3. In a similar vein, GM is wrong to suggest that Plaintiffs must allege

12   "intent to defraud" with "the particularity demanded by Rule 9(b)." (ECF No. 39 at 7). This is doubly

13   mistaken. Fraudulent intent is not essential to Plaintiffs' statutory claims. *See, e.g., Beyer*, 333 F.

14   Supp. 3d at 978 (intent not among elements of omission claim). And, insofar as Plaintiffs do allege

15   that GM intentionally deceived them, those allegations are not subject to heightened pleading under

16   Rule 9(b). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged

17   generally." Fed. R. Civ. P. 9(b). Plaintiffs have fairly put GM on notice of their unlawful-omission

18   claims, which is all the law requires.

19   **E.      Representations Are Pleaded With Adequate Specificity and Are Not Puffery.**

20   Contrary to GM's contentions, Plaintiffs have also adequately pled GM's misrepresentations

21   with adequate particularity under the applicable UCL and CLRA standards, and these representations

22   do not constitute "mere puffery." And even under Rule 9(b), pleadings need only "give defendants

23   notice of the particular misconduct . . . so that they can defend against the charge and not just deny

24   that they have done anything wrong." *Kowalsky*, 2011 WL 3501715 at *4 (quoting *Kearns v. Ford*

25   *Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009)). The present complaint more than meets that

26   standard. Again, the complaint specifies the "who, what, when, where, and how of the misconduct

27

28

1    charged." *See, e.g., Bryde,* 2016 WL 6804584 at \*3; *supra,* section (II.)(D.). GM cannot plausibly

2    contend that, in view of this complaint, it does not know exactly what it is being charged with.

3         GM suggests statements about the durability and reliability of its CP4-equipped vehicles

4    amounted to non-actionable sales puffing, and that Plaintiffs have not alleged that they saw, heard, or

5    relied upon any specific GM advertisement. But each named plaintiff alleges that, "in purchasing the

6    vehicle, [s/he] relied on representations" from GM "that the vehicle was compatible with American

7    diesel fuel," and that "absent these representations . . . [s/he] would not have purchased the vehicle

8    and/or would have paid less for it." *E.g.,* ¶ 11. Plaintiffs have adequately pleaded reliance on an

9    actionable misrepresentation from GM. *See Finney v. Ford Motor Co.*, 2018 WL 2552266, at \*5

10   (N.D. Cal. June 4, 2018) (Tigar, J.) (holding that plaintiff may show reliance on omission by

11   pleading "that she actually relied on the omission in the sense that 'had the omitted information been

12   disclosed, one would have been aware of it and behaved differently,'" and noting that "[a] court may

13   infer that a plaintiff would have behaved differently where the omission was material"). Plaintiffs

14   also describe "specific representations" that Class Vehicles had "superior fuel economy . . . to other

15   diesel trucks on the market." *E.g.,* ¶ 14. Those representations are not "general, subjective, or

16   unverifiable;" they are not mere "opinion" or "exaggerate[ion]"; and so they are not sales "puffery."

17   *Edmundson v. Proctor & Gamble*, 537 F. App'x 708, 709 (9th Cir. 2013)); *Atari Corp. v. 3DO Co.*,

18   1994 WL 723601, at \*2 (N.D. Cal. May 16, 1994). All of GM's U.S. advertisements show the Class

19   Vehicles driving in America (¶¶ 104-05), though the vehicles are not compatible with U.S. diesel

20   fuel. ¶¶ 1, 2, 6. These actionable misrepresentations permeate all of GM's advertisements for the

21   Class Vehicles. *E.g.,* ¶¶ 118-19.

22        In seeking dismissal based on puffery, GM reads portions of the complaint "in a vacuum."

23   *See Marty v. Anheuser-Busch Cos., LLC,* 43 F. Supp. 3d 1333, 1342 (S.D. Fla. 2014). While GM

24   focuses on terms like "durability" and "reliability" in isolation, the law requires that language to be

25   considered in the context of GM's various concrete representations — the ones described above, and

26   GM's additional references to concrete things like "horsepower" (¶¶ 2, 11), "torque" (¶¶ 2, 113),

27

28

and "emission performance" (¶¶ 123–24). These are "[s]pecific, quantifiable 'statements of fact' that refer to" the Class Vehicles' "absolute characteristics"; accordingly, GM's representations are not "puffing." *See Marty,* 43 F. Supp. 3d at 1342.

### III.   PLAINTIFFS HAVE STATED A VALID UNJUST-ENRICHMENT CLAIM

GM argues the unjust-enrichment claims are barred because: (i) an express warranty governs the parties' relationship; (ii) the Plaintiffs' have an adequate remedy at law; and (iii) the Plaintiffs purchased their vehicles from third parties.[3] GM's arguments fail.

### A.   The Existence of an Express Warranty Does Not Bar the Unjust Enrichment Claim.

To begin, the express warranty does control because it does not overlap in scope with Plaintiffs' unjust-enrichment claim. Unlike the warranty, which creates repair obligations for GM *post-sale*, Plaintiffs' unjust enrichment claim focuses on GM's deceptive marketing practices leading up to their purchase of class vehicles. By concealing the existence and severity of the CP4 defect, GM induced Plaintiffs to spend money they would not otherwise have spent on GM vehicles, paying more than the true value of the vehicles, which in turn gave GM an undeserved benefit. *See* ¶¶ 1-7, 11-34 (Plaintiffs paid a premium that they would not have paid had they known about the defect); ¶¶ 204-09. GM's warranty simply has no bearing on that scope of conduct—it is a promise to provide post-sale repairs and is not provided to customers until after the sale is complete.

In the absence of a contract bearing on GM's *pre-sale* conduct (which does not exist in this case), the Court may look to the law of unjust enrichment and order GM to disgorge profits that were wrongfully obtained through the pre-sale concealment of material information. *See Glenn v. Hyundai Motor Am.,* 2016 WL 7507766, at *6 (C.D. Cal. Nov. 21, 2016) (declining to dismiss unjust enrichment claim premised on "any fraudulent concealment before the contract is [entered because it is] not within the scope of the warranty"); *Mei Ling v. City of Los Angeles,* 2018 WL 3814498, at *34 (C.D. Cal. July 25, 2018) ("restitution may be awarded in lieu of breach of contract damages when the parties had an express contract, but it was procured by fraud"); *Deras v. Volkswagen Grp. of Am., Inc.,* 2018 WL 2267448, at *3 n.5 (N.D. Cal. May 17, 2018) (recognizing that unjust

---

[3] Plaintiffs' unjust enrichment claim may be construed as a quasi-contract claim seeking restitution. *Astiana v. Hain Celestial Grp.,* 783 F.3d 753, 762 (9th Cir. 2015).

enrichment claim may be viable where it falls "outside the scope of the warranty"); *see also Hernandez v. Lopez*, 180 Cal. App. 4th 932, 939 (2009).

In fact, "[f]raud is one of the principal grounds for restitution and one of the principal sources of unjust enrichment." Restatement § 13 cmt. a. When material misrepresentations or omissions are involved, it is common for plaintiffs to have several different legal avenues available. *See id.* cmt. h ("Frequently, a claimant who seeks restitution on the basis of the defendant's misrepresentation might have sued for damages instead, whether in contract for breach of warranty or in tort for deceit."); *U.S. v. Brown,* 348 F.3d 1200, 1212 (10th Cir. 2003) ("a claim for unjust enrichment can coexist with a claim sounding in tort, contract, or violation of law"). This principle applies mostly to GM's pre-sale conduct, though it also bears on GM's active concealment of the defect while futile repairs are performed. *See Wildin v. FCA US LLC*, 2018 WL 3032986, at *8 (S.D. Cal. June 19, 2018) (allowing an unjust enrichment claim to proceed to the extent it relies on Defendant's actively concealing the defect while performing ineffective repairs).[4]

**B.     Plaintiffs May Not Have Adequate Remedies at Law and May Plead in the Alternative.**

This Court recently held that an alleged adequate remedy at law for UCL, CLRA, and unjust enrichment claims is not a basis for dismissal at the pleadings stage. *See Aberin v. Am. Honda Motor Co.*, 2018 WL 1473085, at *9 (N.D. Cal. Mar. 28, 2018). And other decisions are in accord. *See, e.g., Luong v. Subaru of Am.*, 2018 WL 2047646, at *7 (N.D. May 2, 2018); *Espineli v. Toyota Motor Sales U.S.A., Inc.*, 2018 WL 3769383, at *4 (E.D. Cal. Aug. 9, 2018) ("Although some federal courts have dismissed UCL claims and other equitable relief claims where the plaintiff has pled claims that may provide adequate remedies at law, many other courts have reached the opposite conclusion, finding no bar to the pursuit of alternative remedies at the pleadings stage.") (citing *Aberin*, 2018 WL 1473085, at *9).

---

[4] GM suggests that Plaintiffs have not pled their unjust-enrichment claim with particularity, but as the foregoing discussion and the discussion in the context of Plaintiffs' fraud and consumer-protection claims shows, there is ample detail in the complaint of GM's knowledge and concealment of a serious defect, which caused an overpayment injury at the point of sale for all those who bought or leased one of the impacted vehicles.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C.      Plaintiffs Need Not Have Purchased Vehicles From GM Dealerships.**

California law does not require contractual privity for a direct benefit to be conferred to GM. *Process Specialties, Inc. v. Sematech, Inc.*, 2002 WL 35646610, at \*19 (E.D. Cal. Jan. 18, 2002) ("quantum meruit is legally distinct from unjust enrichment, and while quantum meruit does require privity, unjust enrichment does not") (citing *Maglica v. Maglica*, 66 Cal. App. 4th 442, 449 (1998)).

**IV.      PLAINTIFFS HAVE STATED A VALID IMPLIED-WARRANTY CLAIM**

GM argues that Plaintiffs "cannot allege the type of contractual privity with GM required for a breach of implied warranty claim under California law." First, privity is not required for implied-warranty ("IW") claims arising under the Song-Beverly Act. Second, to the extent privity is required for UCC-based IW claims, Plaintiffs meet the recognized exceptions.

**A.      Plaintiffs are Third-Party Beneficiaries to GM's Contracts with GM Dealers.**

As pled in the CAC (*see* ¶¶ 223, 248), Plaintiffs who purchased or leased from GM-authorized dealers are third-party beneficiaries to GM's contracts with said dealers, as *they* – not the dealers – were the intended consumers of the vehicles. *See In re Nexus 6P Prod. Liab. Litig.*, 293 F. Supp. 3d 888, 922 (N.D. Cal. 2018) ("[California law] allow[s] plaintiffs to bring implied warranty claims in the absence of privity if the plaintiff shows that he was a beneficiary to a contract between the defendant and a third party."); *Keegan,* 838 F. Supp. 2d at 947("individuals who purchase a vehicle from an authorized dealership can maintain an implied warranty cause of action against the manufacturer as third party beneficiaries"); *Toyota Acceleration*, 754 F. Supp. 2d at 1185 (same); *Matanky v. Gen. Motors LLC*, 2019 WL 1430114, at \*7 (E.D. Mich. Mar. 29, 2019) (applying California law) (same).

GM cites *In re Seagate Tech. LLC Litig.*, 233 F. Supp. 3d 776, 787 (N.D. Cal. 2017), for the assertion that "no published decision of a California court has applied [the third-party beneficiary] doctrine in the context of a consumer claim against a product manufacturer." This is simply false. *See In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 984 (N.D. Cal. 2014) (recognizing third-party beneficiary exception in context of consumer claim against product manufacturer and

noting that "the third-party beneficiary exception remains viable under California law." Moreover, this District unambiguously rejected *Seagate* the following year. *See Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837, 854 (N.D. Cal. 2018) (citing *Gilbert Fin. Corp. v. Steelform Contracting Co.*, 82 Cal. App. 3d 65 (1978)) ("Because *Gilbert* provides the authority for plaintiffs to plead the third-party beneficiary exception, I will allow them to proceed on their implied warranty claim in the absence of privity"). GM's reliance on *Clemens v. DaimlerChrysler Corp.*, 534 F. 3d 1017 (9th Cir. 2008), is equally misplaced. *See Zeiger*, 304 F. Supp. 3d at 837 ("Given that *Clemens* did not directly address the third-party beneficiary exception, nor did it address *Gilbert*, it need not be read to foreclose the third-party beneficiary exception to privity under California law").

**B.      Plaintiffs Directly Relied on GM's Advertising.**

*All* Plaintiffs have pled that they directly relied upon GM's advertising (*see* ¶¶ 11-34) – advertising in which GM depicted the Class Vehicles driving *in America* despite the vehicles being incompatible with American diesel. *See Clemens*, 534 F.3d at 1023 (noting that, for purposes of a breach of implied warranty claim, a plaintiff need not stand in vertical contractual privity with the defendant when the plaintiff relies on written labels or advertisements of a manufacturer). Indeed, what Plaintiffs saw, heard, and relied upon in purchasing or leasing the Class Vehicles from GM were depictions of the vehicles driving across American roadways, traversing all sorts of American terrain as if they are adequately drivable and compatible with U.S. diesel fuel – *but they are not*. Had this omitted information been disclosed, Plaintiffs would have behaved differently – namely, they "would not have purchased the vehicle and/or would have paid less for it." *See, e.g.*, ¶ 12; *accord Bryde*, 2016 WL 6804584, at *12 (plaintiff may prove reliance on omission by showing that had omitted information been disclosed plaintiff would have behaved differently). Further, as noted in *Bryde*, "[i]t can be inferred here that the alleged omission was material because . . . it relates to a safety concern." *Id.* The same may be said of the CP4 defect, as catastrophic failure causes the vehicle to shut-off while in motion which "presents an inherent risk to consumer safety." ¶ 3. *See Schreidel*, 34 Cal. App. 4th at 1250 (stalling is "a dangerous situation on the highway").

**C.      Plaintiffs Have Validly Pleaded Agency Facts.**

Plaintiffs have alleged sufficient facts to show that GM dealers are the agents of GM. In *Bryde v. Gen Motors, LLC*, this District held that it was "reasonable to infer that the dealers are GM's agents" where Plaintiffs alleged that "they bought their vehicles from and took their vehicles to GM's dealers when they had problems with their airbag lights and sensors"; "they contacted GM and/or its authorized agents for vehicle repairs concerning the alleged airbag defect"; and "GM issued [service bulletins] to its dealers, instructing how to deal with airbag light and sensor issues." 2016 WL 6804584, at *16 (internal citations omitted). Here, Plaintiffs have alleged that in August 2014, GM issued an internal bulletin to its dealers instructing them how to address "metallic debris" contaminating the entire fuel injection system in vehicles with Duramax diesel engines. ¶ 100. All Plaintiffs save two have alleged that they purchased their vehicles directly from a GM-authorized dealer. *See* ¶¶ 11-15, 17-22, 24-34.[5] And many Plaintiffs who experienced catastrophic CP4 failure allege that they contacted GM dealerships for vehicle repairs after said failure occurred.[6] In short, Plaintiffs have adequately pleaded the recognized exceptions to the privity requirement. *See Toyota Acceleration*, 754 F. Supp. 2d at 1185 (plaintiffs' breach of implied warranty claim not precluded by lack of vertical privity where plaintiffs "pled that they purchased vehicles from a network of dealers who [we]re agents of [Toyota]" and that plaintiffs were "the intended consumers").

**D.      The Class Vehicles Were Unmerchantable at the Time of Sale.**

The implied warranty of merchantability ("IWM") requires that a product is "in safe condition and substantially free of defects." *Ferrari v. Nat. Partners, Inc.*, 2016 WL 4440242, at *11 (N.D. Cal. Aug. 23, 2016); *see also Brand v. Hyundai Motor Am.*, 226 Cal. App. 4th 1538, 1547 (2014) ("an important consideration under the implied warranty is consumer safety"). As Judge Chen recently held in *Sloan v. General Motors*, "later California authority has distinguished *American Suzuki*"—the key case on which GM relies[7]—and "explicitly rejected the notion that merely because a vehicle provides transportation from point A to point B, it necessarily does not violate the implied

---

[5] Plaintiffs Cochems and Sutherland purchased from non-GM entities. *See* ¶¶ 16, 23.
[6] Plaintiffs Rudy, Sizelove, Moonan, Sutherland, Jensen, Tirozzi, and C. Smith allege that they presented their vehicles to GM and/or its dealers after experiencing catastrophic failure. *See* ¶¶ 11, 12, 14, 23, 28, 32 & 34.
[7] *See* ECF No. 39 at 17, *citing Am. Suzuki Motor Corp. v. Super. Ct.*, 37 Cal. App. 4th 1291 (1995).

warranty of merchantability." 287 F. Supp. 3d 840, 879-80 (N.D. Cal. 2018), *quoting Isip v. Mercedes-Benz*, 155 Cal. App. 4th 19, 27 (2007). Thus, GM's argument that its vehicles are capable of transportation overlooks the fact that their potential for engine stalls and catastrophic failure renders them unfit. *See Isip*, 155 Cal. App. 4th at 27 ("MBUSA's attempt to define a vehicle as unfit only if it does not provide transportation is an unjustified dilution of the implied warranty of merchantability.").

Courts have found a range of defects that make a vehicle unfit for its ordinary purpose." *Bryde*, 2016 WL 6804584, at *15 (collecting cases). For example, in *Sloan*, a "safety risk [was] plausibly alleged" based on allegations that engines that "suddenly shut down are not fit for ordinary use." 287 F. Supp. at 879. Likewise, in *Asghari v. Volkswagen*, the district court held that "[v]ehicles subject to engine failure cannot be said to be merchantable." 42 F. Supp. 3d 1306, 1339 (C.D. Cal. 2013); *see also Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 977 (N.D. Cal. 2018) (claim for breach of implied warranty plausibly alleged where "the defect may manifest at any time and thus surprise drivers when they are already on the road"). Here, Plaintiffs have alleged that the defect "causes the vehicle to shut-off while in motion and renders it unable to be restarted," which "present[s] an inherent risk to consumer safety—one which GM has recognized in the past—and one which Plaintiffs were not aware of prior to purchasing the Class Vehicles." ¶ 3; *see also* ¶¶ 61, 95-97, 99, 173, 197. Moreover, the "severity of these issues and the extent to which they may have rendered the vehicle unmerchantable is a question of fact." *Baranco*, 294 F. Supp. 3d at 977; *Toyota Acceleration*, 754 F. Supp. 2d at 1186 (refusing to dismiss breach of IWM claims at the pleadings stage).

**E.    Plaintiffs' Vehicles Contained a Latent Safety Defect at the Time of Sale.**

"In the case of a latent defect, a product is rendered unmerchantable, and the warranty of merchantability is breached, by the existence of the unseen defect, not by its subsequent discovery." *Mexia v. Rinker Boat Co., Inc.*, 174 Cal. App. 4th 1297, 1305 (2009). Thus, as long as Plaintiffs allege a latent defect that existed at the time of sale, they state timely claims, as in *Daniel, supra*, and *Mexia. See also Ehrlich*, 801 F. Supp. 2d at 922 (following *Mexia* in holding that "the fact that the

alleged defect resulted in a cracked windshield three years after the sale of the MINI 'does not

necessarily mean that the defect did not exist at the time of sale'").

The California Court of Appeals, in *Mexia*, held that the UCC "imposes a 'reasonable' time

within which to notify the seller *only after the point the purchaser knew or should have known of the*

*breach*." *Mexia*, 174 Cal. App. 4th at 1310. Likewise, in *Sloan*, this District held that the plaintiffs'

claims were "not barred by failure to specify that the harms manifested within [the statutory

requirement of] 1 year of purchasing new vehicles," because they "allege the defect was inherent to

the engine design and, therefore, existed at the time of purchase." 287 F. Supp. 3d at 879-80 ("that

the engine damage was not discovered within the one-year period is not determinative because the

underlying defect was already allegedly present before the discovery"); *see also Philips v. Ford*

*Motor Co.,* 2016 WL 1745948, at *8 (N.D. Cal. May 3, 2016) ("*Philips II*"). So too here. Plaintiffs

allege that "the Bosch CP4 fuel injection pump was defective and incompatible with U.S. diesel fuel

from the get-go." ¶ 47.

GM cites *Hovsepian v. Apple, Inc.*, 2009 WL 2591445 (N.D. Cal. Aug. 21, 2009), for the

assertion that its express limitations on the IWM bar certain Plaintiffs' claims.[8] However, in

*Hovsepian*, the plaintiffs did not allege that their computers contained a latent defect that rendered

the product unmerchantable from the outset. *Id.* at *8 n.7. Conversely, Plaintiffs here *have* alleged as

much, and further allege a safety risk that renders the vehicles unmerchantable at the time of sale. ¶¶

3, 61, 173, 197; *see also* ¶ 99 (consumer complaint to NHTSA regarding CP4 failure in a 2011

Chevrolet Silverado 2500 which aptly notes, "A vehicle suddenly d[y]ing with seconds['] notice on

the freeway is certainly a safety issue in my eyes."). Courts in this district have held IWM claims as

adequately and timely pleaded where plaintiffs have alleged their vehicles were unmerchantable at

the time of sale due to an alleged latent safety defect which could not reasonably have been

discovered by Plaintiffs sooner (though it was allegedly known to defendants beforehand). *See*

*Reniger v. Hyundai Motor Am.*, 122 F. Supp. 3d 888, 904 (N.D. Cal. 2015). Thus, contrary to GM's

contention otherwise, *all* Plaintiffs have alleged that their vehicles "experience[d] a defect in the

---

[8] *See* ECF No. 39 at 18-19 (arguing that the claims of Plaintiffs Cochems, Diniz, Rudy, Sizelove, Lawson, A.R. Smith, and C. Smith are not within the term of the implied warranty).

1   warranty period" because the CP4 "disintegration process begins at the very first fill of the tank and

2   starts damaging the vehicle's fuel injection system and engine immediately upon the vehicle's first

3   use." ¶ 2.

### V.     PLAINTIFFS HAVE STATED VALID SB AND MMWA CLAIMS

4

5   GM contends that Plaintiffs' SB claim fails because they have not alleged that the vehicles

6   were "unfit for their ordinary purpose at the time of sale," but as discussed *supra* sections (IV.)(D.)

7   and (IV.)(E.), "[v]ehicles subject to engine failure cannot be said to be merchantable," and the CP4

8   defect is a latent defect that existed at the time of sale. *Asghari*, 42 F. Supp. 3d at 1339; *see also*

9   *Baranco*, 294 F. Supp. 3d at 977; *Victorino v. FCA US LLC*, 326 F.R.D. 282, 292 (S.D. Cal. 2018)

10  (SB Act does not require that a vehicle be inoperable to violate the IWM). In addition, because

11  Plaintiffs have adequately pleaded their breach of IWM under California law, the MMWA claim is

12  also well pled and survives GM's Motion. *See Clemens*, 534 F.3d at 1022.

### VI.     ALL PLAINTIFFS HAVE ARTICLE III STANDING, AS THE DEFECT BEGINS MANIFESTING FROM THE FIRST CRANK OF THE ENGINE.

13

14  "[T]here is no difficulty" regarding Article III injury where, as here, the Plaintiffs "contend

15  that class members paid more for [a product] than they otherwise would have paid." *Hinojos v.*

16  *Kohl's Corp.*, 718 F.3d 1098, 1104 n. 3 (9th Cir. 2013) (quotation omitted). Likewise, in *Mazza v.*

17  *Am. Honda Motor Co.*, the Ninth Circuit held that "[t]o the extent that class members were relieved

18  of their money by Honda's deceptive conduct—as Plaintiffs allege—they have suffered an injury in

19  fact." 666 F.3d 581, 595 (9th Cir. 2012). Indeed, in this Circuit, it is a "quintessential injury-in-fact"

20  when Plaintiffs allege they "spent money that, absent defendants' actions, they would not have

21  spent." *Maya v. Centex Corp.*, 658 F.3d 1060, 1069-71 (9th Cir. 2011).[9] And, at the pleading stage,

22  "general factual allegations of injury resulting from the defendant's conduct may suffice" to establish

23  the injury required for Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

24  Thus, as this district recently stated, "Allegations of overpayment based on a defendant's failure to

25  disclose a product's limitations are clearly sufficient to satisfy Article III's injury-in-fact

26  _____

27  [9] GM inexplicably relies on cases from other circuits despite on-point precedent from this one. ECF No. 39 at 20-21, *citing Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 628 (8th Cir. 1999), and *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1017 (7th Cir. 2002).

28

1    requirement." *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*295

2    F. Supp. 3d 927, 948-49 (N.D. Cal. 2018).

3            In *Chrysler-Dodge-Jeep Ecodiesel*, the defendant car manufacturers argued, as GM does

4    here, that the class plaintiffs had not suffered injury because they offered  "[no] allegation that their

5    vehicles experienced any defect." *Id.* at 946. But the Court rejected this argument, because the

6    plaintiffs alleged that "the Class Vehicles are currently defective" and "were allegedly defective

7    when first sold." 295 F. Supp. 3d at 949; *see also Butler*, 2016 WL 4474630, at *4 ("The fact that

8    Plaintiff did not experience a malfunction affecting Plaintiff's safety does not alter the conclusion

9    that the CAC plausibly alleges that the alleged defect could pose a safety hazard."). Likewise, here

10   Plaintiffs allege that there was a latent defect at the time of sale which was undiscoverable by

11   Plaintiffs — namely, that the CP4 fuel pump is inherently incompatible with U.S. diesel-fuel

12   specifications, such that dry metal shavings from the pump begin manifesting, dispersing through,

13   and damaging the fuel-delivery system on the vehicle's first use. ¶¶ 2, 7.

14           Further, the risk of catastrophic failure is not merely "hypothetical,"[10] as evidenced by the

15   numerous Plaintiffs who have already experienced catastrophic CP4 failure and the volumes of

16   relevant consumer complaints to NHTSA. *See* ¶¶ 11, 12, 14, 16, 23, 25[#2], 27, 32, 34, 76-89, 95-99.

17   In *Hindsman v. General Motors LLC*, for example, the plaintiffs alleged that a "Oil Consumption

18   Defect causes Vehicles to unexpectedly shutdown and potentially catch fire, and that the low oil

19   pressure gauge fails to warn drivers in advance." 2018 WL 2463113, at *12 (N.D. Cal. June 1, 2018).

20   GM argued that the plaintiffs "do not plausibly allege a safety hazard because [they] do not allege

21   that a single engine has ever caught fire or shut down because of the Oil Consumption Defect." *Id.*

22   But this District held that "a consumer need not wait to suffer injury before she is able to challenge a

23   defect as an unreasonable safety hazard, provided she is able to allege a sufficiently close nexus

24   between the defect and the hazard." *Id; see also Butler*, 2016 WL 4474630, at *4; *Victorino*, 326

25   F.R.D. at 299 ("The requirement of *American Honda* that a plaintiff must demonstrate that all class

26   members' vehicles' defect will substantially be certain to experience a malfunction from the alleged

27   ――――――――――――
     [10] ECF No. 39 at 20 (quoting *Birdsong v. Apple, Inc.*, 590 F.3d 955, 961 (9th Cir. 2009)).

28

defect during its useful life is a determination on the merits which this Court does not find proper on class certification").

Indeed, Plaintiffs have alleged that catastrophic malfunction is inevitable: "As the [CP4 pump's metal] shavings disperse and contaminate the high-pressure fuel system, the fuse of the proverbial CP4 'time bomb' has been lit, and it is only a matter of time before the entire engine system fails." ¶ 74; *see also* ¶¶ 107, 222. Accordingly, Plaintiffs allege that they would not have purchased or paid as much for these vehicles had GM disclosed the truth about the defect prior to the relevant transaction. ¶¶ 11-34; *see also* ¶ 7 (plaintiffs paid a premium for their diesel vehicles). This is sufficient to confer Article III standing, as various other district courts have held in recent auto-defect cases. *E.g., In re Volkswagen Clean Diesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 2018 WL 4777134, at *3 (N.D. Cal. Oct. 3, 2018) ("When a consumer overpays for a product because of the seller's conduct, the overpayment is ordinarily a quintessential injury-in-fact."); *Luong,* 2018 WL 2047646 at *4 (consumer plaintiffs' allegations that that "the value of their vehicles was affected as a result of their defective original windshields" are "sufficient to allege injury in fact for purposes of Article III"); *Sloan*, 2017 WL 3283998 at *4  (plaintiffs had standing where they alleged overpayment for a defective vehicle, despite the fact that "none of the Plaintiffs allege[d] that their vehicles actually experienced" the alleged defect's adverse effects); *Rollolazo v. BMW of N. Am., LLC*, 2017 WL 1536456, at *10 (C.D. Cal. Feb. 3, 2017) (denying motion for dismissal on standing grounds where the plaintiffs alleged they "overpaid for Subject Vehicles in light of the [Range Extender] feature's negative impact upon the Subject Vehicles' performance"); *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1166 (C.D. Cal. 2011) ("economic loss injury flows from the plausibly alleged defect at the pleadings stage").

## VII.   PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED

GM incorrectly asserts that the UCL, implied warranty, SB Act, and MMWA claims of eight Plaintiffs are barred because they purchased their vehicles more than four years before bringing this action, and that the fraud and CLRA claims of four other Plaintiffs are barred by the statute of limitations, because the claims accrued when they purchased their vehicles more than three years

ago. But in *Aryeh v. Canon Business Solutions, Inc.*, the California Supreme Court held that claims

under the UCL are "governed by common law accrual rules," including the discovery rule and

fraudulent concealment. 55 Cal. 4th 1185, 1196 (2013). And warranty claims are also subject to

tolling based on fraudulent concealment. *Gerstle v. Am. Honda Motor Co., Inc.*, 2017 WL 2797810,

at *12 (N.D. Cal. June 28, 2017); *Philips II*, 2016 WL 1745948 at *14.

**A.     GM's Fraudulent Conduct Tolls the Statute of Limitations.**

The "doctrine of fraudulent concealment tolls the statute of limitations where a defendant,

through deceptive conduct, has caused a claim to grow stale." *Philips I*, 2015 WL 4111448, at *7-8,

*citing Aryeh*, 55 Cal. 4th at 1191. Plaintiffs plausibly allege tolling based on fraudulent concealment

for the same reasons that they plausibly state that claim. *See supra* section (II.) (discussing GM's

Class Vehicle advertisements, all of which show the Class Vehicles driving *in America*, and

Plaintiffs' reliance thereon). GM advertised the Class Vehicles' durability, efficiency, fuel economy,

power, and performance, all while failing to disclose that the CP4 pump was incompatible with U.S.

diesel fuel and could lead to sudden engine failure (*e.g.*, ¶¶ 1, 3, 6-7, 60, 116, 123-24), and Plaintiffs

allege that they relied on such advertising (¶¶ 11-33, 160, 179, 182). *See Southland Sod Farms v.

Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997) (company's advertisement that its slow-

growing grass required "50% Less Mowing" was an actionable statement of fact); *Sterling Drug, Inc.

v. FTC*, 741 F.2d 1146, 1151-53 (9th Cir. 1984) (company's claim that its brand of aspirin was

consistently better than other brands "for purity, stability, and speed of disintegration" was properly

determined not to be puffery); *see also In re Tobacco II Cases*, 46 Cal. 4th 298, 328 (2009) ("where

… a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to

plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or

statements").

In addition to GM's failure to disclose information it was obliged to disclose (discussed *supra*

section (II.)(C.)), GM actively misled consumers with its advertising and by blaming them for fuel

contamination—and rejecting warranty claims—rather than acknowledge the incompatibility of U.S.

diesel fuel with that required by the pump GM chose for its Duramax diesel vehicles. ¶¶ 6, 68, 72-75,

78, 91, 95-97. Indeed, "GM has refused to honor its warranties, deviously claiming that the metal shavings caused by the failure of its pump design voided the warranty because they also caused fuel contamination." ¶ 126. Moreover, Plaintiffs have alleged "when and under what circumstances the fraud was discovered, and that Plaintiffs were not at fault in failing to discover the fraud." *Aberin*, 2018 WL 1473085, at *4, 6 ("[D]efendant must show not only that Plaintiffs should have known about the defect itself, but also that they know about the Defendant's alleged fraud in concealing the defect."). Plaintiffs allege that they "only learned of the defective nature of the CP4 fuel injection pump … shortly before this action was filed," and that they "did not know of facts that would have caused a reasonable person to suspect" prior thereto. ¶¶ 129, 133. And GM *still* continues to deny responsibility, instead placing blame on consumers and voiding their warranties, despite knowing that there is no true "fix" because the vehicles will continue to fail so long as they are used with U.S. diesel. *E.g.*, ¶¶ 6, 85, 95-97, 106-12. *Cf. MyFord Touch*, 46 F. Supp. 3d at 961-62 ("If, as Plaintiffs allege, Ford pretended to fix the problems with MFT instead of actually admitting that the problems could not be fixed, that would be active concealment."). This suffices to allege tolling based on fraudulent concealment.

## B.     The Discovery Rule Applies to Toll Plaintiffs' Claims.

The "discovery rule postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Philips I*, 2015 WL 4111448, at *7-8, *citing Aryeh*, 55 Cal. 4th at 1192. As stated above, Plaintiffs did not know, or have reason to investigate GM's fraud, until shortly before the action was filed. In *Philips*, Judge Koh acknowledged that "Ford is correct that UCL and CLRA claims in consumer cases generally accrue on the date of purchase," but the court held that the plaintiffs "were not charged with a duty to reasonably investigate until the alleged steering defect manifested in their vehicles." *Id.* at *8. "Prior to that point, California Plaintiffs had no reason to suspect wrongdoing, and there was no fact or circumstance to prompt an investigation." *Id.* Although here Plaintiffs allege the defect manifests from the outset, they also allege it is not then "readily apparent." ¶ 7. So Judge Koh's same rationale applies—until Plaintiffs experienced an

adverse effect arising from the defect, or were informed by counsel (as here), they had no reason to themselves investigate. Thus, the discovery rule applies.

GM's reliance on *Finney v. Ford Motor Co.* in this context is misplaced. First, "Finney purchased her truck in 2005, but did not initiate this lawsuit until 2017," and "fail[ed] to plead why she did not discover the defect until 2015 when she purchased the car 10 years earlier in 2005, *and received several warranty repairs seemingly related to the defect while on warranty between 2005 and 2010*." *Finney*, 2018 WL 22552266, at *3 (emphasis added). Conversely, Plaintiff Sutherland did not experience catastrophic CP4 failure until August 2018 and had *no* way of knowing that metal shavings were dispersing throughout his vehicle's fuel-injection system from the very first time it was driven. ¶ 23. Other Plaintiffs' claims are timely for the same reason. *See, e.g.*, ¶ 11 (Rudy's catastrophic failure occurred in 2017); ¶ 28 (Jensen's catastrophic failure occurred in January 2017). And regardless, <u>no</u> Plaintiffs had any way of knowing that an internal component in their vehicles was slowly disintegrating and dispersing metal shards throughout the vehicles' fuel injection and engine systems from mile one. ¶¶ 2, 7, 129, 160.

### VIII.   CONCLUSION

For the foregoing reasons, GM's motion to dismiss should be **DENIED**.

Dated: May 15, 2019                    Respectfully submitted,

                                       HAGENS BERMAN SOBOL SHAPIRO LLP

                                       By */s/ Steve W. Berman*
                                          Steve W. Berman (admitted *pro hac vice*)
                                       1301 Second Avenue, Suite 2000
                                       Seattle, WA 98101
                                       Telephone: (206) 623-7292
                                       Facsimile: (206) 623-0594
                                       steve@hbsslaw.com

                                       Jeff D. Friedman (SBN 173886)
                                       HAGENS BERMAN SOBOL SHAPIRO LLP
                                       715 Hearst Avenue, Suite 202
                                       Berkeley, CA 94710
                                       Telephone: (510) 725-3000
                                       Facsimile: (510) 725-3001
                                       jefff@hbsslaw.com

Robert C. Hilliard (admitted *pro hac vice*)
Lauren Akers (admitted *pro hac vice*)
Marion Reilly (admitted *pro hac vice*)
Bradford P. Klager (admitted *pro hac vice*)
HILLIARD, MARTINEZ, GONZALES LLP
719 S. Shoreline Blvd.
Corpus Christi, Texas 78401
Telephone: (361) 882-1612
Facsimile: (361) 882-3015
bobh@hmglawfirm.com
lakers@hmglawfirm.com
marion@hmglawfirm.com
brad@hmglawfirm.com

Andrew Parker Felix, Esq. (SBN 276002)
MORGAN & MORGAN, P.A.
20 North Orange Ave., Ste. 1600
P.O. Box 4979
Orlando, FL 32801
Telephone: (407) 244-3204
Facsimile: (407) 245-3334
Andrew@forthepeople.com

Eric H. Gibbs (SBN 178659)
David Stein (SBN 257465)
Steven Lopez (SBN 300540)
GIBBS LAW GROUP LLP
505 14th Street, Suite 1110
Oakland, California 94612

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 15, 2019 a true and correct copy of the foregoing was filed electronically by CM/ECF, which caused notice to be sent to all counsel of record.

/s/     *Steve W. Berman*
Steve W. Berman